UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

MAUD MARON,

    Plaintiff,

- against –

THE LEGAL AID SOCIETY and

ASSOCIATION OF LEGAL AID ATTORNEYS,

    Defendants.

---------------------------------------------------------x

Civil Action No.:

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Maud Maron ("Plaintiff" or "Ms. Maron"), was discriminated against on the basis of race, including hostile work environment and constructive termination, by Defendants The Legal Aid Society ("LAS") and the Association of Legal Aid Attorneys ("ALAA" and, collectively, "Defendants"), her employer and union, who published knowingly false statements in furtherance of ideological and political motives divorced from the core functions of Ms. Maron's employment.

**1.0 PARTIES**

1. Plaintiff, Maud Maron, who is Caucasian, was employed at all relevant times herein by Defendant LAS as a Staff Attorney and is a member in good standing of the ALAA union. At all relevant times herein, Plaintiff was an employee of LAS within the meaning of 42 U.S.C. § 2000e(f).

2. Defendant The Legal Aid Society is a not-for-profit corporation organized under the laws of the State of New York, and is headquartered at 199 Water Street, New York,

NY 10038.  At all relevant times herein, LAS employed more than 15 persons and is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

3. Defendant Association of Legal Aid Attorneys is a labor organization, being Local 2325 of the United Auto Workers, headquartered at 50 Broadway, Suite 1600, New York, NY 10004, and is a "labor organization" within the meaning of 42 U.S.C. § 2000e(d) & (e), and has fifteen or more members.  In accordance with the Certificate of Representation issued by the New York State Labor Relations Board on December 30, 1969, LAS recognizes ALAA as the exclusive bargaining representative of all attorneys admitted to practice and within the scope of the bargaining unit definition in the said certification and of all law graduates employed as such by LAS, *i.e.* Staff Attorneys.

**2.0   JURISDICTION**

4. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this matter is a civil action arising under the laws of the United States, 42 U.S.C. § 2000e *et seq.*, and pursuant to 42 U.S.C. § 2000e-5(f)(3).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) as they arise out of the same facts and are so related to the Federal statutory claim that they form part of the same case and controversy.

5. This Court has personal jurisdiction over the defendants as they are organized and headquartered in the State of New York.

6. Venue is appropriate in this District pursuant to 42 U.S.C. § 2000e-5(f)(3) as the unlawful employment practices were committed in this District, the employment records are maintained and administered in this District, and Plaintiff would have

worked in this District but for the unlawful employment practices. Venue is otherwise appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1) & (2) as all defendants reside in this District and are residents of the State of New York and a substantial part of the events giving rise to the claims occurred in this District.

**3.0    FACTS GIVING RISE TO COMPLAINT**

7. Plaintiff is a 1993 graduate of Barnard College and a 1998 graduate of the Cardozo School of Law whose principal legal career has been as a public defender with The Legal Aid Society, first from 1998-2006 and again from 2017. She has served as staff attorney and as the Director of Training. Additionally, from 2011 to 2015, Ms. Maron, at the repeated invitation of The Legal Aid Society, served as a faculty lecturer at the Society's Trial Advocacy Programs.

8. Plaintiff is presently on sabbatical.

9. Ms. Maron is a committed public defender and strongly believes in the need for police reform and criminal justice reform, and she had been an advocate for the disadvantaged and disenfranchised of all backgrounds.

10. Ms. Maron is a candidate for the New York City Council.

11. As espoused in Plaintiff's platform, she seeks to protect communities from hate crimes and prejudice, and she desires police and prosecutorial reforms to address bias in both law enforcement and prosecution.

12. At the close of 2019, politically motivated members of the Black Attorneys of Legal Aid ("BALA") caucus of Association of Legal Aid Attorneys ("ALAA") initiated a baseless investigation into Ms. Maron.

13. Ms. Maron was informed of the 2019 investigation by Tina Luongo, the Attorney-in-Charge of the Criminal Defense Practice of LAS, via electronic mail.

14. Ms. Maron's entire caseload was reviewed, and her three supervisors were interviewed with respect to her work as a public defender.

15. None of Plaintiff's supervisors identified any concern with regard to the quality or nature of Ms. Maron's client representation. She was fully cleared. The investigation was deemed unfounded.

16. At a January 13, 2020 meeting attended by Ms. Maron and her ALAA representative, Julie Sender, Ms. Luongo communicated the full clearance to Ms. Maron.

17. In addition, Ms. Luongo acknowledged that the same attorneys who initiated the baseless investigation would "leak" information to the press in an effort to damage Ms. Maron's City Council campaign.

18. At that time, Ms. Maron requested that The Legal Aid Society release a statement confirming that Ms. Maron was an attorney in good standing with the organization and that any statements or assertions to the contrary were baseless "if" the fact of an investigation were leaked.

19. Thereupon, Ms. Luongo interrupted Ms. Maron and said, "No, IT WILL be leaked".

20. Ms. Luongo then agreed to Ms. Maron's request that The Legal Aid Society would release a statement acknowledging Ms. Maron's exemplary record of service when the fully anticipated and acknowledged attempt to smear her arose in the press.

21. LAS failed to release the promised statement.

22. On July 23, 2020, Ms. Maron's opinion piece, "Racial obsessions make it impossible for NYC schools to treat parents, kids as people" was published by the New York Post.[1]

23. A copy of that opinion piece is attached as Exhibit A.

24. In the opinion piece, Ms. Maron identified herself as a public defender, but she made no mention of The Legal Aid Society and, importantly, her article discussed an experience at a training with the Department of Education, unrelated to her employment.

25. In the opinion piece, Ms. Maron spoke against having to refer to herself by her racial identity as part of the so-called "anti-bias" training.

26. Ms. Maron noted that, in the training, race-neutral attributes, like "objectivity" were, oddly, labeled as part of "white-supremacy culture", tied to material that labels all white people as racist.

27. The opinion piece was published after her testimony before the City Council and an interview with Nikole Hanna-Jones, all of which focused on inclusivity and diversity of thought in the public schools.

28. Although the opinion piece was unrelated to Ms. Maron's work at LAS, the ALAA, acting through its BALA caucus issued a statement regarding Ms. Maron, her interview with Ms. Hannah-Jones, and the article, which they published on July 26, 2020. See Exhibit B.[2]

---

[1] Available at https://nypost.com/2020/07/23/racial-obsessions-make-it-impossible-for-nyc-schools-to-treat-parents-kids-as-people/
[2] Available at https://twitter.com/BALA_NYC/status/1287572951525666820?s=20 and https://www.facebook.com/BlackAttorneysofLegalAid/posts/122693346182422

29. Thereupon, LAS's official, verified Twitter account, @LegalAidNYC, retweeted the BALA publication without any commentary. See Exhibit C.

30. The statement of BALA, which was endorsed without reservation by The Legal Aid Society, contains numerous race-based, falsehoods and defamatory statements. Without limitation, those include:

   i. "she pretends to favor integration while fighting against it and denying the existence of racism in education". Ms. Maron does not oppose integration and she has never denied racism exists in any context.

   ii. Repeatedly refers to Ms. Maron as "racist". Ms. Maron denies this and opposing racist "anti-bias" training is not itself racist if words continue to have meaning.

   iii. "no public defender can legitimately claim to be a proponent of racial justice if they are lax in how they do the work; and we know for a fact that Maud's commitment to zealous representation of poor people of color is questionable at best." Ms. Maron's work has never been lax nor her commitment questionable. As set forth above, Ms. Maron was cleared of this very same baseless accusation on January 14, 2020.

   iv. Ms. Maron did not call the educational points raised "chilling", but rather the inaptly named "anti-racism" training doctrine, which is, in fact, rooted in racism.

   v. "she religiously advances a false dichotomy between an adequate education and a culturally inclusive education." This statement is entirely disingenuous as her actual City Council testimony was to the opposite. [3]

   vi. "Maud's argument: the problem isn't racism, but a 'culture of laziness and stupidity among African Americans and Hispanic Americans.'" Ms. Maron has never made this argument and finds it repugnant. Ms. Maron is married to a Hispanic immigrant and she takes deep offense at the wholly fictitious characterization of her views.

   vii. "She does not use racial slurs in discourse. At least not publicly." The implication that Ms. Maron does so privately is false.

   viii. "Maud is racist, and openly so. She attacks efforts to end racism by claiming there is no racism." Ms. Maron has never made any such claim.

---

[3] Ms. Maron's testimony is available online at:
https://www.youtube.com/watch?v=7xfu9mvwPvE

ix. It compares her involvement with PLACE NYC (Parent Leaders for Accelerated Curriculum Education in NYC) to the 1960s group PAT ("Parents and Taxpayers"), yet omits that PLACE is co-chaired by two individuals of color.

x. It says she has "no regard for" her clients, which lacks any basis in reality.

xi. "She is one of many charlatans who took this job not out of a desire to make a difference, but for purposes of self-imaging." This is false—The Legal Aid Society has been her primary employer since graduation from law school in 1998, after having interned there while a law student.

xii. "You cannot oppose anti-racism and effectively represent Black and Brown people. It's impossible." Ms. Maron opposes a racist ethos that falsely brands itself "anti-racism". Her representation of all of her clients, including but not limited to people of color, has always been exemplary.

31. The Statement BALA wrote, and The Legal Aid Society endorsed, which states "Maud Maron has no business having a career in public defense, and we're ashamed that she works for the Legal Aid Society" in connection with asserting she opposes actual anti-racism, constitutes irreparable damage to her professional reputation and, for all intents and purposes, terminated her employment in violation of § 1.8.4 of the governing collective bargaining agreement. See Exhibit D. This race-based statement is false and defamatory as Ms. Maron is fully capable of working in public defense.

32. Ms. Maron is currently promised a return from sabbatical pursuant to § 3.4.4.1.2 of the agreement, but The Legal Aid Society has made it impossible for her to do so.

33. The Legal Aid Society also violated the guarantee of free speech per § 3.5, constructively terminating Ms. Maron for her express on personal political and social beliefs without evidence that her speech has or will directly interfere with and detract from the representation of her clients.

34. An employer who says, publicly, it is ashamed she works there and has no business working there, is not an employer any reasonable person could be expect to work for.

35. Such a statement is a violation of § 4.11.2 of the collective bargaining agreement.

36. Not only was ALAA the author and publisher of the BALA statement, it failed to advocate for Ms. Maron in response to LAS's aforesaid violations of the Collective Bargaining Agreement

37. On July 27, 2020, The Legal Aid Society issued its own statement in response to Ms. Maron's article, which utterly misrepresented the content of her article. See Exhibit E.[4]

38. This statement was co-signed by the leadership of The Legal Aid Society, including Janet Sabel, Attorney in Chief and CEO, Adriene Holder, Attorney in Charge, Civil Practice, Dawne Mitchell, Attorney in Charge, Juvenile Rights Practice, Tina Luongo, Attorney in Charge, Criminal Defense Practice, Archana Jayaram, Chief operaring Officer, Scott Rosenberg, General Counsel, Allan Fox, Chief Human Resources Officer, Ciara Walton, Director of Diversity, Equity and Inclusion, Janelle Roundtree, Director of Employee Relations and Lou Sartori, Pro Bono Counsel and Director.

39. The Legal Aid Society's own statement contains numerous race-based false and defamatory statements.

40. These statements lambaste Ms. Maron on account of her race and/or color, creating a hostile work environment. Without limitation, these include:

   i.  Ms. Maron "takes the position that an anti-racist agenda is a chilling doctrine". This is false; she takes the position that using the name 'anti-racism' as cover for overtly racist practices, such as those at the Dept. of Education's "anti-bias" training, is chilling.

   ii. "She denies the existence of structural and institutional racism." Ms. Maron denies no such thing and opposes structural and institutional racism.

   iii. It says that she views working as a public defender as a "pass" for "white supremacy" and has such a "disgusting" "racist perspective" that harms her clients

---

[4] Available at https://twitter.com/LegalAidNYC/status/1287873491232989185?s=20 and https://t.co/YEVPGbHnMS?amp=1 .

8

  of color.  Ms. Maron has no such view and has never harmed her clients, no matter the color.  The Legal Aid Society, as noted above, specifically cleared her of this baseless accusation previously.

 iv. "By ignoring these facts as someone who claims to work in this field, the author shows how they are not only complicit in this system of oppression, but seeks to gaslight communities of color who are vocally demanding change in this country."  Ms. Maron has ignored none of the racism her clients experience and herself vocally demands change.

 v. "we have not taken on the internal work needed to build a truly anti-racist workplace."  This statement falsely asserts Ms. Maron is racist and is racist in the workplace.

 vi. "While you have dedicated your life to public interest, you cannot do this work effectively and fully unless and until you face that reality and own that you are part of the problem."  Ms. Maron has always worked effectively, irrespective of her race.

41. By making these statements and republishing ALAA/BALA's statements, The Legal Aid Society has damaged Ms. Maron, including harassment on the basis of race and/or color in the workplace and constructively terminating her employment.

42. LAS is not immune for retweeting BALA's statement pursuant to Section 230 of the Communications Decency Act, 47 U.S.C. § 230.  The ALAA/BALA members are LAS's own agents and employees, and the retweet demonstrates that the statement was in the course and scope of their employment.  Thus, the statement was not provided by "another information content provider" under 47 U.S.C. § 230(c)(1).  See *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 276 (S.D.N.Y. 2016) (denying motion to dismiss under Section 230 where alleged agent was the source of the allegedly offending content).

43. The misconduct of The Legal Aid Society has also violated § 3.1.1 of the governing collective bargaining agreement.  Since BALA is a unit of the ALAA, the ordinary grievance procedure has been rendered unavailable to Ms. Maron.  The Legal Aid

9

Society denied Ms. Maron the due process to which she is entitled under § 3.1.1.3 and failed to maintain confidentiality under § 3.1.1.2.

44. Plaintiff has suffered damage to her reputation on account of the statements of ALAA, acting through its BALA caucus, which constitutes harassment on the basis of race and/or color in the workplace.

45. Plaintiff filed her charge against Defendants with the U.S. Equal Employment Opportunity Commission ("EEOC") pursuant to 42 U.S.C. § 2000e-5 on January 19, 2021.  See Exhibit F.

46. On April 26, 2021, Plaintiff received a Notice of Right to Sue, issued on request, as against both Defendants, from the EEOC.  See Exhibits G and H.

**4.0    Causes of Action**

COUNT I
HOSTILE WORK ENVIRONMENT AGAINST LAS

47. Plaintiff restates and realleges the allegations of Paragraphs 1-48 above as if fully set forth herein.

48. At all relevant times herein, Plaintiff was employed by LAS.

49. The statement of ALAA/BALA was permeated with discriminatory intimidation so severe as to alter the conditions of Plaintiff's workplace.

50. By republishing the statement of ALAA/BALA, LAS created a hostile work environment for Plaintiff, discriminating against her on the basis of her race and/or color in violation of 42 U.S.C. § 2000e-2(a)(1).

51. The July 27, 2020 statement of LAS was permeated with discriminatory intimidation so severe as to alter the conditions of Plaintiff's workplace.

52. The Legal Aid Society's own statement highlights that it was directed to employees, specifically Ms. Maron, "who are white…because we are white", indicates Ms. Maron's article "is the exact definition of white fragility" and "is a tool used to promulgate white supremacy", imposing a special "duty" on "[w]hite people".

53. By publishing its July 27, 2020 statement, LAS created a hostile work environment for Plaintiff on the basis of her race and/or color, discriminating against her on the basis of her race and/or color in violation of 42 U.S.C. § 2000e-2(a)(1).

54. As a proximate result of these violations, Plaintiff suffered harm to her reputation, emotional distress, and will have a loss of future income.

## COUNT II
## HOSTILE WORK ENVIRONMENT AND DISCRIMINATION AGAINST ALAA

55. Plaintiff restates and realleges the allegations of Paragraphs 1-48 above as if fully set forth herein.

56. At all relevant times herein, Plaintiff was a member of ALAA, which represented her relative to her employment with LAS.

57. As a caucus of ALAA, BALA acts on behalf of ALAA and did so when issuing the aforementioned statement.

58. The statement of ALAA/BALA was permeated with discriminatory intimidation so severe as to alter the conditions of Plaintiff's workplace.

59. In making its statement, ALAA created a hostile work environment for Plaintiff, discriminating against her on the basis of her race and/or color in violation of 42 U.S.C. § 2000e-2(c)(1).

60. By permitting LAS to retweet its statement, ALAA caused LAS to discriminate against Plaintiff in violation of 42 U.S.C. § 2000e-2(c)(3).

61. The July 27, 2020 statement of LAS was permeated with discriminatory intimidation so severe as to alter the conditions of Plaintiff's workplace.

62. The Legal Aid Society's own statement highlights that it was directed to employees, specifically Ms. Maron, "who are white…because we are white", indicates Ms. Maron's article "is the exact definition of white fragility" and "is a tool used to promulgate white supremacy", imposing a special "duty" on "[w]hite people".

63. By causing LAS to make its July 27, 2020 statement, ALAA caused LAS to discriminate against Plaintiff in violation of 42 U.S.C. § 2000e-2(c)(3).

64. As a proximate result of these violations, Plaintiff suffered harm to her reputation, emotional distress, and will have a loss of future income.

## COUNT III
## CONSTRUCTIVE TERMINATION AGAINST LAS

65. Plaintiff restates and realleges the allegations of Paragraphs 1-48 above as if fully set forth herein.

66. At all relevant times herein, Plaintiff was employed by LAS.

67. By republishing the statement of ALAA/BALA and publishing the July 27, 2020 statement, LAS has made Plaintiff's working conditions so intolerable that she will not be able to return from her sabbatical.

68. The two statements were made on account of Plaintiff's race and/or color.

69. Combined, the two statements publicly state that Ms. Maron is unable to effectively represent her clients of color, interfering with many, if not most, of her attorney-client relationships.

70. Thus, LAS has constructively terminated Plaintiff's employment in violation of 42 U.S.C. § 2000e-2(a)(1).

71. As a proximate result of this violation, Plaintiff suffered harm to her reputation, emotional distress, and will have a loss of future income.

## 5.0   Prayer for Relief

WHEREFORE Plaintiff respectfully requests that the Court

a) Declare that ALAA has violated Title VII of the Civil Rights Act;

b) Declare that LAS has violated Title VII of the Civil Rights Act;

c) Enjoin ALAA, including its BALA caucus, and LAS from engaging in further race- and color-based discrimination against Plaintiff and requiring the removal of the prior discriminatory publications;

d) Award Plaintiff compensatory, punitive, and nominal damages;

e) Award Plaintiff her reasonable attorneys' fees and costs.

## 6.0   Demand for Jury Trial

Plaintiff demands trial by jury on all claims, defenses, and all other issues triable by jury in this matter.

Dated:  July 12, 2021

Respectfully submitted,
MAUD MARON,
By her Attorneys,

/s/ Jay M. Wolman

Jay M. Wolman
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
(978) 801-1776
Fax: (305) 437-7662