## GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Christopher D. Belelieu
Direct: +1 212.351.3801
Fax: +1 212.817.9301
CBelelieu@gibsondunn.com

August 4, 2021

VIA ECF & EMAIL

The Honorable Judge Katherine Polk Failla
U.S. District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:  *Maron v. The Legal Aid Society et al.*, No. 1:21-cv-05960 (S.D.N.Y.)

Dear Judge Failla:

Pursuant to Section 4(A) of this Court's Individual Rules of Practice, we respectfully submit this pre-motion submission on behalf of The Legal Aid Society ("Legal Aid") and request a pre-motion conference on Legal Aid's impending motion to dismiss this action. Plaintiff Maud Maron does not consent to this pre-motion submission.

1. Factual Background

Legal Aid is the largest and most influential social justice law firm in New York City. A mainstay of New York's legal community, Legal Aid is built on a simple but powerful belief: that no person should be denied the right to equal justice. Plaintiff Maud Maron is an attorney at Legal Aid. (Compl. ¶ 7.) Maron is also an "elected public-school council member" and a candidate for City Council. (*Id.*, Ex. A.) In the summer of 2020, Maron took a sabbatical from Legal Aid to run for political office. (*See id.* ¶ 8.)[1]

On July 23, 2020—in the midst of her citywide campaign—Maron published an op-ed in the *New York Post* entitled "Racial obsessions make it impossible for NYC schools to treat parents, kids as people," in which she denied the existence of structural and institutional racism and argued that anti-racism is "chilling" because it invites discrimination. (Compl., Ex. A.) Three days later, the Black Attorneys of Legal Aid ("BALA")—a caucus of Legal Aid attorneys (*id.* ¶ 12)—released a statement in response to Maron's op-ed noting that Maron's "views on racism are problematic." (*Id.*, Ex. B.) Legal Aid retweeted the BALA statement without comment. (*Id.*, Ex. C.)

The next day, Legal Aid released a statement explaining that Maron's position amounts to the notion "that by the mere nature of working in public interest and being a public defender you get a pass at looking at your privilege, your role in social dominance and white supremacy." (*Id.*, Ex. E at 4.) Legal Aid further stated that Maron's denial of structural and institutional

---

[1] Solely for purposes of this pre-motion submission and Legal Aid's impending motion to dismiss, Legal Aid takes the allegations Maron has pleaded as true.

# GIBSON DUNN

The Hon. Katherine Polk Failla
August 4, 2021
Page 2

racism and challenge to anti-racism is a "disgusting" "racist perspective" and "results in Black and Brown people being harmed by individuals in public interest roles, who are entrusted with serving Black and Brown clients and their communities." (*Id.*)  Legal Aid concluded the statement by noting that "[w]hite people have a duty to no longer be silent and a responsibility to confront these systems of oppression and to shun all forms of white supremacy in our society, in our workplaces, and within our hearts and minds.  Enough is enough." (*Id.*)

In late October 2020—a few months after Legal Aid published its statement—Maron's counsel sent a letter to Legal Aid alleging that Legal Aid's statement defamed Maron and discriminated against her.  Legal Aid replied in December, refuting the merits of Maron's alleged claims and advising that her contemplated lawsuit fell squarely within the confines of New York's newly amended anti-SLAPP law, exposing her to fee-shifting.  In a misguided (and futile) attempt to plead around the anti-SLAPP statute, Maron no longer alleges defamation against Legal Aid (nor could see under CPLR 215(3)).  Instead, Maron brings two claims against Legal Aid: (1) hostile work environment (Count I); and (2) constructive termination (Count III).

2.  Maron's Claims Lack Any Merit and Should Be Dismissed

***A.  Maron alleges no action taken based on her membership in a protected class (Counts I & III).***  Maron alleges that Legal Aid discriminated against her on the basis of her "race and/or color"—*i.e.*, because she is white. (Compl. ¶¶ 50, 68.)  But Maron's claims are belied by her own allegations.  Maron alleges that Legal Aid constructively terminated her "for her express [sic] on ***personal political and social beliefs***." (*Id.* ¶ 33 (emphasis added).)  Even assuming that publication of Legal Aid's viewpoint without any negative employment action could constitute discrimination (it cannot), "claims of discrimination based on political belief are not actionable under Title VII." *Tsaganea v. City University of New York*, 2007 WL 2907280, at *1 n.4 (S.D.N.Y. Oct. 5, 2007); *Silva v. Legendary, Inc.*, 2016 WL 3556816, at *5 (N.D. Fla. Mar. 21, 2016) ("Title VII does not protect speech or political views.").[2]  Maron mistakenly conflates Legal Aid's objections to the viewpoints and political beliefs expressed in her op-ed, with action taken on account of her race.  This mistake defeats both of her claims.

***B.  Maron fails to state a claim for hostile work environment (Count I).***  "A hostile work environment claim requires a plaintiff to show that a workplace is 'so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered.'" *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d

---

[2]  Maron recently stated publicly that "[n]one of this would have happened if I just said I loved books like *White Fragility*, and I'm a fan of Bill de Blasio's proposals for changing New York City public schools, and I planned to vote for Maya Wiley for mayor.  ***The reason they went after me is because I have a different point of view***."  Bari Weiss, *A Witch Trial at the Legal Aid Society*, COMMON SENSE WITH BARI WEISS, https://bariweiss.substack.com/p/a-witch-trial-at-the-legal-aid-society (July 12, 2021) (emphasis added).

The Hon. Katherine Polk Failla
August 4, 2021
Page 3

Cir. 2013) (quoting *Alfano v. Costello*, 294 F.2d 365, 373–74 (2d Cir. 2002)). An isolated incident "usually will not suffice to establish a hostile work environment," *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175–76 (2d Cir. 2012), unless that incident is "extraordinarily severe," *Desardouin*, 708 F.3d at 105. Maron's hostile work environment claim amounts to nothing more than her *subjective* angst over being called racist by her colleagues and her claim that the identification of her racism is itself racist. That plainly is not enough to sustain this claim.

**C. Maron fails to state a claim for constructive termination (Count III).** "Because the facts do not establish a hostile work environment, [plaintiff's] constructive discharge premised on the same facts also fails." *Arroyo v. WestLB Admin., Inc.*, 54 F. Supp. 2d 224 (S.D.N.Y. June 16, 1999). Maron has alleged no facts showing Legal Aid's "intent to create an intolerable environment" that forced her to resign, nor has she provided "evidence show[ing] that a reasonable person would have found the work conditions so intolerable that [s]he would have felt compelled to resign"—required showings for a constructive discharge claim under Title VII. *Gonzalez v. N.Y.C. Health & Hosp. Corp.*, 2019 WL 2435622, at *8 (S.D.N.Y. June 11, 2019). In fact, Ms. Maron remains employed by Legal Aid and admits that she is "***currently promised a return from sabbatical***." (Compl. ¶ 32 (emphasis added).) Further, Maron alleges that she "is a member in good standing of" Legal Aid's attorney union (*id.* ¶ 1), which is inconsistent with having resigned. "[B]ecause she never resigned, Plaintiff has failed to plead one of the fundamental tenets of a constructive termination claim." *Brescia v. LTF Club Mgmt. Co., LLC*, 2020 WL 137311, at *7 (S.D.N.Y. Jan. 9, 2020). Having decided *before* this dispute arose to take a sabbatical to pursue public office, and having not alleged that her sabbatical is "'permanent,'" *id.* at *7, Maron cannot now manufacture a constructive termination claim.

**D. Legal Aid cannot be held liable for retweeting a tweet posted by another user**. Maron devotes a substantial portion of her complaint to a statement authored by BALA. (Compl. ¶¶ 28–36, 42.) But the Communications Decency Act forecloses any argument that Legal Aid can be held liable for its retweet. *See* 47 U.S.C. § 230(c)(1); *see also Brikman v. Twitter, Inc.*, 2020 WL 5594637, at *2 (E.D.N.Y. Sept. 17, 2020). Courts have repeatedly held that the user of an interactive computer service who merely retweets information created by another information content provider is entitled to immunity under Section 230. *See, e.g.*, *Mitan v. A. Neumann & Assocs., LLC*, 2010 WL 4782771, at *5 (D.N.J. Nov. 17, 2010).

In sum, Maron advanced specious and offensive political views as a part of her citywide campaign for public office. In response, Legal Aid took no employment action against Maron. Instead, Legal Aid issued a statement challenging Maron's positions and ensuring its stakeholders knew where the organization stood on these critical issues because its "BIPOC staff and clients deserve nothing less." (Compl. Ex. E at 4.) That does not expose Legal Aid to liability under Title VII. This Court should dismiss this specious SLAPP suit and, ultimately, award full costs and fees to Legal Aid. New York Civ. Rights Law §§ 70-a, § 76-a.

GIBSON DUNN

The Hon. Katherine Polk Failla
August 4, 2021
Page 4

Respectfully,

Christopher D. Belelieu

cc:   Counsel for Plaintiff (via ECF)