

Jay Marshall Wolman, JD
Licensed in CT, MA, NY, DC

August 9, 2021

<u>Via ECF and Email</u>
The Honorable Judge Katherine Polk Failla
U.S. District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007



Re:   *Maron v. The Legal Aid Society et al.*, No. 1:21-cv-05960 (S.D.N.Y.)

Dear Judge Failla:

Pursuant to Your Honor's Individual Rules of Practice in Civil Cases, § 4(A), Plaintiff Maud Maron responds to the Pre-Motion submissions of Defendants The Legal Aid Society ("LAS") (ECF No. 18) and the Association of Legal Aid Attorneys ("ALAA")(ECF No. 20).[1] No pre-motion conference is necessary as any motion to dismiss would be without merit.

## 1.0   Factual Background

Ms. Maron has been a LAS Staff Attorney, working as a public defender, and is a member of the ALAA union.  (Complaint (ECF No. 1) at ¶¶ 1 & 7).  On July 23, 2020, separate from her employment, Ms. Maron published an opinion piece in the New York Post contesting mandatory training she was forced to undertake (not work-related) that addressed alleged "white-supremacy culture", tied to material labeling all white people, including herself, as racist.  (*Id.* at ¶¶ 22-26).

In response, on July 26, 2020, employees of LAS, acting through ALAA, through its BALA caucus (Black Attorneys of Legal Aid), published a racially-charged document, accusing her of racism, fighting integration, unable to represent people of color.  (*Id.* at ¶¶ 28 & 30).  The official LAS Twitter account republished this statement.  (*Id.* at ¶ 29).

The next day, LAS issued its own statement, signed by the leadership of LAS, including those with direct supervision over Plaintiff.  (*Id.* at ¶¶ 37-38).  The LAS statement accused Ms. Maron of having a "disgusting" "racist perspective", that she was using her work as a "pass [for her] white supremacy", that she was harming her clients of color, and that she was "gaslight[ing] communities of color".  (*Id.* at ¶ 40).

Both statements were made on account of Ms. Maron's race and/or color.  (*Id.* at ¶¶ 50, 59 & 68).  Ms. Maron had been on sabbatical, but these racially hostile statements have made it impossible for her to return to work.  (*Id.* at ¶¶ 32, 41, & 67).  Thus, Ms. Maron filed a timely complaint with the EEOC and thereupon, at her request, received a Notice of Right to Sue.  (*Id.* at ¶¶ 45-46).

---

[1] Although ALAA represents that Plaintiff did not consent to its submission, ALAA made no such request. However, ALAA is correct that Plaintiff would not have otherwise consented.

Randazza Legal Group
Page 2 of 3



### 2.0 The Putative Motions Will Not Succeed

Ms. Maron sufficiently alleged hostile work environment racial discrimination against LAS and ALAA (Counts I & II) and constructive termination (Count III).

First, LAS wrongly asserts it cannot be held liable for the BALA statement pursuant to 47 U.S.C. § 230(c)(1). Curiously, LAS fails to address *Enigma Software Grp. USA, LLC v. Bleeping Computer, LLC,* 194 F. Supp. 3d 263, 276 (S.D.N.Y. 2016), cited in the Complaint, in which a motion to dismiss under Section 230 was denied where an alleged agent of the defendant was the source of the offending content. (ECF No. 1 at ¶ 42). Here, LAS contends that it cannot be held liable for merely retweeting "information created by another information content provider". (ECF No. 18 at 3). As the *Enigma* Court noted, all that is sufficient to survive a motion to dismiss is for the plaintiff to raise a sufficient inference of an agency relationship, rendering questions as to the existence and scope thereof as issues for the jury. 194 F.Supp. 3d at 175. As pleaded in the Complaint, ¶ 42, "[t]he ALAA/BALA members are LAS's own agents and employees, and the retweet demonstrates that the statement was in the course and scope of their employment." There is more than a sufficient inference that the ALAA/BALA members were acting as agents.

Moreover, the retweet is not the sole basis of liability. The retweet, rather, is also evidence that LAS tolerated, promoted, and endorsed such race-based hostile statements, rather than taking swift action to reprimand its authors. LAS suborned such racism among its employees, creating a hostile work environment, contributing to her constructive termination. And, of course, LAS is liable for the racism and unlawful discrimination on account of the statement published under its own name. Thus, Section 230 will not dispose of any claim.

Second, both LAS and ALAA assert that their adverse employment actions were on account of Ms. Maron's viewpoint, not her race, with LAS citing to ¶ 33 of the Complaint. Paragraph 33 merely asserts that LAS breached a provision of the collective bargaining agreement guaranteeing free speech. But, both LAS and ALAA fail to address the context—Ms. Maron's viewpoint was that of a white person forced to undergo a racist training session as described in her NY Post piece, made Exhibit A to the Complaint—how she was "instructed to refer to [her]self as a 'white woman'" and her opposition to insistence that "all white people are racist". Her viewpoint is inextricably linked to her being white and the response to that, calling her racist, cannot be disentangled from Ms. Maron's race or being white or member of a protected class. But for Ms. Maron's racial identity, there would have been no op-ed nor would there have been either racially-hostile statement.

Further, ALAA's caselaw citations are misplaced. Both cases were in the summary judgment context where the racism issues were found to be detached from causality of the adverse actions. Here, Ms. Maron has sufficiently alleged that the racist statements were (necessarily) the proximate cause of the adverse actions, constituting hostile work environment and constructive termination.

Third, both LAS and ALAA assert that the statements were not sufficiently severe or pervasive. However, a jury may well find that the two public denunciations of Ms. Maron



were extraordinarily severe.  These were not private comments.  These were circulated to the world, in the course of Ms. Maron's political campaign, meant for widespread consumption, asserting as a matter of fact that Ms. Maron, a dedicated public defender, could not represent her clients adequately.  This is a severe charge to make against an attorney, which undermines her relationships with her clients, and essentially accusing her of routinely violating Rule 1.1 of the NY Rules of Professional Conduct.  How many indigent defendants of color would want a public defender who is publicly called out by her colleagues and employer as a white supremacist?  From 2006 to 2019, for example, over 80% of arrestees were individuals of color.[2]   These publications were extraordinarily severe.

Third, Ms. Maron sufficiently alleged constructive termination.  An employer accusing you of routine violation of your professional duties on account of your race is intolerable.  She is unable to return to work and the fact that her own union initiated the discrimination, endorsed and ratified by her employer, forecloses any grievance procedure.  To survive a constructive discharge claim, the employer must show the grievance procedure is a "viable alternative".  *Katz v. Beth Isr. Med. Ctr.*, 95 Civ. 7183 (AGS), 2001 U.S. Dist. LEXIS 29, at *40 (S.D.N.Y. Jan. 3, 2001).  It is an exercise in futility and it is not viable to her.[3]

Fourth, ALAA breached the duty of fair representation.  This is not about a mere failure to prosecute a grievance.  ALAA failed to "serve the interest of all members without hostility or discrimination toward any".  *Air Line Pilots Ass'n. Int'l v. O'Neill*, 499 U.S. 65, 76 (1991).  Publishing a statement maliciously accusing your own member of being unable to do her job because of her race is arbitrary "behavior so far outside a wide range of reasonableness as to be irrational".  *Id.* at 67.  And, it is without question that these actions were motivated by discriminatory animus to Ms. Maron's perspective as a white person.

In light of the foregoing, no pre-motion conference is necessary.

Sincerely,

Jay M. Wolman
Marc J. Randazza

---

[2] Hutchinson, Bill, "*Blacks account for nearly half of all NYC arrests 6 years after end of stop-and-frisk: NYPD data*", ABC NEWS (Jun. 30, 2020) available at < https://abcnews.go.com/US/blacks-account-half-nyc-arrests-years-end-stop/story?id=71412485 >.

[3] *Cleveland v. Int'l Paper Co.,* 96-CV-1068 (RSP/DNH), 1998 U.S. Dist. LEXIS 15557, at *14-16 (N.D.N.Y. Sep. 30, 1998) is factually distinct.  *Cleveland* did not involve a situation where the official public arm of the employer engaged in the racially hostile act, whereas here, it was a statement from the CEO, the Attorney-in-Charge, the *Chief Human Resources Officer*, and the *Director of Diversity, Equity and Inclusion.*  Unlike in *Cleveland,* Ms. Maron had no neutral supervisor to complain to—they all joined in the discrimination.

The Court is in receipt of the parties' submissions regarding Defendants' anticipated motions to dismiss. (Dkt. # 18, 20, 22). After review of the material contained therein, the Court is of the view that a pre-motion conference will not be productive in this instance. Thus, Defendants' request for a conference is hereby DENIED. Instead, the Court will set a briefing schedule for Defendants' motions to dismiss. This schedule includes time for Plaintiff to file an Amended Complaint, although Plaintiff need not do so if she does not wish.

The briefing schedule shall be as follows:

    Plaintiff's Amended Pleading, if any: **September 1, 2021;**
    Defendants' moving papers: **October 1, 2021;**
    Plaintiff's opposition papers: **November 10, 2021** (Plaintiff shall file a single submission in opposition, not to exceed 40 pages);
    Defendants' reply papers: **November 24, 2021.**

The Clerk of Court is directed to terminate the pending motions at docket entries 18 and 20.

Date:    August 18, 2021
         New York, New York

SO ORDERED.

*Katherine Polk Failla*

HON. KATHERINE POLK FAILLA
UNITED STATES DISTRICT JUDGE