# Exhibit A-1

# Exhibit A

Racial obsessions make it impossible for NYC
schools to treat parents, kids as people

Maud Maron
The New York Post, July 23, 2020

OPINION

# Racial obsessions make it impossible for NYC schools to treat parents, kids as people

By Maud Maron

July 23, 2020 | 7:51pm | Updated



The Tweed courthouse building today houses the city Department of Education.
Christopher Sadowski

I am a mom, a public defender, an elected public-school council member and a City Council candidate. But at a city Department of Education anti-bias training, I was instructed to refer to myself as a "white woman" — as if my whole life reduces to my race.

Those who oppose this ideology are shunned and humiliated, even as it does nothing to actually improve our broken schools.

Though facing severe budget cuts, the DOE has spent more than $6 million for the training, which defines qualities such as "worship of the written word," "individualism" and "objectivity" as "white-supremacy culture."

The administration, and many local politicians, buy into a benign-sounding but chilling doctrine called anti-racism, which insists on defining everyone by race, invites discrimination and divides all thought and behavior along a racial axis.

Many of the theories trace to "White Fragility," a small-minded book which relentlessly insists all white people are racist and need to think about race all the time. Conveniently for its author, who charges $6,000 an hour to discuss this conundrum, there is no way to fix the situation ... except with more of her expensive workshops.

I was personally exposed to the pitfalls of this ideology after New York Times writer Nikole Hannah-Jones asked to interview me. She had heard me testify at a City Council hearing, where I said, "Parents who disagree with [Chancellor Richard Carranza] should not have to be called racist all the time."

Our interview lasted 90 minutes and covered a range of topics, but she and others in the toxic Twittersphere took offense at my suggestion to listen to other parents' viewpoints, "even if you think it's racist." That bit was snipped out of a much longer answer about the importance of integration efforts and the role of school choice.

Naturally, the Twitter mobs descended on me.

After I explained my thinking and provided context on Twitter, Hannah-Jones tweeted in response that it was "disingenuous" of me to refer to specialized high schools as "majority people of color," when they are actually "Asian."

Her casual dismissal of Asians as not being people of color infuriated many who viewed her comment as racist. Nevertheless, she is a public-school parent, and she should be invited to the table to continue to discuss her concerns about her daughter's education, even though many people think her words are evidence of her racism.

See how that works?

There are some who are much more interested in casting aspersions than doing the hard work of building alliances to achieve the important shared goal of fixing our schools. And they need fixing.

**SEE ALSO**
> Obscene federal 'diversity training' scam prospers — even under Trump

In 2019, only 46 percent of students were proficient in math and 47 percent in English Language Arts. For black students, who struggle the most, those numbers drop to 28 percent and 35 percent, respectively. Only 75 percent graduate high school.

Yet the race-obsessed account of education reform persists. The state Department of Education is funding school districts to develop and implement integration plans based on the theory that integrated schools raise the academic proficiency of all the students.

But the endeavor has its skeptics. At one community forum, a Chinese-American parent shared that she transferred her child from a majority-white school to a less affluent, mostly Asian school, where she believed the students are "better behaved and work harder." She told me, "I don't think sitting next to white kids is important for learning." Then she added: "No offense, Maud." Which made me laugh and made me think.

I want more integrated schools, regardless of whether integration is an academic booster. Diverse classrooms have beautiful gifts to bestow, wholly separate from the crude metric of increased test scores. But we have to think through all this with nuance, not by vilifying some parents or setting parents against each other.

We all want a well-integrated, high-quality public-school system. Parents have the right to demand an education that prepares their children to meet or exceed grade-level expectations, which in America often lag other countries.

Those who yell the loudest about integration should stop the accusations against those who think or speak differently than they do about the shared goal of integrated, quality schools — and find ways to work together.

*Maud Maron is a public-school parent and the president of Community Education Council District 2.*

FILED UNDER   CITY COUNCIL, DEPARTMENT OF EDUCATION, RACISM, TRAINING, 7/23/20

RECOMMENDED



Get notifications from The New York Post

Click 'Sign Up' then 'Allow'

Dismiss       Sign Up

# __Exhibit B__

Tweet and Facebook Posts

Black Attorneys of Legal Aid

12/07/2021 BlackAttysofLegalAid on Twitter: opposeanti-racism...activelyrepresent Black and Brown... possible." @MaudMaro...

Case 1:21-cv-05960-KPF Document 24-2 Filed 09/01/21 Page 2 of 5



 **BALA - Black Attorneys of Legal Aid**
July 26 at 9:40 PM · 🌐                                                                    •••

The Black Attorneys of Legal Aid caucus (BALA) is a group of Black Legal Aid attorneys committed to advocating for racial justice and equality both within and without the Legal Aid Society. We recently learned of an op-Ed published by Maud Maron, a person we are ashamed to call our colleague, in the right-wing paper The New York Post. Maud is better known as a prominent opponent of equality in New York City's school system; she pretends to favor integration while fighting against it and denying the existence of racism in education. Up until now, our caucus has quietly shown support to groups that have spoken out against Maud's racist views. However, we now feel compelled to publicly respond to Maud's recent anti-racism philippic, and to denounce Maud as the racist that she is.

It comes as no surprise to us that Maud opens the piece by informing readers that she is a public defender. In fact, she is quick to announce this on her website and in many of her communications on social media, in print, and in person. This speaks to a common myth among many white practitioners that being public defenders preclude them from being racist. Racism is a centuries-old system in this country, the effects of which cannot possibly be wiped away simply by joining the profession of indigent defense. Further, no public defender can legitimately claim to be a proponent of racial justice if they are lax in how they do the work; and we know for a fact that Maud's commitment to zealous representation of poor people of color is questionable at best. Nonetheless, it is important for Maud to announce that she is a public defender; in her mind, it undermines the criticisms rightly leveled against her.

One need not go too far into Maud's diatribe to see that her views on racism are problematic. She characterizes the idea of anti-racism as "a benign-sounding but chilling doctrine." Predictably, her definition of anti-racism is way off base. Anti-racism is about recognizing existing racial inequalities and the systems that perpetuate them, and taking action to correct them. Within the field of education, that includes a fairer distribution of finite resources across all schools; it includes increased representation of traditionally underrepresented racial groups and cultures, both in the curriculum and in standardized assessments; and it includes increased diversity of teaching staff and student bodies, which integration helps to accomplish. That Maud finds this to be "chilling" tells true racial advocates all they need to know: she's racist, and wants the school system—which holds the honors of being the most segregated in America—to remain unequal.

Last December, a couple of our members had the opportunity to attend a meeting of the Community Education Council District 2, the school board that Maud is the president of. During a question and answer period, a father and young son—both white—got up and took the board to task, chastising them for "being in violation of Brown v. Board of Education for sixty-five years" and demanding to know when integration would finally become a reality in their district. The responses to their repeated questions were expectedly nonresponsive; but it was indeed noteworthy to us that Maud, the council president, was absolutely quiet during the entire exchange. For us, her silence spoke volumes. With no cameras flashing, no reporters, no members of the press seemingly in attendance, Maud had no reason to pretend. If you are a proponent of making New York City's school system more racially equitable, Maud has nothing to say to you.

In the press, however, Maud feigns herself to be supportive of integration. Even as she gleefully asserts that local integration efforts "has its skeptics," she professes to want more integrated schools. Putting her poor act aside, it is telling that she religiously advances a false dichotomy between an adequate education and a culturally inclusive education. One does not have to choose between the two; children can be properly instructed in an educational environment that fosters diversity, inclusion and equity. Maud's insistence in treating the two as mutually exclusive allows her to paint her critics in the eyes of the right-wing press as lunatics who prioritize playing the race card over quality education. It's an illegitimate argument, but

nevertheless persuasive to many in this city.

Maud throws out statistics in her op-Ed about poor performance among Black students, but unsurprisingly offers no explanation as to the cause. However, racism certainly could not be the culprit because, as Maud has frequently highlighted, Asian Americans have allegedly outperformed all other racial groups. Yes, the model minority myth is essential to Maud's argument: the problem isn't racism, but a "culture" of laziness and stupidity among African Americans and Hispanic Americans. This argument, however, invalidates the very distinct experiences of nonwhite groups in this country. Racial groups have been treated differently in America, so because one group may be unaffected by a problem does not discount the presence of racism. We're not aware of statistics that show Asian Americans being disproportionately killed by the police; does that mean that police brutality is not a racial issue? Of course not.

Maud complains about the "Twitter mobs" that came after her following her interview with New York Times journalist Nikole Hannah-Jones. Oh, how the pot calls the kettle black: maybe Maud can tell the world about the mobs she sent after Teens Take Charge, a multiracial student-led organization fighting to integrate New York City schools. In a Twitter attack in May, the mob stated, "Our public education shouldn't be HIJACKED by special interest groups. It's time to listen to real NYC parents," signed "Thousands of Real Parents." That's right, folks: a group of adolescents that wish to make Brown v. Board of Education a reality in their city is a "special interest group" to Maud and her cronies.

Or perhaps Maud can tell us about the mobs she sent after Aaron Narraph, a young college student of color. Aaron put together a spreadsheet of City Council candidates of his own volition and included notes on some of the candidates, listing "socialist" under some and "declared, but not filed" for others. For Maud, he wrote, "racism allegations." Regardless of whether or not Maud is racist, allegations of racism were in fact made against her, so what Aaron wrote was true. Of course, however, the truth did not stop Maud from trying to jeopardize his job, messaging both Aaron and his employer and accusing him of making "baseless charges" about her. She then assailed him publicly for daring to call her out; and then her circle of equally narrowminded friends have been attacking him on Twitter bitterly enough that he thought about deleting his account. This past Friday, our caucus took to Twitter to call out Maud for her Post op-Ed; apparently, we too are now a target of her pack of internet bullies.

Maud is a classic example of what 21st century racism looks like. She does not parade around the city in white sheets. She does not use racial slurs in discourse, at least not publicly. Times have changed; overt racism is no longer publicly acceptable. The new racism of today is to pretend that racism is largely non-existent, confined to a few bad apples that utter statements clearly offensive to even the most ignorant among us. Its adherents pay thin lip service to the cause of racial justice, but refuse to recognize the central role that racism has historically played and continues to play now. To do so requires them acknowledging the undue privilege society has conferred upon them, a privilege they are clearly not willing to give up for the sake of true equality. They distort and poohpooh efforts to deal with racial inequality and seek to shut down conversations on the topic, ironically by accusing racial equality proponents of trying to silence them. And at the end of the day, all fluff aside, the statements they make and the positions they take evidence their belief in white superiority as well as Black and Brown inferiority.

It is obvious to anyone with any sense of racial justice that Maud is racist, and openly so. She attacks efforts to end racism by claiming there is no racism. And as usual, this is not new: when efforts were made to desegregate NYC public schools in the 1960s, a coalition of mostly white parents called "Parents and Taxpayers" (PAT) was formed to resist those efforts. This coalition professed in speech to be in favor of integration while fighting against it in action. Those efforts were obviously successful, because the school system remains segregated. Now, Maud is a central part of a new coalition called "Parent Leaders for Accelerated Curriculum and Education" (PLACE). Like PAT five-plus decades ago, PLACE professes to be for racial equality in education while fighting to keep the mechanisms that reinforce inequality intact.

It also comes as no surprise to us that Maud's op-Ed was published in the same tabloid that singlehandedly

contributed more to the recent pretrial reform rollbacks than any other local publication. It was only a decade ago that this same publication likened then-President Barack Obama to a chimpanzee in a cartoon. Its coverage of stop-and-frisk and other issues related to racism has been similarly abysmal. In short, The New York Post is no friend of Black Americans, and neither is Maud.

What makes this all the more sickening is that Maud is a public defender, tasked with representing a constituency she clearly has no regard for. She is one of many charlatans who took this job not out of a desire to make a difference, but for purposes of self-imaging. Her constant invocations of her public defender position is neither accidental nor pointless. She's asserting to whomever will listen that she is a credible, unbigoted voice by virtue of the work she has allegedly done, representing poor people of color in a judicial system she would likely agree is racist. The only thing more shameful is that she has a following, and a powerful, well-connected following at that.

In closing, one of our genuinely dedicated colleagues said it best: "You cannot oppose anti-racism and effectively represent Black and Brown people. It's impossible." Maud Maron has no business having a career in public defense, and we're ashamed that she works for the Legal Aid Society.





👍 11

8 Shares

# <u>Exhibit C</u>

Black Attorneys of Legal Aid Tweet
Re-Tweeted by The Legal Aid Society



Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile

Tweet

**BlackAttysofLegalAid**
@BALA_NYC

"You cannot oppose anti-racism and effectively represent Black and Brown people. It's impossible."
@MaudMaron has no business having a career in public defense, and we're ashamed that she works for the Legal Aid Society.

**Retweeted by**

**Sharon "hes a CLOWN!" Howell**
@Mzsma
WAKANDA FOREVER! Hard core library user. Doesn't sleep well at night It is what it is Michelle Obama 2020
Follow

**n l**
@nlicalzi
Software developer in training @launchschool Urban Data Science M @nyu_cusp Formerly @kpf_ui @BIGstertweets
Follow

**Aboolition Now**
@_mjwilliams_
Attorney Supporter Defender Abolitionist | @MPJInstitute Board | @MJWilliams_Law for ™ and © law FOIA/FOIL and surveillance | Tweets ≠ legal advice | she/they
Follow

**The Legal Aid Society**
@LegalAidNYC
The nation's oldest and largest law firm for low income families and individuals. Making the case for humanity in NYC since 1876. #legalaid #publicdefender
Follow

**Taylor McGraw**
@taylor_mcgraw
Brooklynite but still a Mississippian at heart. Writer, podcaster, teacher, organizer, chess player. Director of The Bell (@BellVoices)
Follow

**Black Lives Matter**
@waxingcrecent
Follow

…lusionist hiding behind the …ist or trans/homophobic! …ious problem with their

…en from Maude and her

**NancyZazulka** @NancyZazulka · Jul 27
Replying to @BALA_NYC and @MaudMaron
On public schools in NYC...
Schools in affluent communities would NEVER have to deal with their kids' school bathrooms that lack soap, toilet paper, hot water...

Ask MOST schools in communities of color and here's what you'll get: "Wait, some schools have all of these things..."

**CarriageOn New York 2020** @xkhdc · Jul 27
Replying to @BALA_NYC and @MaudMaron
Maud Maron is the best!
1

**naijabeaux** @naijabeaux · Jul 28
Replying to @BALA_NYC and @MaudMaron
Same ppl are wearing Gucci and fendi

Search Twitter

**Relevant people**

**BlackAttysofLegalA…**
@BALA_NYC
Find us on Instagra… Facebook: Facebook.com/blac… & Lin… Attorneys of Legal A…

**Maud**
@MaudMaron
Candidate for City C… President, Commun… Council District 2 | …

**What's happening**

COVID-19 · 20 minutes ago
**CDC director says small gatherings are becoming a… of COVID-19 infection spre…**

**#SistasOnBET**
Season 2 of #SistasOnBET pr… 9/8c on BET... Join us!
Promoted by Tyler Perry's Sist…

Politics · Trending
**ce Cube**
Trending with Arrest the Preside…

The Telegraph · Last nigh…
**The secret feminist messag… behind Meghan Markle's bodysuit**

US elections · LIVE
**Massachusetts: Election ne… updates**

Show more

Terms of Service Privacy Policy Ads info More © 2020 Twit…

[redacted]

**Messages**

Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile

**yuppy2501** @yuppy2501 · Jul 28
Replying to @BALA_NYC and @MeadMaron
Chairman Mao would approve, even if being inappropriately labelled "Racist" today is China s Communist Parties Capitalist enemy of the 1960 s who cares what the label is as long as it purges those hethen unbelievers of the new religion of ocial Justice!

**i. rae alden** @humanistaOne · Jul 31
Replying to @BALA_NYC and @MeadMaron
Ask her about her hand in firing the African-American assistant teacher at her child s preschool who was the glue of the school for 18+ years?Downing Street Cooperative on Carmine Street. Housed for free in city parks' building for low and middle income families
1 2

**jason wu** @CriticalRace · Jul 27
Replying to @BALA_NYC and @MeadMaron
…titutional racism," says
…ay it is committed to

…ague running for City Co…
…ning for City Council in
…f color after saying in an …

…annot be racist because
…white person that denies
@BALA_NYC

**Retweeted by**

**Sharon "hes a CLOWN!" Howell** Follow
@Mzsma
WAKANDA FOREVER! 💪🏾Hard core library user. Doesn't sleep well at night It is what it is Michelle Obama 2020

**n l** Follow
@nlicalzi
💻 Software developer in training @launchschool 🌆 Urban Data Science M @nyu cusp 🏗 Formerly @kpf ui @BIGstertweets

**Aboolition Now** Follow
@_mjwilliams_
Attorney Supporter Defender Abolitionist | @MPJInstitute Board | @MJWilliams_Law for ™ and © law, FOIA/FOIL and surveillance | Tweets ≠ legal advice | she/they

**The Legal Aid Society** Follow
@LegalAidNYC
The nation's oldest and largest law firm for low-income families and individuals. Making the case for humanity in NYC since 1876. #legalaid #publicdefender

**Taylor McGraw** Follow
@taylor_mcgraw
Brooklynite but still a Mississippian at heart. Writer, podcaster, teacher, organizer, chess player. Director of The Bell (@BellVoices)

**Black Lives Matter** Follow
@waxingcrecent

Can Public Defenders Be Racist? Black Attorneys of Legal Aid Caucus
Can public defenders be racist? This question is addresed by the Black Attorneys of Legal Aid Caucus. This is a must read for all public …
gideonssoldiers.com
1 4 11

[redacted]

Messages





Search Twitter

Home

Explore

Notifications

Messages

Bookmarks

Lists

Profile

**Retweeted by**

**Sharon "hes a CLOWN!" Howell**
@Mzsma
Follow
WAKANDA FOREVER! 💪🏾✊🏾Hard core library user. Doesn't sleep well at night It is what it is Michelle Obama 2020

**n l**
@nlicalzi
Follow
💻 Software developer in training @launchschool 🌃 Urban Data Science M @nyu cusp 🏗 Formerly @kpf ui @BIGstertweets

**Aboolition Now**
@_mjwilliams_
Follow
Attorney Supporter Defender Abolitionist | @MPJInstitute Board | @MJWilliams_Law for ™ and © law, FOIA/FOIL and surveillance | Tweets ≠ legal advice | she/they

**The Legal Aid Society**
@LegalAidNYC
Follow
The nation's oldest and largest law firm for low-income families and individuals. Making the case for humanity in NYC since 1876. #legalaid #publicdefender

**Taylor McGraw**
@taylor_mcgraw
Follow
Brooklynite but still a Mississippian at heart. Writer, podcaster, teacher, organizer, chess player. Director of The Bell (@BellVoices)

**Black Lives Matter** ✊🏾
@waxingcrecent
Follow

[redacted]

Messages

# Exhibit D.1

Governing Collective Bargaining Agreement

# ALAA Contract 2016-2019

Collective Bargaining Agreement Between The
Association of Legal Aid Attorneys, UAW 2325 (AFL-CIO) and
The Legal Aid Society (NYC)

*Supersedes the 2013-2014 contract and incorporates all memoranda of agreement and understanding through October 4, 2017.*

# Contents

**Preamble** ............................................. **2**

**Article 1/Labor Relations:**

§ 1.1.  Union Recognition and Agency Shop ........................................................ 3

§ 1.2.  Collective Bargaining Agreement ............................................ 3

§ 1.3.  No Strike or Lockout ...................... 4

§ 1.4.  Union Access to Financial Records ............................................... 4

§ 1.5.  Union Activities .................................. 4

§ 1.6.  Presence of Union Representatives ................................... 5

§ 1.7.  Joint Union-Management Committees ........................................... 5

§ 1.8.  Grievances ............................................ 5

§ 1.9.  Management Rights .......................... 6

§ 1.10. Future Joint Lobbying .................... 6

**Article 2/Compensation:**

§ 2.1.  Salary .................................................... 7

§ 2.2.  TransitCheks ...................................... 8

§ 2.3.  Bar Registration Fee ........................ 8

§ 2.4.  Fellowships .................................... . . .8

§ 2.5.  Loan Forgiveness ............................... 8

§ 2.6.  Bar Association Dues ............. ..9

§ 2.7.  Compensatory, Personal and Flex Time ....................................................... 9

§ 2.8.  Health Insurance ............................... 10

§ 2.9.  Life Insurance ................................... 12

§ 2.10. Pension .............................................. 12

§ 2.11. Tax Shelters ...................................... 12

§ 2.12. Vacation ............................................. 12

§ 2.13. Adoption & Fertility ............... .13

§ 2.14. Childcare ............................. .13

**Article 3/Employment Policy:**

§ 3.1.  Fair Employment Practices ........... 14

§ 3.2.  Hiring ................................................. 16

§ 3.3.  Employment Status ......................... 16

§ 3.4.  Leave .................................................. 17

§ 3.5.  Free Speech ........................................ 19

§ 3.6.  Interpersonal Conflict ...................... 19

§ 3.7.  Part-Time Work Schedules ........... 19

§ 3.8.  Telecommuting ................................... 20

§ 3.9.  Transfers and Promotions ............. 20

§ 3.10. Expenses ............................................. 21

§ 3.11. Personnel Records ............................. 22

§ 3.12. Pro Bono Representation ............... 22

§ 3.13. Senior Staff Retention ..................... 22

§ 3.14. Job Security ....................................... 23

§ 3.15. Resignation ........................................ 24

§ 3.16. One-Time Early Retirement Program ............................................ 24

§ 3.17. Health and Safety ............................. 24

§ 3.18. Record Keeping ................................. 25

**Article 4/Quality of Representation:**

§ 4.1.  Standard of Advocacy ................... 26

§ 4.2.  Continuity of Representation ....... 26

§ 4.3.  Workload ............................................ 27

§ 4.4.  Interview Conditions ...................... 28

§ 4.5.  Office Day .......................................... 29

§ 4.6.  Attorney-Client-Supervisor Relationship ..................................... 29

§ 4.7.  Training, Education and Certification ...................................... 29

§ 4.8.  Malpractice Insurance ..................... 32

§ 4.9.  Outside Counsel ............................... 32

§ 4.10. Special Litigation ............................. 32

§ 4.11. Support Services .............................. 32

§ 4.12. Law Enforcement Issues ............... 32

§ 4.13. Society Policy Positions ............... 33

**Signature Page ................................... 37**

**Appendices:**

Appendix 1/Salary Scale .................................. 38

Appendix 2/Benefits Summary Life and Accidental Death & Dismemberment Insurance ......................... 39

**Index .......................................... ......40**

# Preamble

This Collective Bargaining Agreement is an expression of the parties' shared commitment to: 1) Delivery of the highest possible quality of indigent legal representation; 2) Mutual respect among, and fair treatment of all Legal Aid Society staff; and 3) Full participation by the Union and its members in pursuing the Society's mission. Each term of this contract will be interpreted in the context of these fundamental principles.

# Article 1/Labor Relations

### § 1.1.   *UNION RECOGNITION AND AGENCY SHOP*.

§ **1.1.1.**      *Recognition*.  In accordance with the Certification of Representation issued by the New York State Labor Relations Board on December 30, 1969, the Legal Aid Society ("Society" or "LAS") recognizes the Association of Legal Aid Attorneys, UAW Local 2325 (AFL-CIO) ("Union" or "ALAA") as the exclusive bargaining representative of all attorneys admitted to practice and within the scope of the bargaining unit definition contained in the above-mentioned Certification and of all law graduates employed as such by the Society ("Staff Attorneys").

§ **1.1.2.**      *Union Membership*.  The Union agrees to continue its policy, as defined by law, of admitting persons to membership without discrimination on the basis of actual or perceived race, color, national origin, alienage or citizenship status, religion, creed, sex, gender (including "gender identity" -- which refers to a person's actual or perceived sex, and includes self-image, appearance, behavior or expression, whether or not different from that traditionally associated with the legal sex assigned to the person at birth), disability, age (18 and over), military status, prior record of arrest or conviction, marital status, genetic predisposition or carrier status, sexual orientation, or status as a victim of domestic violence, a sex offense or stalking, or membership in, or association with the activities of, any employee organization.  No attorney will be required to join the Union.

§ **1.1.3.**      *Dues and Fees*.  All bargaining unit members, whether newly-hired, rehired, or returned to the bargaining unit, must, within thirty [30] days of hire, pay the current dues and initiation fees or, where applicable, current service fees to the Union, and any interest charges that may be set by the Union for late payment of dues or service fees.  Upon the Union's written request, the Society will discharge any Staff Attorney who fails to pay such dues, fees or interest, after the Union has given at least two [2] weeks' written notice, by certified mail, to the delinquent attorney and to the Society.  Any member of the bargaining unit may authorize the Society to deduct from her paycheck(s) and forward to the Union all dues, initiation fees, credit union, political action, other assessments and/or agency fees.  Such authorization will be effective until revoked, in writing, by the signer thereof.

### § 1.2.   *COLLECTIVE BARGAINING AGREEMENT*.

§ **1.2.1.**      *Term*.  This Agreement will be effective as of October 4, 2017, will continue in full force and effect through June 30, 2019, and will continue past its expiration date, subject to ten [10] days' written notice of termination by either party.  As always, all terms and conditions, including salary, pension and all benefit obligations, will be subject to collective bargaining upon the expiration date.

§ **1.2.2.**      *Negotiation*.  When feasible, the parties will:  1) provide one hundred and twenty [120] days' notice prior to expiration of its intent to modify or terminate this Agreement; 2) present written proposals at least one hundred [100] days prior to expiration; 3) begin contract negotiations at least ninety [90] days prior to expiration; and 4) meet as frequently as necessary for a full and fair discussion of the issues.  If there is no successor agreement at least forty-five [45] days prior to expiration, the parties will jointly request the intervention of the Federal Mediation and

Conciliation Service. If, in the mediator's judgment, maintenance of the status quo for a period of up to thirty [30] days past expiration appears likely to improve the chances for a negotiated agreement without declaration of an impasse, the mediator will ask the parties' agreement to such extension, and/or to such other steps within that time period as she deems useful to resolve outstanding issues.

        § 1.2.3.     *Headings and Terms*. Headings and/or subject groupings are for general identification only and will not be construed in a substantive manner. The pronoun "her" will be deemed applicable to both genders.

        § 1.2.4.     *Reproduction and Distribution*. The Society will reproduce this Agreement using union labor, distribute at least one [1] copy to each attorney, and make available necessary additional copies.

§ 1.3.     *NO STRIKE OR LOCKOUT*. The parties subscribe to the principle that differences will be resolved by peaceful and appropriate means without interruption of the work of the Society or the courts. The Union agrees that there will be no strikes, work stoppages, slowdowns or concerted refusal to perform work during the term of this Agreement, during which neither the Union, nor any officer or agent thereof will, directly or indirectly, authorize, assist, condone, encourage, or in any way participate in any such activities. The Society will not lockout its employees during the term of this Agreement.

§ 1.4.     *UNION ACCESS TO FINANCIAL RECORDS*. The Society will grant any reasonable request by the Union for open access to its financial books and records, subject to appropriate safeguards against release or other inappropriate use of individually-identifiable information about non-bargaining unit employees, including access to outside auditors in regard to the Society's financial condition and to perform due diligence in regard thereto.

§ 1.5.     *UNION ACTIVITIES*. The Union will have reasonable use of the Society's internal communication mechanisms and meeting space, one full time equivalent (FTE) of paid release time for general representational and related duties, and reasonable release time for other Union representatives, and other resources necessary to administer this Agreement. In addition, two [2] Staff Attorneys may take unpaid leaves for an unlimited duration to serve on Union staff, during which they will be entitled to all benefits (health, disability, etc.) available to other bargaining unit members, at no additional cost to the Society. Attorneys on Union leave will accrue full seniority for all purposes, including salary, vacation, pension, and leave, and have the right to return to their Society positions at the conclusion of such leave(s). Current Union staff whose leave had previously expired shall be immediately restored to their status as Society employees on the above terms. Reasonable use of the Society's internal communication mechanisms shall be interpreted to mean the following: The Legal Aid Society will maintain an e-mail group that permits the President of ALAA and her designee to send communications to all ALAA members and permits individual members to respond to the President of ALAA and her designee as the sender(s) and not to the whole e-mail group. The Legal Aid Society has provided ALAA with a one-time payment of $12,000 so that ALAA can develop and implement a free-standing e-mail group of ALAA members that is not on The Legal Aid Society's computer network.

**§ 1.6.**     ***PRESENCE OF UNION REPRESENTATIVES***.  Staff Attorneys may exercise their right to the presence of a Union representative, whenever practicable a person of their choice, during any discussion with managers concerning potential or actual disciplinary action.

**§ 1.7.**     ***JOINT UNION-MANAGEMENT COMMITTEES***.   The Union will appoint its representatives to all "Union-Management" committees.

**§ 1.8.**     ***GRIEVANCES***.  Except as otherwise provided herein, the following grievance procedure will apply to all disputes concerning interpretation or application of a specific provision of this Agreement.

 **§ 1.8.1.**     ***Initiation***.  Grievances must be filed in writing within ten [10] calendar days of the event giving rise to the grievance, or within ten [10] calendar days from when the event, with reasonable diligence, should have become known.  The written statement must be sufficient to give notice that the matter is being grieved and should clearly articulate the issue(s) grieved, the relevant contract provision(s), and the relief sought.

 **§ 1.8.2.**     ***Time Limits***.  Once filed, each subsequent step in the grievance process must be completed or initiated, as appropriate, within ten [10] calendar days of the preceding event, except as extended by the parties' mutual agreement, which shall not be unreasonably withheld.  If the Union fails to file within the allotted time, the grievance will be deemed resolved by the Society's most recent position.  If the Society fails to respond within the allotted time, the Union may move the grievance to the next level.

 **§ 1.8.3.**     ***Presentation***.  Grievances will be presented and processed at a time and in a manner that does not materially interfere with work.  Unless otherwise agreed, grievances will be heard outside of normal work hours.

 **§ 1.8.4.**     ***Due Process***.  Except in cases involving dishonesty or gross neglect of a client, no Staff Attorney will be discharged until completion of the First Step grievance process, until the grievance has been resolved by operation of time limits, or until the Staff Attorney has given written notice that she does not intend to file a grievance with respect to a proposed termination. The foregoing does not prevent the Society from placing a Staff Attorney on paid suspension pending resolution of the First Step grievance.  A proposal to suspend or discharge a Staff Attorney must be made in a written notice of charges provided simultaneously to the Staff Attorney and Union President.  Notice of charges may be amended or supplemented at any subsequent time, with the understanding that such changes may require an extension of time limits for further investigation.

 **§ 1.8.5.**     ***Steps***.

  **(1) *First Step:  Immediate Supervisor***.  The First Step grievance will generally be to the immediate supervisor.  If the action being grieved is discipline or termination taken in the name of a higher level supervisor, the First Step grievance will be to that person.  The parties will seek resolution through discussion among the aggrieved Staff Attorney, her Union representative, or, in the appropriate case, the Union as the aggrieved party, and the aggrieved's immediate supervisor, who will issue a written decision.

  **(2) *Second Step:  Practice Attorney-in-Charge***.  If the grievance is not settled in the First Step, the Union may file a written appeal to the Attorney-in-Charge of the practice to which the grieving Staff Attorney is assigned, or was assigned at the relevant time.  Following a meeting among the interested parties, the Attorney-in-Charge will issue a written decision.  If the

practice Attorney-in-Charge decided the First Step grievance, her initial decision will be appealed directly to the Third Step.

       **(3)** ***Third Step: Attorney-in-Chief***. If the grievance is not settled in the Second Step, the Union may file a written appeal to the Attorney-in-Chief, who, following a meeting among the interested parties, will issue a written decision.

       **(4)** ***Fourth Step: Arbitration***. If the grievance is not settled in the Third Step, the Union may give written notice of arbitration to the Attorney-in-Chief. If the parties are unable to agree on an arbitrator within an additional ten [10] calendar days of such notice, the matter will be submitted to arbitration under American Arbitration Association rules, in the event of discharge on an expedited basis. The arbitrator's award will be final and binding on all parties. The Union and the Society will share equally in any costs of grievance arbitration.

      **§ 1.8.6.**    ***Exclusive Remedy***. No Staff Attorney will have the right to independently institute or pursue any grievance or arbitration based upon this Agreement, the right of action being limited to the Union and the Society, and any agreement or adjustment between the Union and the Society with respect to such disputes will be final and binding upon the Staff Attorney.

**§ 1.9.**    ***MANAGEMENT RIGHTS***. The Society will at all times, subject to express provisions of this Agreement, have full control of management, personnel, and conduct of its operations, including any of the rights, powers and authority that the Society had prior to the signing of this Agreement.

**§ 1.10.**    ***FUTURE JOINT LOBBYING***. If there is any future joint lobbying, a plan for such future joint lobbying will be addressed in a side letter between the parties.

# Article 2/Compensation

### § 2.1.  *SALARY*.

§ 2.1.1.     *Salary Schedule*.  The Basic Salary Schedule set forth in Appendix 1 will apply to all Staff Attorneys and be effective March 1, 2017 and July 1, 2018.  Within thirty (30) days of ratification, The Legal Aid Society will increase the salary of each  Staff Attorney in active status at that time in accordance with the levels specified in Appendix 1 and provide a retroactive payment to each such Staff Attorney reflecting the Staff Attorney's salary increase effective on March 1, 2017 and/or July 1, 2018 in accordance with the salary levels set forth in Appendix 1.  For each Staff Attorney who is on an authorized leave when the Society implements the prospective and retroactive salary increase at the levels set forth in Appendix 1, the Society will make retroactive salary adjustments, if any are required, within thirty (30) days of the Staff Attorney's return from the authorized leave.  In accordance with the Society's salary payroll procedures, retroactive salary increases are subject to applicable payroll deductions and are pensionable.  During the life of this contract extension, if the City of New York provides additional funds that are not restricted from use for salary increases, within (30) days of the notification that such funds are available the parties shall reopen this agreement and shall then negotiate the distribution of any such funds to the ALAA/UAW 2325 bargaining unit in a fair and equitable manner for salary increases.  The distribution of any such funds that can be used for salary increases would be effective as of the beginning of the period of time for which such funds have been allocated by the City.  The Basic Salary Schedule may be increased during the term of this Agreement in accord with the above provision.

§ 2.1.1.1.     *ADA Comparability*.  Both ALAA and the LAS recognize and support a goal that staff attorneys receive total compensation which is comparable to that received by ADAs in Bronx, Brooklyn, New York and Queens Counties and that, due to the lack of sufficient funding, the economic terms contained herein narrows, but does not close, the comparability gap between the two groups.  It is also recognized that LAS may receive funding increase(s) during the term of this contract which would allow it to narrow or close this gap.  To that end, the parties agree that should the LAS receive, during the term of this contract, a funding increase sufficient to further narrow or close the comparability gap, the parties will, immediately upon learning of such increase, undertake to ascertain the four-borough average of total compensation received by non-managerial ADAs at yearly levels of service.  After ascertaining such ADA compensation, the LAS agrees to pay staff attorneys as close to comparable total compensation as such additional funding allows.

§ 2.1.1.2.     *Special     Wage     Reopener—Alternative     Defender Organizations*.  If any organization other than the 18-B (assigned counsel) panel offers to furnish defender services for ten [10] percent or more of the clients served by the Criminal Practice or Juvenile Rights Practice in the City and/or State Courts in New York City, and if such organization offers to its Staff Attorneys, on an overall basis, higher salaries, superior terms of employment or working conditions, the Union may, upon ninety [90] days' written notice to the Attorney-in-Chief, reopen the contract as to those items where disparity exists.  If the Society challenges the factual basis on which the reopener notice is predicated, such issue(s) will be submitted to arbitration and the relevant contract provision reopened only upon an appropriate finding by the arbitrator.

§ 2.1.1.3.  *24-Pay Period System.*  Effective April 1, 2012, the Society is implementing a 24 pay period system for each year that consists of two pay days per month on the

15th and on the last day of the month. When the 15th or the last day of the month falls on a weekend or holiday, the pay day will be on the business day  immediately before the weekend or holiday. Converting to the 24 pay period system will not affect the current negotiated annual step rates, but will increase the amount of the gross amount of pay per payroll period so that the gross annual salary remains the same in the 24 pay period system as it had been in the 26 pay period system.

§ 2.1.2.  *Individual Placement on Salary Scale*.

§ 2.1.2.1.  *Anniversary Date*.  The anniversary date will be the date of first employment as a Staff Attorney.  The Society, in consultation with the Union in regard to criteria and principles, may give credit for prior experience or service, and those hired with such credit will receive future increases based on their hiring level rather than their years of service with the Society. In the event of a break in service, any credit for prior service to establish salary, annual leave, retirement benefits, seniority, etc., will be as agreed upon by the Society and the attorney upon rehire.

§ 2.1.2.2.  *Advancement to Step One*.  Movement on the Salary Schedule from Law Graduate to Step 1 will be effective on bar admission.

§ 2.1.2.3.  *Returned-to-Staff Supervisors*. Staff Attorneys who returned to staff from supervisory positions will be entitled to credit for all their experience as an attorney employed by the Society, including the time employed as a supervisory attorney.

§ 2.1.3.  *Lobster Shift*.  Attorneys working the New York County "lobster" shift that begins at 1:00 A.M. will be paid at the following rate:  Tuesday-Friday—$300; Sunday and the day following a holiday—$400; Saturday, Monday and holidays—$350.  Attorneys staffing the lobster shift will not be required to work the shift immediately prior or subsequent thereto.

§ 2.2.  *TRANSITCHEKS*.  Effective July 1, 2004, each Staff Attorney will have the individual option to use pre-tax compensation to purchase TransitCheks as administratively practical within the maximum amount permitted by law.

§ 2.3.  *BAR REGISTRATION FEE*.  The Society will pay Staff Attorney bar registration fees.

§ 2.4.  *FELLOWSHIPS*.  The Society may transmit or facilitate payments by fellowships for repayment of Staff Attorney education loans.

§ 2.5.  *Loan Forgiveness.*  The Union acknowledges that the Society created a one-time $250,000 loan forgiveness fund. The funds remaining will be distributed as described in Section 2.5.1. The Society will work with the Union to seek loan forgiveness funding from government.  The Society will designate a staff person in the Human Resources Department to assist Staff Attorneys with the various loan forgiveness programs offered by governmental entities by collecting information on various programs which may apply to Staff Attorneys and providing updated information about such programs in a timely manner.

§ 2.5.1. *Loan Forgiveness Committee.*  The Union and the Society agree to establish a joint Union-Management committee to make recommendations for educational loan reimbursements of the funds currently in the Archibald Murray Fund and to explore additional strategies for raising funds for educational loan reimbursement.

§ 2.6.        *BAR ASSOCIATION DUES.*  To the extent that recurring funds can be allocated, the Attorney-in-Chief will appoint managers and Staff Attorneys to serve as a representative of The Legal Aid Society on relevant State and local bar association committees, with the required bar dues paid with such funds.  Any appointments of Staff Attorneys will be made in consultation with the Association of Legal Aid Attorneys through its President.

§ 2.7.        *COMPENSATORY, PERSONAL AND FLEX TIME*.
      § 2.7.1.        *Compensatory Time (Criminal Defense Division)*.
          § 2.7.1.1.        *Earnings*.  Staff Attorneys in CDD will earn compensatory time for working certain institutional assignments outside of regular working hours.  Staff Attorneys in the Community Justice Unit will be permitted to earn comp time for institutional assignments performed beyond the normal workday of 9 A.M. to 5 P.M.
          § 2.7.1.2.        *Accumulation and Use*.  Staff Attorneys may accumulate accrued compensatory days.  Accumulated days may be taken as vacation in accordance with the CBA within one year of being earned but may not be carried over to a subsequent year.  Effective April 1, 2005 Staff Attorneys entitled to compensatory days for working institutional assignments outside of regular working hours may, within a month of earning a compensatory day, opt to be paid at their regular hourly rate in effect during the pay period for each day of compensatory time earned to a maximum of 15 days in any fiscal year, provided, however that the maximum is 5 days in Fiscal Year 2005.  Such payments are not pensionable.  Effective December 12, 2007, Criminal Defense Staff Attorneys may opt to be paid a maximum of 17 compensatory days earned during any fiscal year at the regular hourly rate in effect during the pay period in which the compensatory time was earned, provided that such payments are not pensionable.
          § 2.7.1.3.        *Cash-In*.  Effective December 19, 2006, for unpaid leaves in the Criminal Defense practice, other than compensatory time that can be cashed in annually pursuant to paragraph 2.5.1.2, above, Criminal Defense staff compensatory time accumulated prior to April 1, 2005 will be paid out in a lump sum when a Criminal Defense staff attorney resigns or is terminated from LAS, is promoted to a supervisor, or transfers from the Criminal Defense practice. However, in order to reduce the accumulated April 1, 2005 compensatory time liability for the Society and to provide a transition for affected bargaining unit members taking unpaid leaves related to childcare and/or FMLA, on a fiscal year basis, the Society is allocating a fund of up to $250,000 to pay out accumulated pre-April 1, 2005 compensatory time to such affected Criminal Defense attorneys on unpaid leave in a lump sum that represents the duration of the leave and such staff attorneys will be permitted to pay for health care coverage at the applicable employee share while they are on such approved unpaid leave.
          § 2.7.1.4.        *One Time Buy-Back*.  In the first year of this contract, The Legal Aid Society will allow a one time buy-back opportunity for those attorneys with pre-2005 "frozen" comp days.  LAS will allow those attorneys to cash in up to 5 days per eligible attorney for a total amount up to $250,000 by January 31, 2018 or allow those attorneys to use up to 10 days of "frozen" comp days during the course of one year, with the period to be determined.
          § 2.7.1.5.        *Modification*.  The Society may establish reasonable notice requirements in regard to exercise by Staff Attorneys of their right to cash in compensatory days and reasonable payment provisions, not more than two [2] months after such notification, in order to prevent cash-flow problems for the Society.

§ **2.7.1.6.** *Weekend and Holiday Arraignments in the Juvenile Rights Practice.* Staff Attorneys in the Juvenile Rights Practice will be paid for a compensatory day for working a weekend or holiday arraignment shift, with such payment to be provided no later than on the second pay day following the shift that the Staff Attorney worked.

§ **2.7.2.** *Personal Days (Other Practices).* Each full-time and part-time Staff Attorney in the Civil Practice, Special Litigation Unit of the Criminal Practice, Juvenile Rights Practice, and Criminal Appeals Bureau will receive five [5] personal days per calendar year, except that staff attorneys in the Criminal Appeals Bureau will receive no personal days as of the end of calendar year 2006; such days cannot be cashed-in or carried over from year to year. Effective January 1, 2007, the allocation of personal days for staff who work part time and are otherwise eligible for personal days shall be pro-rated.

§ **2.7.3.** *Special Longevity Personal Days.* Effective October 1, 2013, the Society will provide a special longevity allocation of five [5] personal days for use either in the longevity year or in the subsequent years until the next longevity anniversary date: 1) 30 years of service; 2) 35 years of service; 3) 40 years of service; 4) 45 years of service; and 5) subsequent five [5] year intervals of service. These special longevity allocations of five [5] personal days can only be used during the twelve [12] months following these anniversary dates and cannot be carried over to any subsequent year and shall not affect the limitations on the accrual of vacation days, the use of compensatory time, or the annual allocation of personal days for eligible Staff Attorneys.

§ **2.7.4.** *Flexible Hours.* The Society will continue to make reasonable adjustments in attorneys' hours at the workplace, subject to the demands of workload coverage, in consideration of such assignments as night-time tenant or other group meetings concerning clients, jury deliberations, late court time, line-ups, etc.

§ **2.8.** **HEALTH INSURANCE.**
§ **2.8.1.** *Administration.* Staff Attorney health benefits, the current terms of which are detailed in Appendix 2, will be administered by the Society, with full Union access to all information concerning terms, costs, administration and application of those benefits to bargaining unit members. A Joint Union-Management Health Benefits Committee will be established to discuss issues and concerns regarding administration of the benefit program. Effective January 1, 2008, Appendix 2 will be deemed amended to provide that co-payments for medical office visits shall be $20.

§ **2.8.2.** *Changes.* There will be no change in any benefit without the Union's agreement. If the Society's cost for Staff Attorney health benefits decreases during the term of the Collective Bargaining Agreement, disposition of the resulting savings will be discussed with the Union.

§ **2.8.2.1.** *Contributions.* Effective January 1, 2005, ALAA members will make contributions to health care premiums in the amount of 3.5 percent of premium for the "low plan" and 7 percent for the "high plan".

§ **2.8.3.** *Eligibility.*

§ **2.8.3.1.**     *Employment*.   Eligibility for health insurance coverage will require employment on both the first and fifteenth of that month.  Coverage will cease as of the last day of employment, subject to continued benefits under applicable law and insurance policies.

§ **2.8.3.2.**     *Dependents*.   Employees wishing to change from single to dependent coverage, and new enrollees requesting dependent coverage, will be required to certify, and provide a summary plan description to demonstrate, that comparable coverage to that provided by the Society is not available through their spouse's employment.  Benefit comparability analysis will take into account, and assign appropriate weight to, both employee and/or spousal premium contributions.

§ **2.8.3.3.**     *Lesbian and Gay Partners*.   The Society will provide health insurance coverage for domestic partners of lesbian and gay Staff Attorneys who sign an affirmation attesting to their relationship with a named domestic partner (qualifying standards for which will be taken from language contained in the New York City Executive Order), subject to availability, to reasonable eligibility requirements and to costs comparable with those incurred under then-current health insurance.  The Society will take all reasonable steps, excluding litigation, to bring about and maintain availability of such coverage.

§ **2.8.3.3.1**     *Tax Reimbursement for Staff Attorneys with Same Sex Domestic Partners*.   In recognition of the added tax burden that results from the disparate treatment in federal and state tax laws of married heterosexual couples and same sex domestic partners, a Staff Attorney whose health insurance coverage is for herself or himself and a domestic partner shall be reimbursed in accordance with either one of these options: (a) the Staff Attorney will be reimbursed in an amount equivalent to 20% of the cost of the additional coverage for the domestic partner; or (b) LAS will "Gross Up" the tax liability such that the Staff Attorney shall be reimbursed in a net amount equivalent to the tax liability incurred by the Staff Attorney as a result of the treatment of the additional premium as income to the Staff Attorney.  If this second option is chosen, the Staff Attorney shall demonstrate the additional tax liability by providing exact copies of the filed tax returns of the Staff Attorney and the domestic partner, as well as a tax return prepared as a joint return for a couple that would be treated as married under the tax laws.  The tax returns shall be accompanied by an affirmation from the Staff Attorneys attesting to their financial accuracy. Reimbursement under either option (a) or (b) shall be paid within 60 days of receipt of the required documentation by the LAS Human Resources Department.  Any tax liability resulting from the reimbursements for employees who select option (a) shall be the responsibility of the Staff Attorney. At such time as the tax laws are modified to eliminate this disparate treatment which this provision is being adopted to address, this provision will expire.

§ **2.8.3.4.**     *Enrollment*.   Each Staff Attorney may select from health plan options detailed in Appendix 2, or as may be otherwise agreed upon by the Union and the Society, during an annual open enrollment period, and/or throughout the year due to qualifying changes in family status.

§ **2.8.3.5.**     *Retirees*.   Effective July 1, 2002, a Medicare supplement with prescription drug rider will be provided to Staff Attorneys who:  (1) retire on or after July 1, 2002; (2) have been employed by The Legal Aid Society for 25 years or more (time spent on long-term disability will be included in determining this period); and (3) will at retirement have reached age 65. A dependent of a retiree may purchase at the dependent's expense the same Medicare supplement with a prescription drug rider that will be provided to staff attorney retirees. If the dependent is not Medicare eligible, the dependent may purchase at the dependent's expense LAS health care coverage

that is provided to staff attorneys. Retiree health care coverage is limited to retirees who are not eligible for health care coverage from another employer or former employer, and the ability of a retiree's dependent to purchase a Medicare supplement or LAS health care coverage is similarly limited.

§ **2.8.3.6.** ***Opt Out.*** LAS will implement a health care opt-out plan to provide a $2,500 annual incentive to Staff Attorneys who opt out of annual health care coverage provided that they submit written documentation demonstrating that they are covered for that year by another health care insurance plan.

§ **2.9.** ***LIFE INSURANCE***. The Society will provide Staff Attorneys with life insurance as detailed in Appendix 2 and will permit Staff Attorneys to voluntarily purchase additional group life insurance through check off, subject to the carrier's requirements.

§ **2.10.** ***PENSION***. The Society will, no later than seven [7] months from the close of the respective semiannual evaluation period, contribute 6.5% of covered salary, as defined in the Pension Trust Agreement and Pension Plan, to the Legal Aid Society Staff Attorney Pension Plan. Actual out-of-pocket expenses for legal counsel (not to exceed $50,000 per Plan year), consultants, accountants or others retained by the Plan will be payable from the Society's contributions. The LAS pension contributions to the Legal Aid Staff Attorney Pension Plan that are due and payable in Fiscal Year 2006 (July 1, 2005- June 30, 2006) shall be reduced to 3 percent of covered salary as defined by the Pension Trust Agreement and Pension Plan. LAS shall make two semi-annual pension payments by January 31 and July 31 of each year. Effective December 2004, ALAA hereby waives its claim based on LAS' alleged failure to make timely pension fund payments to the Legal Aid Staff Attorney Pension Plan prior to December 2004 in the amount of $381,000.

§ **2.11.** ***TAX SHELTERS***. The Society will make all necessary efforts to establish, maintain and offer to Staff Attorneys IRS-qualified plans for tax-deferred and/or tax-exempt annuities (overseen by a joint Union-Management committee of equal number), dependent care, excess unreimbursed medical expenses, health insurance premium contributions and long-term disability payments. The Society will arrange for a vendor to offer a Roth 403(b) to Staff Attorneys. The Society will provide an additional payroll deduction option for a New York State 529 Educational Savings Plan. Effective January 1, 2014, the Society will waive the administrative costs for flexible spending and dependant care accounts.

§ **2.12.** ***VACATION***.

§ **2.12.1.** ***Amount***. Staff Attorneys will receive annual leave with pay for vacation and religious observance in the amount of twenty [20] workdays for the first year of service; twenty-three [23] workdays for the second and third years of service; and twenty-seven [27] workdays for the fourth and subsequent years of service.

§ **2.12.2.** ***Eligibility***. Annual leave (except for religious holidays) will not ordinarily be granted until a Staff Attorney has been employed for at least six [6] months. Consistent with workload demands, supervisors will approve exceptions to this policy in response to plans or other specific and unusual circumstances which cannot be deferred.

§ **2.12.3.** ***Accrual***. Annual leave will be earned on an accrual basis calculated from employment anniversary date on the basis of one and two-thirds [12/3] days per month during the

first year of employment; one and eleven-twelfths [111/12] days during the second and third years; and two and one-quarter [21/4] thereafter.  By June 1 of each year, each Staff Attorney will be provided with a statement of her accrued vacation as of May 1 and/or when their respective accruals reach thirty-five [35] days.

    **§ 2.12.4.**    *Paychecks*.  Paychecks due during vacation will be available on the last working day prior to the vacation, provided that the Society is given three [3] week's notice of any change in scheduled vacation.

    **§ 2.12.5.**    *Scheduling*.  Vacation schedules will be subject to office and practice staffing requirements.

    **§ 2.12.6.**    *Illness or Accident*.  If a Staff Attorney becomes ill or suffers an accident during a period of vacation, the Society will exercise reasonable discretion in converting vacation time to sick time.

    **§ 2.12.7.**    *Buy-Back*.  Each full-time and part-time Staff Attorney in the Civil Practice, Juvenile Rights Practice, Parole Revocation Defense Unit and Special Litigation Unit of the Criminal Practice will have the option of selling back up to five [5] vacation days per calendar year and staff attorneys in the Criminal Appeals Bureau may sell back up to 10 vacation days per calendar year, to be paid at the rate in effect on June 30. Provided during the period July 1, 2004 through June 30, 2005 Staff Attorneys shall not have the right of selling back any vacation time during this year. Staff Attorneys in the Staten Island Criminal Office will be allowed to buy-back up to 17 vacation days per fiscal year minus the number of comp days bought back.

    **§ 2.12.8.**    *Forfeiture.*  Any accrued leave will be waived if not used within six (6) months after the anniversary date.  There will be a grace period for Staff Attorneys who forfeit accrued vacation time as a result of canceled scheduled vacation(s) due to scheduling beyond their control of trials, pre-trial hearings or appellate arguments.

    **§ 2.12.9.**    *Restoration of 1995 Vacation Accruals*.  Effective January 1, 2004, the Society will restore the maximum vacation time accrual to all Staff Attorneys who in 1995 reduced their maximum vacation time accrual.

**§ 2.13.**    **Adoption & Fertility Treatments**.  The Society will create a fund of $300,000 each year in order to offer financial assistance for adoption and the costs not covered by insurance to establish fertility at a maximum reimbursement of $15,000 per attorney.

**§ 2.14.**    *CHILDCARE*.  Management will create a committee to explore the feasibility, cost and potential liability issues regarding the provision of childcare services or a childcare subsidy.

# Article 3/Employment Policy

**§ 3.1.    *FAIR EMPLOYMENT PRACTICES*.**
  **§ 3.1.1.    *Non-Discrimination*.** The Society will continue its policy of not discriminating, as defined by law, against an employee on the basis of actual or perceived race, color, national origin, alienage or citizenship status, religion, creed, sex, gender (including "gender identity" -- which refers to a person's actual or perceived sex, and includes self-image, appearance, behavior or expression, whether or not different from that traditionally associated with the legal sex assigned to the person at birth), disability, age (18 and over), military status, prior record of arrest or conviction, marital status, genetic predisposition or carrier status, sexual orientation, or status as a victim of domestic violence, a sex offense or stalking, or membership in, or association with the activities of, any employee organization. The Joint Union-Management Staff Attorneys Affirmative Action and Diversity Committee provided for herein will establish written procedures to resolve bargaining unit discrimination complaints. Such procedures will include following elements:
  **§ 3.1.1.1.    *Individual Options*.** If both the complainant and the target of the complainant voluntarily agree, they may submit to voluntary mediation. The Joint Union-Management Staff Attorney Affirmative Action and Diversity Committee will recommend to the Attorney-in-Chief a diverse panel of qualified mediators. When investigation of a complaint is required, the investigation will be conducted by the Director of Diversity and Inclusion or outside counsel with appropriation experience and training consistent with EEOC guidance.
  **§ 3.1.1.2.    *Confidentiality*.** Information about the complaint will not be revealed except as required to complete a full and fair investigation and/or to attempt resolution.
  **§ 3.1.1.3.    *Due Process*.** Employees accused of discrimination will have a full and fair opportunity to respond to the accusation. Both accuser and accused will be entitled to representation in the proceeding.
  **§ 3.1.1.4.    *Recommendation*.** Individuals found to have engaged in discriminatory conduct will be disciplined up to and including possible termination.
  **§ 3.1.1.5.    *Retaliation*.** Complainants and witnesses will be fully protected against retaliation.
  **§ 3.1.1.6.    *Alternate Remedies*.** None of the provisions of this mechanism precludes access to other discrimination remedies.
  **§ 3.1.2.    *Affirmative Action*.** The Legal Aid Society will continue to pursue affirmative action and diversity with regard to race, ethnicity, age, gender, sex, sexual orientation and disability and to pursue a truly inclusive workplace where colleagues of diverse backgrounds and lifestyles feel accepted, respected and encouraged to grow professionally. The Society recognizes that, given the high degree of diversity of its client population, it has a responsibility to continue its affirmative action efforts, in accordance with ABA standards, beyond simply meeting traditional utilization measures for the relevant labor pool. The Society will also continue to pursue diversity with respect to skills in languages commonly-spoken by the Society's eligible client population. Diversity will be considered a relevant criterion in hiring and selection decisions. The Joint Union-Management Affirmative Action and Diversity Committee will refine and articulate more specific objectives and strategies through the affirmative action planning process.

§ **3.1.2.1.** *Discussion*.  The Society will consider and respond to the Union's concerns in regard to affirmative action, and the Union will participate in development of the annual Staff Attorneys' Affirmative Action Plan described below.

§ **3.1.2.2.** *Joint Union-Management Staff Attorneys Affirmative Action And Diversity Committee*.  There will be a Joint Union-Management Staff Attorneys Affirmative Action and Diversity Committee consisting of the Attorney-in-Chief, the Attorneys-in-Charge of the Civil, Criminal, and Juvenile Rights Practices, the Society's Diversity Officer, the Society's Chief Human Resources Officer, and another representative of the Society's senior management, and the President of ALAA and six [6] ALAA representatives (including representatives of each Practice, a representative of the Attorneys of Color Caucus of Legal Aid, and the ALAA Affirmative Action Representative).  The Committee will be co-chaired by the Attorney-in-Chief or her designee and the ALAA President or her designee.  The purpose of the Committee is to foster workforce diversity in the bargaining unit, with particular reference to recruitment, retention and promotion of people of color, women, and a diverse staff as described in § 3.1.1.  The Committee will meet on the second Wednesday of each quarter.  The Committee will develop, monitor and evaluate an annual Affirmative Action and Diversity Plan, as described below, which will be the focal point around which these efforts are organized.  Based on the annual plan, the Society will periodically post and maintain Affirmative Action and Diversity data and information on its Website.

§ **3.1.2.3.** *Society Resources*.  The Society will provide staff support for implementation of the Affirmative Action and Diversity Plan, and will maintain one [1] full-time Diversity Officer and appropriate supporting staff, whose principal responsibilities will include affirmative action and diversity.

§ **3.1.2.4.** *Practice Committees*.  Practice Joint Union-Management Staff Attorney Affirmative Action and Diversity committees will be established at the initiative of either party to address concerns unique to the Practice.

§ **3.1.2.5.** *Plan*.  The Society-wide Union-Management Staff Attorney Affirmative Action and Diversity Committee will develop an annual Staff Attorney Affirmative Action and Diversity Plan to foster workforce diversity.  The plan will include the following components:

§ **3.1.2.5.1.** *Statistics*.  The Attorney-in-Chief will timely maintain statistics in a consistent format necessary to support the affirmative action objectives of the Society and the Committee's work.  Statistics will include, but not be limited to, recruitment, promotion and retention profiles for all protected classes as defined under the Federal EEO-1 process as well as other groups included in § 3.1.1.  Data will be collected, retained and reported for each organizational unit and for the bargaining unit as a whole.  This information will be included in each annual Staff Attorneys Affirmative Action and Diversity Plan, will be used as an analytical tool for identifying areas in need of particular attention in that year's plan, and will be used for determining progress relative to prior years' plans.  This information will be regularly distributed and made available to the Union upon request.

§ **3.1.2.5.2.** *Recruitment*.  The Attorney-in-Chief will provide a recruitment plan to comply with the goals of the Committee prior to each recruitment period.  The Affirmative Action and Diversity Plan will include strategies to foster diversity in recruiting for bargaining unit positions.  At a minimum, the Plan will provide for:  1) emphasis in recruiting notices, literature and presentations on affirmative action and workforce diversity as a significant Society value; 2) strategies for expediting job offers as early as possible before January 1, in order to

compete more effectively for highly qualified and highly diverse entering classes; 3) continued diversity of attorneys who participate in the interview and follow-up processes in each practice, with particular emphasis on increasing the participation of attorneys described in § 3.1.1 in interviewing applicants; and 4) broad outreach in selecting locations for special recruitment efforts.

§ 3.1.2.5.3.     _Retention_.  The Affirmative Action and Diversity Plan will include ongoing strategies to recognize and eliminate institutional or personal barriers to retention of a diverse workforce.  The Attorney-in-Chief will report retention data to the Committee, and identify institutional barriers that lead to the attrition of diverse attorneys.  At a minimum, these strategies will include mandatory diversity training or similar programs for attorneys and managers to address the issues listed above.

§ 3.1.2.5.4.     _Promotion_.  The Affirmative Action and Diversity Plan will include strategies to assess and convey supervisory potential of bargaining unit members and to develop their supervisory skills, with special emphasis on reaching attorneys of color, women, and other groups included in § 3.1.1, and on addressing issues of particular concern to their career development.

§ 3.1.2.5.5.     _Vacancies_.  The Society will post and forward to the Union all Staff Attorney and Supervisory vacancies.

§ 3.2.     _Hiring_.  Consistent with the goals and procedures discussed above ("Fair Employment Practices"), each practice will establish a joint Union-Management committee to ensure Staff Attorney participation in regard to Staff Attorney and attorney management hiring.

§ 3.3.     _EMPLOYMENT STATUS_.

§ 3.3.1.     _Probationary Period_.  During the first eight [8] months of employment, the employment relationship will be considered probationary and may be terminated upon one [1] month's notice with a statement of the reason for termination with recourse to the grievance procedure but not to subsequent arbitration.  At the end of four [4], six [6], and eight [8] months of employment, the new attorney must be evaluated by his or her supervisor and receive a written report identifying those areas in which the employee should improve her professional performance. At the end of eight [8] months of employment, the probationary period will end, unless the supervisor, upon written notice to the attorney, extends probation by another four [4] months.  The notice shall identify the particular reasons for the extension, and where appropriate shall identify the particular areas in need of improvement based on the previous evaluations and then-current concerns.  Extension of the probationary period shall be subject to the grievance procedure, but not to subsequent arbitration. The probationary period may be extended a second time only in extraordinary circumstances, such as the excused absence of the probationary employee for such a lengthy period of time that the supervisor is unable to evaluate her.

§ 3.3.2.     _Bar Examination_.  A law graduate will not be discharged solely for a first failure to pass the bar examination.  The Society will provide days off for those taking the bar for a second time, in order to permit participation in the Society-sponsored bar review course, the length and content of which will be determined by the Society in consultation with the Union.  With respect to a law graduate whose employment is terminated because of her second failure to pass the bar examination, one [1] month's notice of termination will be deemed to have been given on the third day following the date on the notice of bar examination results issued to the law graduate by the Board of Law Examiners; provided that, if the third day falls on a Saturday, Sunday or contractual

holiday, then the notice will be deemed to have been given on the next business day that is not a Saturday, Sunday or contractual holiday.  If the law graduate is successful in passing the bar examination on a third attempt, upon admission to the bar she will have recall rights to the job from which she was terminated for one [1] year following her date of termination, subject to hiring needs and conditioned on satisfactory probationary evaluations during her initial tenure.  Staff Attorneys who are rehired after passing the bar examination following termination after two bar failures will be given service credit for each month actually worked as a law graduate prior to termination.

§ **3.3.3.**     *Senior Staff*.  A Senior Staff Attorney may be disciplined or terminated only for "just cause," with recourse to the grievance and arbitration procedures provided in § 1.8.

§ **3.4.**    *LEAVE*.

§ **3.4.1.**     *Illness or Disability*.  The Society will continue full salary for up to ninety [90] days of employment for all attorneys on extended illness or disability.  Thereafter, such attorneys will receive sixty [60] percent of salary up to a maximum of $3,000 per month, or, for attorneys who become disabled on or after January 1, 2001, $4,000 per month, or, for attorneys who become disabled on or after January 1, 2014, $8,000 per month, subject to the terms of the then-current insurance policy, which is incorporated by reference herein and which may be changed only if equivalent coverage and terms are provided.  In accordance with the disability insurance policy, any social security benefit payable when disability occurs will be deducted from the insurance benefit, but the amount of deduction will not be increased because of a subsequent rise in social security benefits.  In order to ensure that long-term disability benefits are paid on a tax-free basis, Staff Attorneys will have the individual option of paying any extra premium for such coverage, provided that this arrangement is cost-neutral to the Society. The Society will not terminate or modify the disability insurance policy during this Agreement without the Union's consent.

§ **3.4.2.**     *Holidays*.  Staff Attorneys will receive the paid holidays of New Year's Day; Martin Luther King Jr., Day; Lincoln's Birthday; Presidents' Day, Memorial Day; Independence Day; Labor Day; Indigenous Peoples' Day; Veteran's Day; Election Day; Thanksgiving Day; Christmas Day, and on such additional days as set forth by the Society.  Indigenous Peoples' Day, the second Monday of October, will be designated as a floating holiday.

§ **3.4.3.**     *Bereavement*.  Staff Attorneys are entitled to paid bereavement leave of five [5] consecutive work days upon death of a Staff Attorney's and/or a qualifying domestic partner's parent, parent-in-law, child, child-in-law, sibling, spouse, grandparent, or domestic partner.  All other bereavement leave will be charged against annual leave.  However, each employee shall also receive an additional ten [10] days of discretionary bereavement leave for the purposes associated with the death of an individual not among the immediate family members listed, or for additional paid time off in association with the death of a listed family member.  These days are to be used exclusively for bereavement purposes and are accrued as follows: five [5] days at the completion of the first year of employment; five [5] additional days upon completion of the fifth year of employment.  Employees may use up to the amount of discretionary leave accrued at the time of the bereavement.  Every ten years of a Staff Attorney's tenure, all exhausted discretionary bereavement leave will be replenished so that the Staff Attorney begins again with a maximum total of ten [days] of discretionary bereavement leave at each ten [10] year interval of tenure.

§ **3.4.4.**     *Leaves of Absence*.  The Society will provide the leaves of absence described below.  Upon written request and payment of the premium by a Staff Attorney, the Society will continue her insurance coverage during such leave.

§ **3.4.4.1.**     *Sabbatical*. After each three [3] years of service, Staff Attorneys may request an unpaid sabbatical leave of absence for up to one [1] year. Sabbatical leaves may only commence on January 1, April 1, July 1, or October 1. A request for a sabbatical leave must be made at least 120 days prior to the proposed commencement date.

§ **3.4.4.1.1.**     *Private Practice*. Staff Attorneys on sabbatical leave may engage in the practice of law when it does not present a legal or funding conflict with the Society, subject to case-specific prior Management approval.

§ **3.4.4.1.2.**     *Return*. Upon her return from sabbatical leave, a Staff Attorney will be paid at the then-current salary level at which she was last employed prior to her leave, unless the Society, in consultation with the Union in regard to criteria and principles, determines that the Staff Attorney's work experience while on leave justifies a higher level. Absent a showing of reasonable necessity by the Society, an attorney will have the right to return to the practice from which she departed.

§ **3.4.4.2.**     *Child Care*. A Staff Attorney may take an unpaid leave of absence for up to ten [10] months for the sole purpose of caring for an adopted or a newborn natural child of the Staff Attorney, or of her same- or opposite-sex domestic partner. When possible, requests for such leave will be submitted at least three [3] months in advance of the approximate starting date of such leave. A pregnant Staff Attorney may elect to use part of such leave prior and contiguous to her pregnancy disability leave.

§ **3.4.4.3.**     *Parental Leave*. Subject to approval as to its legality, any parent of a newborn or newly-adopted child/children or a new step parent of a child/children who resides with the Staff Attorney-parent more than fifty [50] percent of the time, may take up to twelve [12] weeks (60 days, exclusive of paid holidays) of paid parental leave in order to care for and establish a relationship with the child/children. In concept, this leave is provided to assure paid time off during the period immediately following the birth, adoption, etc. Paid parental leave would therefore precede any vacation, comp. time or unpaid leave that the new parent/step-parent may wish to take in connection with the birth, or adoption, etc., and would run concurrently with any disability leave—maternity-related or otherwise—that may be appropriate for either parent during the initial eight [8] week period after the triggering event, exclusive of paid holidays. However, recognizing that individual circumstances may vary, the employee(s) may, in consultation with supervisor(s) involved, use the paid parental leave on a different schedule, provided that (1) it cannot extend beyond the first year after the triggering event; and (2) the total amount of paid time off associated with the commencement of the particular parenting relationship is not increased by the rescheduling. This section fully applies to all the enumerated categories of children of an attorney's domestic partner. For the purposes of adoption the child must be under 21 at the start of the adoption process.

§ **3.4.4.4.**     *Other Leave*. The Society may, in consultation with the Union in regard to criteria and principles, extend or grant leaves for purposes other than those set forth above.

§ **3.5.**     *FREE SPEECH*. The expression of personal religious, political, social or economic beliefs of each and every attorney is fully guaranteed and will never constitute grounds for discharge or relief from an individual assignment unless, in either instance, it can be demonstrated that such expression has, or will, directly interfere(d) with, and detract from, representation of a Society client so as to render said representation less than at the highest level of competence and effectiveness.