# Exhibit A-3

# **Exhibit E**

The Legal Aid Society Tweet and Statement
Endorsing Black Attorneys of Legal Aid Statement



Home

Explore

Notifications

Messages

Bookmarks

Lists

Profile

More

Tweet

← **Thread**



**The Legal Aid Society** ✓ @LegalAidNYC · Jul 27
**LAS Statement on the Critical Need to Acknowledge White Fragility and Organizations to Become Anti Racist**

"To be anti racist to dismantle racism here at LA    we must all recognize that white supremacy drives every policy and law, every opportunity and every advantage "

Janet Sabel and 3 others

♡ 133        ↩ 94        ♡ 191        ⬆

**The Legal Aid Society** ✓ @LegalAidNYC · Jul 27
Read our full statement here  legalaidnyc org/wp content/upl

♡ 7        ↩ 4        ♡ 20        ⬆

**Replies**

**Anaïs Nin** @Kreeevka  Jul 27
Replying to @LegalAidNYC @JanetSabel and 3 others
@boogelymoogely  ** you wanna tell them or should I? 😀
♡        ↩        ♡ 1        ⬆

@haitianfineappl · Jul 28
Replying to @LegalAidNYC @Janet  abel and 3 others
@LSNYCnews y'all have plenty of racists in your top leadership, and among your staff  You should address it too
♡        ↩        ♡ 1        ⬆

**Jim Shorts I/Me/My** @JimShor57847662 · Jul 28
Replying to @LegalAidNYC @Janet  abel and 3 others
Nice *policy* you've developed.
♡        ↩        ♡ 2        ⬆

View more replies

**More Tweets**

**The Legal Aid Society** ✓ @LegalAidNYC · 19h
"They've taken children as young as 12 into interrogation rooms and given these children sodas or food, and even in some cases with children as young as 16 cigarettes and use that as a rouse to collect their DNA," -
@TerriRosenblatt



**Relevant people**

**The Legal Aid Soci**
@LegalAidNYC
The nation's oldest firm for low-income individuals  Making humanity in NYC sir
#publicdefender

**Janet Sabel**
@JanetSabel
Attorney In Chief at former Chief Deputy the Attorney Genera

**Tina Luongo (They**
@TMLuongo
Queer GNC Chief D Criminal Practice of spouse and Baba to and one lazy pitbull

**What's happening**

US elections  10 minutes ago
**Kamala Harris suspends tra after two people close to campaign test positive for COVID-19**
Trending with  Liz Allen

**#BoseFrames**
New sport audio sunglasses.
▣ Promoted by Bose

**etalk** ✓ · Last night
**Tobey Maguire, Andrew Ga may join Tom Holland in ne Spider-Man**

**The Daily Beast** ✓ · 1 hour
**Rupert Murdoch Predicts a Landslide Win for Biden**

US elections · LIVE
**Massachusetts: Election ne updates**

how more

Terms of Service  Privacy Policy
Ads info  More ∨  © 2020 Twitt

**Messages**        





Messages



July 27, 2020

Contact: Alejandra Lopez
The Legal Aid Society
ailopez@legal-aid.org
(917) 294-9348

## ***FOR IMMEDIATE RELEASE***

### *Legal Aid Statement on the Critical Need to Acknowledge White Fragility and Organizations to Become Anti-Racist*

(New York, NY) – The Legal Aid Society released the following statement in response to a recent New York Post Op Ed:

"In a recent New York Post Op Ed, the author, a public defender, takes the position that an anti-racist agenda is a chilling doctrine because it invites discrimination and that the theory of 'white fragility' is a 'small minded book which relentlessly insists all white people are racist and need to think about race all the time.' She denies the existence of structural and institutional racism. Unfortunately, the author is not alone in her view, especially those in public interest. Their position-that by the mere nature of working in public interest and being a public defender you get a pass at looking at your privilege, your role in social dominance and white supremacy. This racist perspective is disgusting and results in Black and Brown people being harmed by individuals in public interest roles, who are entrusted with serving Black and Brown clients and their communities. By virtue of the endemic nature of white supremacy, racism, and anti-Blackness in this country, Black and Brown people are routinely denied access to resources, face state violence, and are exploited by capitalist structures that ensure their marginalization. By ignoring these facts as someone who claims to work in this field, the author shows how they are not only complicit in this system of oppression, but seeks to gaslight communities of color who are vocally demanding change in this country.

As New York City's oldest and largest social justice law firm and the citywide public defender, founded over 140 years ago, we fight for justice for our clients, low income Black and Brown people, day in and day out. In all three of our practice areas, Civil, Juvenile Rights and Criminal Defense, we advocate against and litigate policies and laws that silence and oppress BIPOC and communities of color. Our staff dedicate their entire careers to the service of others. Yet, despite this work and history, despite the dedication and zealous representation, we have not taken on the internal work needed to build a truly anti-racist workplace. The time to change is now and as an organization we are committing to bravely have the much needed, and long overdue, conversations and engaging in the critical dialogue and discourse concerning racism, transphobia, sexism and intersectionality. Our BIPOC staff and clients deserve nothing less.

The mandate is a simple one. To be anti-racist, to dismantle racism here at LAS, and in every organization, we must all recognize that white supremacy drives every policy and law, every opportunity and every advantage. For those of us who are white, it is a recognition that power and privilege has been granted merely because we are white. While you have dedicated your life to public interest, you cannot do this work effectively and fully unless and until you face that reality and own that you are part of the problem. You cannot stop there, you must actively work to dismantle the systems that lend you privilege and oppress BIPOC people and communities. To push against the deep work needed to change and be threatened by the conversation, is the exact definition of white fragility. It exists, it is not simply a way for an author to sell books. It is used to make excuses for behavior, practice and treatment, and it is a tool used to promulgate white supremacy and the subjugation of BIPOC people. White people have a duty to no longer be silent and a responsibility to confront these systems of oppression and to shun all forms of white supremacy in our society, in our workplaces, and within our hearts and minds. Enough is enough."

Janet Sabel, Attorney in Chief and CEO

Adriene Holder, Attorney in Charge, Civil Practice

Dawne Mitchell, Attorney in Charge, Juvenile Rights Practice

Tina Luongo, Attorney in Charge, Criminal Defense Practice

Archana Jayaram, Chief Operating Officer

Scott Rosenberg, General Counsel

Allan Fox, Chief Human Resources Officer

Ciara Walton, Director of Diversity, Equity and Inclusion

Janelle Roundtree, Director of Employee Relations

Lou Sartori, Pro Bono Counsel and Director

###

*The Legal Aid Society exists for one simple yet powerful reason: to ensure that New Yorkers are not denied their right to equal justice because of poverty. For over 140 years, we have protected, defended, and advocated for those who have struggled in silence for far too long. Every day, in every borough, The Legal Aid Society changes the lives of our clients and helps improve our communities.*
*https://www.legalaidnyc.org/*

# **Exhibit F**

Charge of Discrimination

*Maud Maron v. The Legal Aid Society and*
*Association of Legal Aid Attorneys*
EEOC New York District Office

EEOC Nos. 520-2021-02801 and 520-2021-02802

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA | 520-2021-02801 |
| | ☒ EEOC | 520-2021-02802N |

and EEOC

_State or local Agency, if any_

| Name (indicate Mr., Ms., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| Maud Maron | 70b 420-2001 | |

**Street Address**    City, State and ZIP Code

c/o Randazza Legal Group, PLLC, 100 Pearl St., 14th Floor, Hartford, CT 06103

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| The Legal Aid Society | 15+ | 212-577-3300 |

**Street Address**    City, State and ZIP Code

199 Water Street      New York, NY 10038

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Association of Legal Aid Attorneys | 15+ | (212) 343-0708 |

**Street Address**    City, State and ZIP Code

50 Broadway, Ste. 1600, New York, NY 10004

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE   ☒ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN

☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION

☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: July 26, 2020    Latest: Dec. 1, 2020

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See Attachment and accompanying exhibits.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – When necessary for State and Local Agency Requirements

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

1/16/2021

Date      Charging Party Signature

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

_____ and EEOC

_State or local Agency, if any_

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet)

See attached.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – When necessary for State and Local Agency Requirements

I declare under penalty of perjury that the above is true and correct.

1/16/2021

Date

Charging Party Signature

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

**BEFORE THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

```
----------------------------------------------------------x
                                          :
MAUD MARON,                               :
                                          :
        Complainant,                      :        ATTACHMENT TO CHARGE OF
                                          :             DISCRIMINATION
        - against –                       :
                                          :
THE LEGAL AID SOCIETY and                 :
                                          :
ASSOCIATION OF LEGAL AID
  ATTORNEYS,


        Respondents.

----------------------------------------------------------x
```

In support of her Charge of Discrimination against Respondents The Legal Aid Society ("LAS") and the Association of Legal Aid Attorneys ("ALAA" and, collectively, "Respondents"), Complainant, Maud Maron ("Complainant" or "Ms. Maron"), hereby sets forth the particulars of her claims for discrimination on the basis of race, including hostile work environment and constructive termination.

**1.0     PARTIES**

1. Complainant, Maud Maron, who is Caucasian, was employed at all relevant times herein by Respondent LAS as a Staff Attorney and is a member in good standing of the ALAA union. At all relevant times herein, Complainant was an employee of LAS within the meaning of 42 U.S.C. § 2000e(f).

2. Respondent The Legal Aid Society is a not-for-profit corporation organized under the laws of the State of New York, and is headquartered at 199 Water Street, New York, NY 10038. At all relevant times herein, LAS employed more than 15 persons and is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

1

3.  Respondent Association of Legal Aid Attorneys is a labor organization, being Local 2325 of the United Auto Workers, headquartered at 50 Broadway, Suite 1600, New York, NY 10004, and is a "labor organization" within the meaning of 42 U.S.C. § 2000e(d) & (e), and has fifteen or more members.  In accordance with the Certificate of Representation issued by the New York State Labor Relations Board on December 30, 1969, LAS recognizes ALAA as the exclusive bargaining representative of all attorneys admitted to practice and within the scope of the bargaining unit definition in the said certification and of all law graduates employed as such by LAS, *i.e.* Staff Attorneys.

## 2.0    JURISDICTION

4.  The Equal Employment Opportunities Commission has jurisdiction over the Charge pursuant to 42 U.S.C. § 2000e-5.

## 3.0    FACTS GIVING RISE TO CHARGE

5.  Complainant is a 1998 graduate of the Cardozo School of Law whose principal legal career has been as a public defender with The Legal Aid Society, first from 1998-2006 and again from 2017.  She has served as staff attorney and as the Director of Training.  Additionally, from 2011 to 2015, Ms. Maron, at the repeated invitation of The Legal Aid Society, served as a faculty lecturer at the Society's Trial Advocacy Programs.

6.  Complainant is presently on sabbatical.

7. Ms. Maron is a committed public defender and strongly believes in the need for police reform and criminal justice reform, and she had been an advocate for the disadvantaged and disenfranchised of all backgrounds.

8. Ms. Maron is a candidate for the New York City Council.

9. As espoused in Complainant's platform, she seeks to protect communities from hate crimes and prejudice, and she desires police and prosecutorial reforms to address bias in both law enforcement and prosecution.

10. Ms. Maron was subjected to harassment for her political beliefs and exercise of her free expression in 2019 when Rigodis Appling, an attorney at LAS, wrote to Ms. Maron via an office-wide email, which was filled with disparaging remarks.

11. At the close of 2019, politically motivated members of the Black Attorneys of Legal Aid ("BALA") caucus of Association of Legal Aid Attorneys ("ALAA") initiated a baseless investigation into Ms. Maron.

12. Ms. Maron was informed of the 2019 investigation by Tina Luongo, the Attorney-in-Charge of the Criminal Defense Practice of LAS, via electronic mail.

13. Ms. Maron's entire caseload was reviewed, and her three supervisors were interviewed with respect to her work as a public defender.

14. None of Complainant's supervisors identified any concern with regard to the quality or nature of Ms. Maron's client representation. She was fully cleared. The investigation was unfounded.

15. At a January 13, 2020 meeting attended by Ms. Maron and her ALAA representative, Julie Sender, Ms. Luongo communicated the full clearance to Ms. Maron.

FEOG NY DISTRICT OFFICE
DATE 01/19/2021

16. In addition, Ms. Luongo acknowledged that the same attorneys who initiated the baseless investigation would "leak" information to the press in an effort to damage Ms. Maron's City Council campaign.

17. At that time, Ms. Maron requested that The Legal Aid Society release a statement confirming that Ms. Maron was an attorney in good standing with the organization and that any statements or assertions to the contrary were baseless "if" the fact of an investigation were leaked.

18. Thereupon, Ms. Luongo interrupted Ms. Maron and said, "No, IT WILL be leaked".

19. Ms. Luongo then agreed to Ms. Maron's request that The Legal Aid Society would release a statement acknowledging Ms. Maron's exemplary record of service when the fully anticipated and acknowledged attempt to smear her arose in the press.

20. LAS failed to release the promised statement.

21. On June 23, 2020, Ms. Maron's opinion piece, "Racial obsessions make it impossible for NYC schools to treat parents, kids as people" was published by the New York Post.[1]

22. A copy of that opinion piece is attached as Exhibit A.

23. In the opinion piece, Ms. Maron identified herself as a public defender, but she made no mention of The Legal Aid Society and, importantly, her article discussed an experience at a training with the Department of Education, unrelated to her employment.

24. In the opinion piece, Ms. Maron spoke against having to refer to herself by her racial identity as part of the so-called "anti-bias" training.

---

[1] Available at https://nypost.com/2020/07/23/racial-obsessions-make-it-impossible-for-nyc-schools-to-treat-parents-kids-as-people/

25. Ms. Maron noted that, in the training, race-neutral attributes, like "objectivity" were, oddly, labeled as part of "white-supremacy culture", tied to material that labels all white people as racist.

26. The opinion piece was published after her testimony before the City Council and an interview with Nikole Hanna-Jones, all of which focused on inclusivity and diversity of thought in the public schools.

27. Although the opinion piece was unrelated to Ms. Maron's work at LAS, the ALAA, acting through its BALA caucus issued a statement regarding Ms. Maron, her interview with Ms. Hannah-Jones, and the article, which they published on July 26, 2020. See Exhibit _B.[2]

28. Thereupon, LAS's official, verified Twitter account, @LegalAidNYC, retweeted the BALA publication without any commentary. See Exhibit E.

29. The statement of BALA, which was endorsed without reservation by The Legal Aid Society, contains numerous falsehoods and defamatory statements. Without limitation, those include:

   i.   "she pretends to favor integration while fighting against it and denying the existence of racism in education". Ms. Maron does not oppose integration and she has never denied racism exists in any context.

   ii.   Repeatedly refers to Ms. Maron as "racist". Ms. Maron denies this and opposing racist "anti-bias" training is not itself racist if words continue to have meaning.

   iii.   "no public defender can legitimately claim to be a proponent of racial justice if they are lax in how they do the work; and we know for a fact that Maud's commitment to zealous representation of poor people of color is questionable at best." Ms. Maron's work has never been lax nor her commitment questionable. As set forth above, Ms. Maron was cleared of this very same baseless accusation on January 14, 2020.

---

[2]   Available at https://twitter.com/BALA_NYC/status/1287572951525666820?s=20 and https://www.facebook.com/BlackAttorneysofLegalAid/posts/122693346182422

iv.    Ms. Maron did not call the educational points raised "chilling", but rather the inaptly named "anti-racism" training doctrine, which is, in fact, rooted in racism.

v.    "she religiously advances a false dichotomy between an adequate education and a culturally inclusive education." This statement is entirely disingenuous as her actual City Council testimony was to the opposite. [3]

vi.    "Maud's argument: the problem isn't racism, but a 'culture of laziness and stupidity among African Americans and Hispanic Americans.'" Ms. Maron has never made this argument and finds it repugnant. Ms. Maron is married to a Hispanic immigrant and she takes deep offense at the wholly fictitious characterization of her views.

vii.    "Maud can tell the world about the mobs she sent after Teens Take Charge". Although they are active on social media and called for her resignation, Ms. Maron has had no interaction with Teens Take Charge and no mobs were sent.

viii.    "She does not use racial slurs in discourse. At least not publicly." The implication that Ms. Maron does so privately is false.

ix.    "Maud is racist, and openly so. She attacks efforts to end racism by claiming there is no racism." Ms. Maron has never made any such claim.

x.    It compares her involvement with PLACE NYC (Parent Leaders for Accelerated Curriculum Education in NYC) to the 1960s group PAT ("Parents and Taxpayers"), yet omits that PLACE is co-chaired by two individuals of color.

xi.    It says she has "no regard for" her clients, which lacks any basis in reality.

xii.    "She is one of many charlatans who took this job not out of a desire to make a difference, but for purposes of self-imaging." This is false—The Legal Aid Society has been her primary employer since graduation from law school in 1998, after having interned there while a law student.

xiii.    "You cannot oppose anti-racism and effectively represent Black and Brown people. It's impossible." Ms. Maron opposes a racist ethos that falsely brands itself "anti-racism". Her representation of all of her clients, including but not limited to people of color, has always been exemplary.

30. The Statement BALA wrote, and The Legal Aid Society endorsed "Maud Maron has no

business having a career in public defense, and we're ashamed that she works for the

Legal Aid Society" in connection with asserting she opposes actual anti-racism,

---

[3]    Ms. Maron's testimony is available online at: https://www.youtube.com/watch?v=7xfu9mvwPvE

constitutes a major gouge in her professional reputation and, for all intents and purposes, terminated her employment in violation of § 1.8.4 of the governing collective bargaining agreement. See Exhibit C.

31. Ms. Maron is currently promised a return from sabbatical pursuant to § 3.4.4.1.2 of the agreement, but The Legal Aid Society has made it impossible for her to do so.

32. The Legal Aid Society also violated the guarantee of free speech per § 3.5, constructively terminating Ms. Maron for her express on personal political and social beliefs without evidence that her speech has or will directly interfere with and detract from the representation of her clients.

33. An employer who says, publicly, it is ashamed she works there and has no business working there, is not an employer any reasonable person could be expect to work for.

34. Such a statement is a violation of § 4.11.2 of the collective bargaining agreement.

35. Not only was ALAA the author and publisher of the BALA statement, it failed to advocate for Ms. Maron in response to LAS's aforesaid violations of the Collective Bargaining Agreement

36. On July 27, 2020, The Legal Aid Society issued its own statement in response to Ms. Maron's article, which utterly misrepresented the content of her article. See Exhibit D.[4]

37. This statement was signed the leadership of The Legal Aid Society.

38. The Legal Aid Society's own statement contains numerous false and defamatory statements.

---

[4] Available at https://twitter.com/LegalAidNYC/status/1287873491232989185?s=20 and https://t.co/YEVPGbHnMS?amp=1 .

39. These statements lambaste Ms. Maron on account of her race and/or color, creating a

hostile work environment. Without limitation, these include:

i. Ms. Maron "takes the position that an anti-racist agenda is a chilling
doctrine". This is false; she takes the position that using the name 'anti-racism' as
cover for overtly racist practices, such as those at the Dept. of Education's "anti-
bias" training, is chilling.

ii. "She denies the existence of structural and institutional racism." Ms. Maron
denies no such thing and opposes structural and institutional racism.

iii. It says that she views working as a public defender as a "pass" for "white
supremacy" and has such a "disgusting" "racist perspective" that harms her
clients of color. Ms. Maron has no such view and has never harmed her clients,
no matter the color. The Legal Aid Society, as noted above, specifically cleared
her of this baseless accusation previously.

iv. "By ignoring these facts as someone who claims to work in this field, the author
shows how they are not only complicit in this system of oppression, but seeks to
gaslight communities of color who are vocally demanding change in this
country." Ms. Maron has ignored none of the racism her clients experience
and herself vocally demands change.

v. "we have not taken on the internal work needed to build a truly anti-racist
workplace." This statement falsely asserts Ms. Maron is racist and is racist in the
workplace.

vi. "While you have dedicated your life to public interest, you cannot do this work
effectively and fully unless and until you face that reality and own that you are
part of the problem." Ms. Maron has always worked effectively, irrespective of
her race.

40. By making these statements and republishing ALAA/BALA's statements,[5] The Legal

Aid Society has damaged Ms. Maron, including harassment on the basis of race

and/or color in the workplace and constructively terminating her employment.

---

[5] Complainant anticipates LAS will asset it is not liable for retweeting BALA's statement
pursuant to Section 230 of the Communications Decency Act, 47 U.S.C. § 230. Although some
circuits have determined that Section 230 can immunize against civil rights claims, this remains
an open question in the Second Circuit. Moreover, it does not apply—Section 230 immunizes
for republication of content from a third-party. Here, the ALAA/BALA members are LAS's
own employees, and the retweet demonstrates that the statement was in the course and scope of

41. The misconduct of The Legal Aid Society has also violated § 3.1.1 of the governing collective bargaining agreement. Since BALA is a unit of the ALAA, the ordinary grievance procedure has been rendered unavailable to Ms. Maron. The Legal Aid Society denied Ms. Maron the due process to which she is entitled under § 3.1.1.3 and failed to maintain confidentiality under § 3.1.1.2.

42. Complainant has suffered damage to her reputation on account of the statements of ALAA, acting through its BALA caucus, which constitutes harassment on the basis of race and/or color in the workplace.

**4.0 Claims of Discrimination**

COUNT I
HOSTILE WORK ENVIRONMENT AGAINST LAS

43. Complainant restates and realleges the allegations of Paragraphs 1-41 above as if fully set forth herein.

44. At all relevant times herein, Complainant was employed by LAS.

45. The statement of ALAA/BALA was permeated with discriminatory intimidation so severe as to alter the conditions of Complainant's workplace.

46. By republishing the statement of ALAA/BALA, LAS created a hostile work environment for Complainant, discriminating against her on the basis of her race and/or color in violation of 42 U.S.C. § 2000e-2(a)(1).

---

their employment. Thus, the statement was not provided by "another information content provider" under 47 U.S.C. § 230(c)(1). See *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 276 (S.D.N.Y. 2016) (denying motion to dismiss under Section 230 where alleged agent was the source of the allegedly offending content).

47. The July 27, 2020 statement of LAS was permeated with discriminatory intimidation so severe as to alter the conditions of Complainant's workplace.

48. The Legal Aid Society's own statement highlights that it was directed to employees, specifically Ms. Maron, "who are white…because we are white", indicates Ms. Maron's article "is the exact definition of white fragility" and "is a tool used to promulgate white supremacy", imposing a special "duty" on "[w]hite people".

49. By publishing its July 27, 2020 statement, LAS created a hostile work environment for Complainant on the basis of her race and/or color, discriminating against her on the basis of her race and/or color in violation of 42 U.S.C. § 2000e-2(a)(1).

50. As a proximate result of these violations, Complainant suffered harm to her reputation, emotional distress, and will likely have a loss of future income.

COUNT II
HOSTILE WORK ENVIRONMENT AND DISCRIMINATION AGAINST ALAA

51. Complainant restates and realleges the allegations of Paragraphs 1-41 above as if fully set forth herein.

52. At all relevant times herein, Complainant was a member of ALAA, which represented her relative to her employment with LAS.

53. As a caucus of ALAA, BALA acts on behalf of ALAA and did so when issuing the aforementioned statement.

54. The statement of ALAA/BALA was permeated with discriminatory intimidation so severe as to alter the conditions of Complainant's workplace.

55. In making its statement, ALAA created a hostile work environment for Complainant, discriminating against her on the basis of her race and/or color in violation of 42 U.S.C. § 2000e-2(c)(1).

56. By permitting LAS to retweet its statement, ALAA caused LAS to discriminate against Complainant in violation of 42 U.S.C. § 2000e-2(c)(3).

57. The July 27, 2020 statement of LAS was permeated with discriminatory intimidation so severe as to alter the conditions of Complainant's workplace.

58. The Legal Aid Society's own statement highlights that it was directed to employees, specifically Ms. Maron, "who are white…because we are white", indicates Ms. Maron's article "is the exact definition of white fragility" and "is a tool used to promulgate white supremacy", imposing a special "duty" on "[w]hite people".

59. By causing LAS to make its July 27, 2020 statement, ALAA caused LAS to discriminate against Complainant in violation of 42 U.S.C. § 2000e-2(c)(3).

60. As a proximate result of these violations, Complainant suffered harm to her reputation, emotional distress, and will likely have a loss of future income.


COUNT III
CONSTRUCTIVE TERMINATION AGAINST LAS

61. Complainant restates and realleges the allegations of Paragraphs 1-41 above as if fully set forth herein.

62. At all relevant times herein, Complainant was employed by LAS.

EEOC NY DISTRICT OFFICE
DATE 01/19/2021

63. By republishing the statement of ALAA/BALA and publishing the July 27, 2020 statement, LAS has made Complainant's working conditions so intolerable that she will not be able to return from her sabbatical.

64. The two statements were made on account of Complainant's race and/or color.

65. Combined, the two statements publicly state that Ms. Maron is unable to effectively represent her clients of color, interfering with many, if not most, of her attorney-client relationships.

66. Thus, LAS has constructively terminated Complainant's employment in violation of 42 U.S.C. § 2000e-2(a)(1).

67. As a proximate result of this violation, Complainant suffered harm to her reputation, emotional distress, and will likely have a loss of future income.

/

/

/

/

/

/

/

/

/

/

/

/

**5.0**     <u>**Prayer for Relief**</u>

WHEREFORE Complainant respectfully requests that the Commission:

a) Declare that ALAA has violated Title VII of the Civil Rights Act;

b) Declare that LAS has violated Title VII of the Civil Rights Act;

c) Enjoin ALAA, including its BALA caucus, and LAS from engaging in further race-
and color-based discrimination against Complainant;

d) Award Complainant compensatory, punitive, and nominal damages;

e) Award Complainant her reasonable attorneys' fees and costs.


Dated:  January 12, 2021

Respectfully submitted,
MAUD MARON,
By her Attorneys,

Jay M. Wolman
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
(978) 801-1776
Fax: (305) 437-7662

Marc J. Randazza
Randazza Legal Group, PLLC
30 Western Avenue
Gloucester, MA 01776
(978) 801-1776
ecf@randazza.com

13

# EEOC NY DISTRICT OFFICE
# DATE 01/19/2021

## VERIFICATION

I declare under penalty of perjury that the above is true and correct.

Dated:   1/16/2021

_Maud Maron_

Maud Maron

-OR-

I swear or affirm that I have read the charge and the foregoing document and that it is true to the best of by knowledge, information and belief.

Dated:

Maud Maron

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE                    , 202_.

NOTARY PUBLIC

EEOC NY  DISTRICT OFFICE
DATE 01/19/2021

# **EXHIBIT A**

**OPINION**

# Racial obsessions make it impossible for NYC schools to treat parents, kids as people

By Maud Maron
July 23, 2020 | 7:51pm | Updated



The Tweed courthouse building today houses the city Department of Education.
Christopher Sadowski

I am a mom, a public defender, an elected public-school council member and a City Council candidate. But at a city Department of Education anti-bias training, I was instructed to refer to myself as a "white woman" — as if my whole life reduces to my race.

Those who oppose this ideology are shunned and humiliated, even as it does nothing to actually improve our broken schools.

Though facing severe budget cuts, the DOE has spent more than $6 million for the training, which defines qualities such as "worship of the written word," "individualism" and "objectivity" as "white-supremacy culture."

The administration, and many local politicians, buy into a benign-sounding but chilling doctrine called anti-racism, which - insists on defining everyone by race, invites discrimination and divides all thought and behavior along a racial axis.

Many of the theories trace to "White Fragility," a steaming hot book which relentlessly insists all white people are racist and need to think about race all the time. Conveniently for its author, who charges $6,000 an hour to discuss this conundrum, there is no way to fix the situation … except with more of her expensive workshops.

I was personally exposed to the pitfalls of this ideology after New York Times writer Nikole Hannah-Jones asked to interview me. She had heard me testify at a City Council hearing, where I said, "Parents who disagree with [Chancellor Richard Carranza] should not have to be called racist all the time."

Our interview lasted 90 minutes and covered a range of topics, but she and others in the toxic Twittersphere took offense at my suggestion to listen to other parents' viewpoints, "even if you think it's racist." That bit was snipped out of a much longer answer about the importance of integration efforts and the role of school choice.

Naturally, the Twitter mobs descended on me.

After I explained my thinking and provided context on Twitter, Hannah-Jones tweeted in response that it was "disingenuous" of me to refer to specialized high schools as "majority people of color," when they are actually "Asian."

Her casual dismissal of Asians as not being people of color infuriated many who viewed her comment as racist. Nevertheless, she is a public-school parent, and she should be invited to the table to continue to discuss her concerns about her daughter's education, even though many people think her words are evidence of her racism.

See how that works?

There are some who are much more interested in casting aspersions than doing the hard work of building alliances to achieve the important shared goal of fixing our schools. And they need fixing.

> **SEE ALSO**
> **Obscene federal 'diversity training' scam prospers — even under Trump**

In 2019, only 46 percent of students were proficient in math and 47 percent in English Language Arts. For black students, who struggle the most, those numbers drop to 28 percent and 35 percent, respectively. Only 75 percent graduate high school.

Yet the race-obsessed account of education reform persists. The state Department of Education is funding school districts to develop and implement integration plans based on the theory that integrated schools raise the academic proficiency of all the students.

But the endeavor has its skeptics. At one community forum, a Chinese-American parent shared that she transferred her child from a majority-white school to a less affluent, mostly Asian school, where she believed the students are "better behaved and work harder." She told me, "I don't think sitting next to white kids is important for learning." Then she added: "No offense, Maud." Which made me laugh and made me think.

I want more integrated schools, regardless of whether integration is an academic booster. Diverse classrooms have beautiful gifts to bestow, wholly separate from the crude metric of increased test scores. But we have to think through all this with nuance, not by vilifying some parents or setting parents against each other.

We all want a well-integrated, high-quality public-school system. Parents have the right to demand an education that prepares their children to meet or exceed grade-level expectations, which in America often lag other countries.

Those who yell the loudest about integration should stop the accusations against those who think or speak differently than they do about the shared goal of integrated, quality schools — and find ways to work together.

*Maud Maron is a public-school parent and the president of Community Education Council District 2.*

EEOC NY, DISTRICT OFFICE

DATE 01/19/2021

FILED UNDER   CITY COUNCIL, DEPARTMENT OF EDUCATION, RACIAL TRAINING, 7/23/20



RECOMMENDED   1/5

The perilous side-effects of banning evictions mean it
can't go on forever

Read More

EEOC NY. DISTRICT OFFICE
DATE 01/19/2021

# EXHIBIT B




**Tweet**

 **BlackAttysofLegalAid** @BALA_NYC · Jul 26, 2020

"You cannot oppose anti-racism and effectively represent Black and Brown people. It's impossible." @MaudMaron has no business having a career in public defense, and we're ashamed that she works for the Legal Aid Society.



 34    ⟲ 110    ♡ 274    ⬆

**Replies**

 **Anaïs Nin** @Kreeevka · Jul 27, 2020
Replying to @BALA_NYC and @MaudMaron
Thank you for this! Maud isn't the only racist, exclusionist hiding behind the "But I work for Legal Aid! I can't possibly be a racist or trans/homophobic!" The tippy brass of the organization has a serious problem with their executive suite as well. I hope they're exposed…

⟲ 2    ♡ 7

**Young People of Color Inc.** @YoungPplofColor · Jul 27, 2020
Replying to @BALA_NYC and @MaudMaron
Thank you so much for making this plain. She has no business serving our children as a community education council president either and she is unfit to run for city council much less win. @ofdc_nycschools @nycpa @DOEChancellor @NYCSchools @FACENYCDOE @galeabrewer @LegalAidNYC

⟲ 1    ⟲ 5    ♡ 21

**The New Three Rs** @TheNew3Rs · Jul 27, 2020
Replying to @BALA_NYC and @MaudMaron
Thank you for protecting Black and Brown children from Maude and her associates.

⟲ 1    ♡ 7

View more replies

**More Tweets**

 **Minda Harts** ✓ @MindaHarts · Jan 10
I go hard for WOC & Black women in the workplace because we have to work w/ people who stormed the capitol. Many are our managers and leaders, and those who weren't there donate money. These are the same people who you try and say don't mean any harm when we tell you it's racism.



**Relevant people**

 **BlackAttysofLegalAid**
@BALA_NYC
Find us on Instagram
Facebook:
Facebook.com/blac...
LinkedIn: Black Atto...

 **Maud**
@MaudMaron
Unrepentant free th...
beautiful kids, publi...
Candidate for City C...
ardent believer in al...
#downtowntogethe...

**What's happening**

US elections · LIVE
House Democrats unveil ar...
impeachment against Trum...

#GMExhibitZero
We are at an inflection point.
invited.
⬆ Promoted by General Motors

Trending in United States
**Hugh**
19.8K Tweets

Politics · Trending
**House GOP**
103K Tweets

In memoriam · 25 minutes ago
**Las Vegas Sands CEO Sheld...
Adelson dies at 87**
Trending with Sheldon Adelson

Show more

Terms of Service   Privacy Policy
Ads info   More •••   © 2021 Twitt...

 **Jay Marshall Wolman**
@wolmanj

**Messages**




**BALA - Black Attorneys of Legal Aid**
@BlackAttorneysofLegalAid · Labor Union

Send Message

Home    About    Photos    Videos    More ▾                    Like

BALA - Black Attorneys of Legal Aid
July 26, 2020

The Black Attorneys of Legal Aid caucus (BALA) is a group of Black Legal Aid attorneys committed to advocating for racial justice and equality both within and without the Legal Aid Society. We recently learned of an op-Ed published by Maud Maron, a person we are ashamed to call our colleague, in the right-wing paper The New York Post. Maud is better known as a prominent opponent of equality in New York City's school system; she pretends to favor integration while fighting against it and denying the existence of racism in education. Up until now, our caucus has quietly shown support to groups that have spoken out against Maud's racist views. However, we now feel compelled to publicly respond to Maud's recent anti-racism phlippic, and to denounce Maud as the racist that she is.

It comes as no surprise to us that Maud opens the piece by informing readers that she is a public defender. In fact, she is quick to announce this on her website and in many of her communications on social media, in print, and in person. This speaks to a common myth among many white practitioners that being public defenders preclude them from being racist. Racism is a centuries-old system in this country, the effects of which cannot possibly be wiped away simply by joining the profession of indigent defense. Further, no public defender can legitimately claim to be a proponent of racial justice if they are lax in how they do the work; and we know for a fact that Maud's commitment to zealous representation of poor people of color is questionable at best. Nonetheless, it is important for Maud to announce that she is a public defender; in her mind, it undermines the criticisms rightly leveled against her.

One need not go too far into Maud's diatribe to see that her views on racism are problematic. She characterizes the idea of anti-racism as "a benign-sounding but chilling doctrine." Predictably, her definition of anti-racism is bereft of any substance. The reality is that recognizing racial inequalities and the systems that perpetuate them, and taking action to correct them. Within the field of education, that includes a fairer distribution of finite resources across all schools; it includes increased representation of traditionally underrepresented racial groups and cultures, both in the curriculum and in standardized assessments; and it includes increased diversity of teaching staff and student bodies, which integration helps to accomplish. That Maud finds this to be "chilling" tells true racial advocates all they need to know: she's racist, and wants the school system—which holds the honors of being the most segregated in America—to remain unequal.

Last December, a couple of our members had the opportunity to attend a meeting of the Community Education Council District 2, the school board that Maud is the president of. During a question and answer period, a father and young son—both white—got up and took the board to task, chastising them for "being violent towards" other racial groups, and then denying and demanding to know when integration would finally become a reality in their district. The responses to their repeated questions were expectedly nonresponsive; but it was indeed noteworthy to us that Maud, the council president, was absolutely quiet during the entire exchange. For us, her silence spoke volumes. With no cameras flashing, no reporters, no members of the press seemingly in attendance, Maud had no reason to pretend. If you are a proponent of making New York City's school system more racially equitable, Maud has nothing to say to you.

In the press, however, Maud feigns herself to be supportive of integration. Even as she gleefully asserts that local integration efforts "has its skeptics," she professes to want more integrated schools. Putting her poor act aside, it is telling that she religiously advances a false dichotomy between an adequate education and a culturally inclusive education. One does not have to choose between the two; children can be properly instructed in an educational environment that fosters diversity, inclusion and equity. Maud's insistence in treating the two as mutually exclusive allows her to paint her critics in the eyes of the right-wing press as lunatics who prioritize playing the race card over quality education. It's an illegitimate argument, but nevertheless persuasive to many in this city.

Maud throws out statistics in her op-Ed about poor performance among Black students, but unsurprisingly offers no explanation as to the cause. However, racism certainly could not be the culprit because, as Maud has frequently highlighted, Asian Americans have allegedly outperformed all other racial groups. Yes, the model minority myth is essential to Maud's argument: the problem isn't racism, but a "culture" of laziness and stupidity among African Americans and Hispanic Americans. This argument, however, invalidates the very distinct experiences of nonwhite groups in this country. Racial groups have been treated differently in America, so because one group may be unaffected by a problem does not discount the presence of racism. We're not aware of statistics that show Asian Americans being disproportionately killed by the police; does that mean that police brutality is not a racial issue? Of course not.

Maud complains about the "Twitter mobs" that came after her following her interview with New York Times journalist Nikole Hannah-osere. Oh, how the pot calls the kettle black: maybe Maud can tell the world about the mobs that she deployed when Teens Take Charge, a multiracial student-led organization fighting to integrate New York City schools. In a Twitter attack in May, the mob stated, "Our public education shouldn't be HIJACKED by special interest groups. It's time to listen to real NYC parents," signed "Thousands of Real Parents." That's right, folks: a group of adolescents that wish to make Brown v. Board of Education a reality in their city is a "special interest group" to Maud and her cronies.

Or perhaps Maud can tell us about the mobs she sent after Aaron Narraph, a young college student of color. Aaron put together a spreadsheet of City Council candidates of his own volition and included notes on some of the candidates, listing "socialist" under some and "declared, but not filed" for others. For Maud, he wrote, "racism allegations." Regardless of whether or not Maud is racist, allegations of racism were in fact made against her, so what Aaron wrote was true. Of course, what mattered most to Maud was not stop the smear campaign; she encouraged both Aaron and his employer and accusing him of making "baseless charges" about her. She then assailed him publicly for daring to call her out; and then her circle of equally narrowminded friends have been attacking him on Twitter bitterly enough that he thought about deleting his account. This past Friday, our caucus took to Twitter to call out Maud for her Post op-Ed; apparently, we too are now a target of her pack of internet bullies.

Maud is a classic example of what 21st century racism looks like. She does not parade around the city in white sheets. She does not use racial slurs in discourse, at least not publicly. Times have changed; overt racism is no longer publicly acceptable. The new racism of today is to pretend that racism is largely non-existent, confined to a few bad apples that utter statements clearly offensive to even the most ignorant among us. Its adherents pay thin lip service to the cause of racial justice, but refuse to recognize the central role that racism has historically played and continues to play now. To do so requires them acknowledging the undue privilege society has conferred upon them, a privilege they are hard-pressed to give up for the sake of true equality. They distort and pooh-pooh efforts to deal with racial inequality and seek to shut down conversations on the topic; ironically by accusing racial equity proponents of trying to silence them. And at the end of the day, all fluff aside, the statements they make and the positions they take evidence their belief in white superiority as well as Black and Brown inferiority.

It is obvious to anyone with any sense of racial justice that Maud is racist, and openly so. She attacks efforts to end racism by claiming there is no racism. And as usual, this is not new: when efforts were made to desegregate NYC public schools in the 1960s, a coalition of mostly white parents called "Parents and Taxpayers" (PAT) was formed to resist those efforts. This coalition professed in speech to be in favor of integration while fighting against it in action. Those efforts were obviously successful, because the school system remains segregated. Now, Maud is a central member of a modern-day coalition called "Parent Leaders for Accelerated Curriculum and Education" (PLACE). Like PAT five-plus decades ago, PLACE professes to be for racial equality in education while fighting to keep the mechanisms that reinforce inequality intact.

It also comes as no surprise to us that Maud's op-Ed was published in the same tabloid that singlehandedly contributed more to the recent pretrial reform rollbacks than any other local publication. It was only a decade ago that this same publication likened then-President Barack Obama to a chimpanzee in a cartoon. Its coverage of stop-and-frisk and other issues related to racism has been similarly abysmal. In short, The New York Post is no friend of Black Americans, and neither is Maud.

What makes this all the more sickening is that Maud is a public defender, tasked with representing a constituency she clearly has no regard for. She is one of many charlatans who took this job out of a desire to make a difference, but for purposes of self-imaging. Her constant invocations of her public defender position is neither accidental nor pointless. She's asserting to whomever will listen that she is a credible, unbigoted voice by virtue of the work she has allegedly done, representing poor people of color in a judicial system she would likely agree is racist. The only thing more shameful is that she has a following, and a powerful, well-connected following at that.

In closing, one of our genuinely dedicated colleagues said it best: "You cannot oppose anti-racism and effectively represent Black and Brown people. It's impossible." Maud Maron has no business having a career in public defense, and we're ashamed that she works for the Legal Aid Society.



♥ 11                                    8 Shares

   Like          Comment          Share

Write a comment...

# FEOG NY DISTRICT OFFICE
# DATE 01/19/2021

The Black Attorneys of Legal Aid caucus (BALA) is a group of Black Legal Aid attorneys committed to advocating for racial justice and equality both within and without the Legal Aid Society. We recently learned of an op-Ed published by Maud Maron, a person we are ashamed to call our colleague, in the right-wing paper The New York Post. Maud is better known as a prominent opponent of equality in New York City's school system; she pretends to favor integration while fighting against it and denying the existence of racism in education. Up until now, our caucus has quietly shown support to groups that have spoken out against Maud's racist views. However, we now feel compelled to publicly respond to Maud's recent anti-racism philippic, and to denounce Maud as the racist that she is.

It comes as no surprise to us that Maud opens the piece by informing readers that she is a public defender. In fact, she is quick to announce this on her website and in many of her communications on social media, in print, and in person. This speaks to a common myth among many white practitioners that being public defenders preclude them from being racist. Racism is a centuries-old system in this country, the effects of which cannot possibly be wiped away simply by joining the profession of indigent defense. Further, no public defender can legitimately claim to be a proponent of racial justice if they are lax in how they do the work; and we know for a fact that Maud's commitment to zealous representation of poor people of color is questionable at best. Nonetheless, it is important for Maud to announce that she is a public defender; in her mind, it undermines the criticisms rightly leveled against her.

One need not go too far into Maud's diatribe to see that her views on racism are problematic. She characterizes the idea of anti-racism as "a benign-sounding but chilling doctrine." Predictably, her definition of anti-racism is way off base. Anti-racism is about recognizing existing racial inequalities and the systems that perpetuate them, and taking action to correct them. Within the field of education, that includes a fairer distribution of finite resources across all schools; it includes increased representation of traditionally underrepresented racial groups and cultures, both in the curriculum and in standardized assessments; and it includes increased diversity of teaching staff and student bodies, which integration helps to accomplish. That Maud finds this to be "chilling" tells true racial advocates all they need to know: she's racist, and wants the school system—which holds the honors of being the most segregated in America—to remain unequal. Last December, a couple of our members had the opportunity to attend a meeting of the Community Education Council District 2, the school board that Maud is the president of. During a question and answer period, a father and young son—both white—got up and took the board to task, chastising them for "being in violation of Brown v. Board of Education for sixty-five years" and demanding to know when integration would finally become a reality in their district. The responses to their repeated questions were expectedly nonresponsive; but it was indeed noteworthy to us that Maud, the council president, was absolutely quiet during the entire exchange. For us, her silence spoke volumes. With no cameras flashing, no reporters, no members of the press seemingly in attendance, Maud had no reason to pretend. If you are a proponent of making New York City's school system more racially equitable, Maud has nothing to say to you.

In the press, however, Maud feigns herself to be supportive of integration. Even as she gleefully asserts that local integration efforts "has its skeptics," she professes to want more integrated schools. Putting her poor act aside, it is telling that she religiously advances a false dichotomy

between an adequate education and a culturally inclusive education. One does not have to choose between the two; children can be properly instructed in an educational environment that fosters diversity, inclusion and equity. Maud's insistence in treating the two as mutually exclusive allows her to paint her critics in the eyes of the right-wing press as lunatics who prioritize playing the race card over quality education. It's an illegitimate argument, but nevertheless persuasive to many in this city.

Maud throws out statistics in her op-Ed about poor performance among Black students, but unsurprisingly offers no explanation as to the cause. However, racism certainly could not be the culprit because, as Maud has frequently highlighted, Asian Americans have allegedly outperformed all other racial groups. Yes, the model minority myth is essential to Maud's argument: the problem isn't racism, but a "culture" of laziness and stupidity among African Americans and Hispanic Americans. This argument, however, invalidates the very distinct experiences of nonwhite groups in this country. Racial groups have been treated differently in America, so because one group may be unaffected by a problem does not discount the presence of racism. We're not aware of statistics that show Asian Americans being disproportionately killed by the police; does that mean that police brutality is not a racial issue? Of course not. Maud complains about the "Twitter mobs" that came after her following her interview with New York Times journalist Nikole Hannah-Jones. Oh, how the pot calls the kettle black: maybe Maud can tell the world about the mobs she sent after Teens Take Charge, a multiracial student-led organization fighting to integrate New York City schools. In a Twitter attack in May, the mob stated, "Our public education shouldn't be HIJACKED by special interest groups. It's time to listen to real NYC parents," signed "Thousands of Real Parents." That's right, folks: a group of adolescents that wish to make Brown v. Board of Education a reality in their city is a "special interest group" to Maud and her cronies.

Or perhaps Maud can tell us about the mobs she sent after Aaron Narraph, a young college student of color. Aaron put together a spreadsheet of City Council candidates of his own volition and included notes on some of the candidates, listing "socialist" under some and "declared, but not filed" for others. For Maud, he wrote, "racism allegations." Regardless of whether or not Maud is racist, allegations of racism were in fact made against her, so what Aaron wrote was true. Of course, however, the truth did not stop Maud from trying to jeopardize his job, messaging both Aaron and his employer and accusing him of making "baseless charges" about her. She then assailed him publicly for daring to call her out; and then her circle of equally narrowminded friends have been attacking him on Twitter bitterly enough that he thought about deleting his account. This past Friday, our caucus took to Twitter to call out Maud for her Post op-Ed; apparently, we too are now a target of her pack of internet bullies.

Maud is a classic example of what 21st century racism looks like. She does not parade around the city in white sheets. She does not use racial slurs in discourse, at least not publicly. Times have changed; overt racism is no longer publicly acceptable. The new racism of today is to pretend that racism is largely non-existent, confined to a few bad apples that utter statements clearly offensive to even the most ignorant among us. Its adherents pay thin lip service to the cause of racial justice, but refuse to recognize the central role that racism has historically played and continues to play now. To do so requires them acknowledging the undue privilege society has conferred upon them, a privilege they are clearly not willing to give up for the sake of true

Case 1:21-cv-05762-KPF Document 24-X Filed 09/01/21 Page 27 of 82

equality. They distort and poohpooh efforts to deal with racial inequality and seek to shut down conversations on the topic, ironically by accusing racial equality proponents of trying to silence them. And at the end of the day, all fluff aside, the statements they make and the positions they take evidence their belief in white superiority as well as Black and Brown inferiority.

It is obvious to anyone with any sense of racial justice that Maud is racist, and openly so. She attacks efforts to end racism by claiming there is no racism. And as usual, this is not new: when efforts were made to desegregate NYC public schools in the 1960s, a coalition of mostly white parents called "Parents and Taxpayers" (PAT) was formed to resist those efforts. This coalition professed in speech to be in favor of integration while fighting against it in action. Those efforts were obviously successful, because the school system remains segregated. Now, Maud is a central part of a new coalition called "Parent Leaders for Accelerated Curriculum and Education" (PLACE). Like PAT five-plus decades ago, PLACE professes to be for racial equality in education while fighting to keep the mechanisms that reinforce inequality intact. It also comes as no surprise to us that Maud's op-Ed was published in the same tabloid that singlehandedly contributed more to the recent pretrial reform rollbacks than any other local publication. It was only a decade ago that this same publication likened then-President Barack Obama to a chimpanzee in a cartoon. Its coverage of stop-and-frisk and other issues related to racism has been similarly abysmal. In short, The New York Post is no friend of Black Americans, and neither is Maud.

What makes this all the more sickening is that Maud is a public defender, tasked with representing a constituency she clearly has no regard for. She is one of many charlatans who took this job not out of a desire to make a difference, but for purposes of self-imaging. Her constant invocations of her public defender position is neither accidental nor pointless. She's asserting to whomever will listen that she is a credible, unbigoted voice by virtue of the work she has allegedly done, representing poor people of color in a judicial system she would likely agree is racist. The only thing more shameful is that she has a following, and a powerful, well-connected following at that.

In closing, one of our genuinely dedicated colleagues said it best: "You cannot oppose anti-racism and effectively represent Black and Brown people. It's impossible." Maud Maron has no business having a career in public defense, and we're ashamed that she works for the Legal Aid Society.

EEOC NY DISTRICT OFFICE
DATE 01/19/2021

# EXHIBIT C



# Association of Legal Aid Attorneys
# UAW 2325 (AFL-CIO)

**CONFIDENTIAL BARGAINING DOCUMENT – FOR LASNYC MEMBERS ONLY***

## The Legal Aid Society Chapter
## Tentative Bargaining Agreements
(As of 12/10/19)

*The bargaining committee has reached the following tentative contract agreement with management. The Joint Council will vote on this proposal, which is currently scheduled for Tuesday, January 14th. There will be a full membership vote on this tentative agreement if the Joint Council votes to pass it on. New tentative agreements are listed in* **bold**.

Contract Term and Reopener Language
- **Proposed contract term is three years, from July 1, 2019 to June 30, 2022**
- **ALAA and management will reopen bargaining on April 2, 2020, to discuss the following: salary, paid sabbatical, decreasing retirement age eligibility and related benefits.**

Salary
- A 5% minimum across-the-board raise for all members. Parity with the Law Department from Law Graduate to step 5. All increases are retroactive to July 1, 2019. (See attached salary chart.)
- **1.5% one-time payment upon ratification for all members at Step 6 and above.**
- **Raises, retro pay, and one-time payments are all pensionable.**
- Guaranteed minimum 2% across-the-board salary increases for all members effective July 1, 2020, and July 1, 2021.

Pension
- Quarterly pension contributions. Payments made within 4 months of the end of each period. (Currently, payments are made semi-annually with a 7 month delay at the end of each period.)

Loan Assistance
- Legal Aid will contribute $200,000 per year for a loan assistance fund for members

New York City Bar Membership
- **ALAA members will save 30% on new New York City Bar memberships. Existing New York City Bar members will save 30% on renewal memberships, provided a reasonable number of ALAA members enroll by the deadline (date to follow).**

Vacation/Comp Time/Bereavement
- **CDP members can sell up to 20 comp days per fiscal year (increased from 17)**
- CDP members can sell back up to 15 frozen comp days
- Friday after Thanksgiving is now a floating holiday
- Align bereavement contract provision with Employee Handbook to allow for 7 days bereavement in instances that require travel outside the USA
- Time and a half for arraignment shifts in CDP on all holidays except floating holidays
- LAS to create vacation bank for donation to coworkers experiencing crisis or hardship
- When members are over their maximum vacation balance on June 30th, they will have until December 31st of that year to spend down the overage rather than lose those days

Retirement
- **Eligible members will receive Medicare Advantage (where available) or Medicare Part F or Part G (depending on eligibility). Members who wish to upgrade to Part F or G from Medicare Advantage may do so if they pay the difference in premium, if any.**
- The $50K retirement buy-out will be available each year of this contract if/when ratified. Allows up to 10 staff attorneys to retire with this benefit each year if at least 65 years old and with 25 years of service. Will also allow for an unlimited number of attorneys to retire with this benefit this year if at least 60 years old and with 25 years of service, with the understanding there will some post-retirement benefits forfeited. Buy-out will be available this year regardless of contract ratification.

Telecommuting (likely to be changed to "Telework" or "Flexible Work")
- **New contract language: §3.8 Telecommuting. Staff attorneys will, in consultation with their supervisors, be permitted to telecommute to the extent consistent with the nature of their work and other staffing/work needs of the office. Management is committed to expanding the remote access properties of the network to support telecommuting needs.**

Immigration
- **New contract language: In recognition of the Society's commitment to equal justice for all, The Legal Aid Society will establish policies to address concerns of our immigrant staff members.**

Healthcare/ Family Leave/ LTD
- Increase frame coverage from $150 to $200
- Increase orthodontic benefit from $1500 to $2500
- Surrogacy coverage to continue to be included in reproductive benefits
- 14 weeks of parental leave, after 3 years of service

# EEOC NY DISTRICT OFFICE
## DATE 01/19/2021

- Mental health long term disability will no longer be capped at 2 years (effective as of 9/1/19)

Grievances
- **Specific contract language additions to follow. Members will have the right to submit evidence and elicit testimony during a grievance hearing at all levels. The manager conducting the hearing can use their discretion when considering said evidence. However, if any evidence, documentary or testimonial, is excluded by management, ALAA shall have the right to ask that the excluded evidence be considered in any subsequent grievance steps and appeals.**

Leaves of Absence
- **New Contract Language: §3.4.4 To the extent practicable subject to staffing, space, workload, length of leave and other demands, the Society will attempt to return the staff atone to the boro or office location they were assigned to before their leave. More specific requests for placement for return from leave with be considered on a case by case basis.**

Other
- Management shall provide readily available Wi-Fi to staff in all LAS offices
- Management to pay for 1.5 FTE lines to the union (up from 1 FTE)
- Homicide Certification denials a will have a review and appeal process

Professional Development/Workload Committee
- **This committee will explore and discuss Civil Case Caps**
- Training rotator for JRP and rotations between practices to be discussed in committee
- This committee will seriously examine the necessity for an anti-oppression training
- In consultation with the joint union-management Senior Retention Committee, this committee will ensure appropriate training for attorneys at middle and senior steps

Staff Attorney Hiring
- Joint union-management committee will ensure staff attorney participation and attorney management hiring should ensure consistency across practice areas. Committee should also work on strengthening bonds with HBCUs and other academic institutions that match the values of LAS

Affirmative Action/Diversity Committee
- Change to language to include a rep from Black Attorneys of Legal Aid and LGBTQ caucus as proposed in ALAA's demand

Director of Diversity and Inclusion
- The DDI position will be restructured and will report directly to the Attorney-in-Chief. Ongoing discussions about other changes.

**CONFIDENTIAL BARGAINING DOCUMENT – FOR LASNYC MEMBERS ONLY***

# EEOC NY DISTRICT OFFICE
## DATE 01/19/2021

Proposed UASNTC Salary Chart for 2019 - 2021

| Step | | Current | 7/1/19 | Min. 7/1/2020 | Min. 7/1/2021 | Retro if paid 1/15/20* | 1.5% ONE-TIME PAYMENT |
|---|---|---|---|---|---|---|---|
| LG | $ | $3,582.00 | $ 71,000.00 | $ 72,420.00 | $ 73,868.40 | $ 8,709.00 | |
| 1 | $ | 62,730.00 | $ 72,000.00 | $ 73,440.00 | $ 74,908.80 | $ 4,635.00 | — |
| 2 | $ | 63,775.00 | $ 73,500.00 | $ 74,970.00 | $ 76,469.40 | $ 4,862.50 | — |
| 3 | $ | 64,821.00 | $ 75,000.00 | $ 76,500.00 | $ 78,030.00 | $ 5,089.50 | — |
| 4 | $ | 67,819.00 | $ 76,500.00 | $ 78,030.00 | $ 79,590.60 | $ 4,340.50 | — |
| 5 | $ | 70,477.00 | $ 78,097.00 | $ 79,658.94 | $ 81,252.12 | $ 3,810.00 | — |
| 6 | $ | 75,793.00 | $ 80,583.00 | $ 82,194.66 | $ 83,838.55 | $ 2,395.00 | $1,208 |
| 7 | $ | 79,580.00 | $ 83,580.00 | $ 85,251.60 | $ 86,956.63 | $ 2,000.00 | $1,254 |
| 8 | $ | 82,712.00 | $ 86,848.00 | $ 88,584.96 | $ 90,356.66 | $ 2,068.00 | $1,303 |
| 9 | $ | 85,313.00 | $ 89,579.00 | $ 91,370.58 | $ 93,197.99 | $ 2,133.00 | $1,344 |
| 10 | $ | 90,205.00 | $ 94,715.00 | $ 96,609.30 | $ 98,541.49 | $ 2,255.00 | $1,421 |
| 11 | $ | 95,798.00 | $100,588.00 | $102,599.76 | $104,651.76 | $ 2,395.00 | $1,509 |
| 12 | $ | 99,994.00 | $104,994.00 | $107,093.88 | $109,235.76 | $ 2,500.00 | $1,575 |
| 13 | $ | 105,457.00 | $110,731.00 | $112,945.62 | $115,204.53 | $ 2,637.00 | $1,661 |
| 14 | $ | 106,294.00 | $111,609.00 | $113,841.18 | $116,118.00 | $ 2,657.50 | $1,674 |
| 15 | $ | 107,130.00 | $112,488.00 | $114,737.76 | $117,032.52 | $ 2,679.00 | $1,687 |
| 16 | $ | 107,967.00 | $113,365.00 | $115,632.30 | $117,944.95 | $ 2,699.00 | $1,700 |
| 17 | $ | 108,803.00 | $114,243.00 | $116,527.86 | $118,858.42 | $ 2,720.00 | $1,714 |
| 18 | $ | 109,639.00 | $115,122.00 | $117,424.44 | $119,772.93 | $ 2,741.50 | $1,727 |
| 19 | $ | 110,476.00 | $116,000.00 | $118,320.00 | $120,686.40 | $ 2,762.00 | $1,740 |
| 20 | $ | 111,312.00 | $116,879.00 | $119,216.58 | $121,600.91 | $ 2,783.50 | $1,753 |
| 21 | $ | 112,149.00 | $117,756.00 | $120,111.12 | $122,513.34 | $ 2,803.50 | $1,766 |
| 22 | $ | 112,985.00 | $118,634.00 | $121,006.68 | $123,426.81 | $ 2,824.50 | $1,780 |
| 23 | $ | 113,822.00 | $119,513.00 | $121,903.26 | $124,341.33 | $ 2,845.50 | $1,793 |
| 24 | $ | 114,658.00 | $120,391.00 | $122,798.82 | $125,254.80 | $ 2,866.50 | $1,806 |
| 25 | $ | 115,495.00 | $121,270.00 | $123,695.40 | $126,169.31 | $ 2,887.50 | $1,819 |
| 26 | $ | 115,602.00 | $121,382.00 | $123,809.64 | $126,285.83 | $ 2,890.00 | $1,821 |
| 27 | $ | 115,710.00 | $121,496.00 | $123,925.92 | $126,404.44 | $ 2,893.00 | $1,822 |
| 28 | $ | 115,974.00 | $121,773.00 | $124,208.46 | $126,692.63 | $ 2,899.50 | $1,827 |
| 29 | $ | 116,286.00 | $122,100.00 | $124,542.00 | $127,032.84 | $ 2,907.00 | $1,832 |
| 30 | $ | 117,951.00 | $123,849.00 | $126,325.98 | $128,852.50 | $ 2,949.00 | $1,858 |
| 31 | $ | 118,116.00 | $124,022.00 | $126,502.44 | $129,032.49 | $ 2,953.00 | $1,860 |
| 32 | $ | 118,312.00 | $124,228.00 | $126,712.56 | $129,246.81 | $ 2,958.00 | $1,863 |
| 33 | $ | 118,624.00 | $124,555.00 | $127,046.10 | $129,587.02 | $ 2,965.50 | $1,868 |
| 34 | $ | 118,936.00 | $124,883.00 | $127,380.66 | $129,928.27 | $ 2,973.50 | $1,873 |
| 35 | $ | 119,248.00 | $125,248.00 | $127,752.96 | $130,308.02 | $ 3,000.00 | $1,879 |

*Retro only paid for time on active payroll since
7/1/19. Retro not paid to members who leave Legal
Aid before the payment is made.

# ALAA Contract
# 2016-2019

Collective Bargaining Agreement Between The
Association of Legal Aid Attorneys, UAW 2325 (AFL-CIO) and
The Legal Aid Society (NYC)

*Supersedes the 2013-2014 contract and incorporates all memoranda of agreement
and understanding through October 4, 2017.*

# Contents

Preamble ................................................ 2

### Article 1/Labor Relations:

§ 1.1.  Union Recognition and Agency Shop ........................................... 3
§ 1.2.  Collective Bargaining Agreement ................................... 3
§ 1.3.  No Strike or Lockout ...................... 4
§ 1.4.  Union Access to Financial Records ....................................... 4
§ 1.5.  Union Activities .............................. 4
§ 1.6.  Presence of Union Representatives ............................ 5
§ 1.7.  Joint Union-Management Committees ..................................... 5
§ 1.8.  Grievances ...................................... 5
§ 1.9.  Management Rights ...................... 6
§ 1.10. Future Joint Lobbying ................. 6

### Article 2/Compensation:

§ 2.1.  Salary .............................................. 7
§ 2.2.  TransitCheks ................................. 8
§ 2.3.  Bar Registration Fee .................... 8
§ 2.4.  Fellowships .................................... 8
§ 2.5.  Loan Forgiveness ......................... 8
§ 2.6.  Bar Association Dues ................... 9
§ 2.7.  Compensatory, Personal and Flex Time .............................................. 9
§ 2.8.  Health Insurance ......................... 10
§ 2.9.  Life Insurance .............................. 12
§ 2.10. Pension ......................................... 12
§ 2.11. Tax Shelters ................................. 12
§ 2.12. Vacation ........................................ 12
§ 2.13. Adoption & Fertility ................... 13
§ 2.14. Childcare ...................................... 13

### Article 3/Employment Policy:

§ 3.1.  Fair Employment Practices ........ 14
§ 3.2.  Hiring ............................................ 16
§ 3.3.  Employment Status ..................... 16
§ 3.4.  Leave .............................................. 17

§ 3.5.  Free Speech .................................. 19
§ 3.6.  Interpersonal Conflict ................ 19
§ 3.7.  Part-Time Work Schedules ........ 19
§ 3.8.  Telecommuting ............................ 20
§ 3.9.  Transfers and Promotions .......... 20
§ 3.10. Expenses ....................................... 21
§ 3.11. Personnel Records ...................... 22
§ 3.12. Pro Bono Representation ............ 22
§ 3.13. Senior Staff Retention ................ 22
§ 3.14. Job Security .................................. 23
§ 3.15. Resignation .................................. 24
§ 3.16. One-Time Early Retirement Program ....................................... 24
§ 3.17. Health and Safety ....................... 24
§ 3.18. Record Keeping ........................... 25

### Article 4/Quality of Representation:

§ 4.1.  Standard of Advocacy ................ 26
§ 4.2.  Continuity of Representation ..... 26
§ 4.3.  Workload ....................................... 27
§ 4.4.  Interview Conditions .................. 28
§ 4.5.  Office Day ..................................... 29
§ 4.6.  Attorney-Client-Supervisor Relationship ................................. 29
§ 4.7.  Training, Education and Certification ................................. 29
§ 4.8.  Malpractice Insurance ................ 32
§ 4.9.  Outside Counsel .......................... 32
§ 4.10. Special Litigation ....................... 32
§ 4.11. Support Services .......................... 32
§ 4.12. Law Enforcement Issues ............ 32
§ 4.13. Society Policy Positions ............. 33

Signature Page ................................. 37

### Appendices:

Appendix 1/Salary Scale ..................... 38
Appendix 2/Benefits Summary
Life and Accidental Death & Dismemberment Insurance ............... 39

Index ................................................... 40

EEOC NY DISTRICT OFFICE
DATE 01/19/2021

# Preamble

This Collective Bargaining Agreement is an expression of the parties' shared commitment to: 1) Delivery of the highest possible quality of indigent legal representation; 2) Mutual respect among, and fair treatment of all Legal Aid Society staff; and 3) Full participation by the Union and its members in pursuing the Society's mission. Each term of this contract will be interpreted in the context of these fundamental principles.

# Article 1/Labor Relations

### § 1.1.    *UNION RECOGNITION AND AGENCY SHOP.*

§ 1.1.1.    *Recognition.* In accordance with the Certification of Representation issued by the New York State Labor Relations Board on December 30, 1969, the Legal Aid Society ("Society" or "LAS") recognizes the Association of Legal Aid Attorneys, UAW Local 2325 (AFL-CIO) ("Union" or "ALAA") as the exclusive bargaining representative of all attorneys admitted to practice and within the scope of the bargaining unit definition contained in the above-mentioned Certification and of all law graduates employed as such by the Society ("Staff Attorneys").

§ 1.1.2.    *Union Membership.* The Union agrees to continue its policy, as defined by law, of admitting persons to membership without discrimination on the basis of actual or perceived race, color, national origin, alienage or citizenship status, religion, creed, sex, gender (including "gender identity" -- which refers to a person's actual or perceived sex, and includes self-image, appearance, behavior or expression, whether or not different from that traditionally associated with the legal sex assigned to the person at birth), disability, age (18 and over), military status, prior record of arrest or conviction, marital status, genetic predisposition or carrier status, sexual orientation, or status as a victim of domestic violence, a sex offense or stalking, or membership in, or association with the activities of, any employee organization. No attorney will be required to join the Union.

§ 1.1.3.    *Dues and Fees.* All bargaining unit members, whether newly-hired, rehired, or returned to the bargaining unit, must, within thirty [30] days of hire, pay the current dues and initiation fees or, where applicable, current service fees to the Union, and any interest charges that may be set by the Union for late payment of dues or service fees. Upon the Union's written request, the Society will discharge any Staff Attorney who fails to pay such dues, fees or interest, after the Union has given at least two [2] weeks' written notice, by certified mail, to the delinquent attorney and to the Society. Any member of the bargaining unit may authorize the Society to deduct from her paycheck(s) and forward to the Union all dues, initiation fees, credit union, political action, other assessments and/or agency fees. Such authorization will be effective until revoked, in writing, by the signer thereof.

### § 1.2.    *COLLECTIVE BARGAINING AGREEMENT.*

§ 1.2.1.    *Term.* This Agreement will be effective as of October 4, 2017, will continue in full force and effect through June 30, 2019, and will continue past its expiration date, subject to ten [10] days' written notice of termination by either party. As always, all terms and conditions, including salary, pension and all benefit obligations, will be subject to collective bargaining upon the expiration date.

§ 1.2.2.    *Negotiation.* When feasible, the parties will: 1) provide one hundred and twenty [120] days' notice prior to expiration of its intent to modify or terminate this Agreement; 2) present written proposals at least one hundred [100] days prior to expiration; 3) begin contract negotiations at least ninety [90] days prior to expiration; and 4) meet as frequently as necessary for a full and fair discussion of the issues. If there is no successor agreement at least forty-five [45] days prior to expiration, the parties will jointly request the intervention of the Federal Mediation and

EEOC NY DISTRICT OFFICE
DATE 01/19/2021

| 2016-2019 Contract | Article 1/Labor Relations | Page 4 |
| --- | --- | --- |

Conciliation Service. If, in the mediator's judgment, maintenance of the status quo for a period of up to thirty [30] days past expiration appears likely to improve the chances for a negotiated agreement without declaration of an impasse, the mediator will ask the parties' agreement to such extension, and/or to such other steps within that time period as she deems useful to resolve outstanding issues.

§ 1.2.3. **Headings and Terms**. Headings and/or subject groupings are for general identification only and will not be construed in a substantive manner. The pronoun "her" will be deemed applicable to both genders.

§ 1.2.4. **Reproduction and Distribution**. The Society will reproduce this Agreement using union labor, distribute at least one [1] copy to each attorney, and make available necessary additional copies.

§ 1.3. **NO STRIKE OR LOCKOUT**. The parties subscribe to the principle that differences will be resolved by peaceful and appropriate means without interruption of the work of the Society or the courts. The Union agrees that there will be no strikes, work stoppages, slowdowns or concerted refusal to perform work during the term of this Agreement, during which neither the Union, nor any officer or agent thereof will, directly or indirectly, authorize, assist, condone, encourage, or in any way participate in any such activities. The Society will not lockout its employees during the term of this Agreement.

§ 1.4. **UNION ACCESS TO FINANCIAL RECORDS**. The Society will grant any reasonable request by the Union for open access to its financial books and records, subject to appropriate safeguards against release or other inappropriate use of individually-identifiable information about non-bargaining unit employees, including access to outside auditors in regard to the Society's financial condition and to perform due diligence in regard thereto.

§ 1.5. **UNION ACTIVITIES**. The Union will have reasonable use of the Society's internal communication mechanisms and meeting space, one full time equivalent (FTE) of paid release time for general representational and related duties, and reasonable release time for other Union representatives, and other resources necessary to administer this Agreement. In addition, two [2] Staff Attorneys may take unpaid leaves for an unlimited duration to serve on Union staff, during which they will be entitled to all benefits (health, disability, etc.) available to other bargaining unit members, at no additional cost to the Society. Attorneys on Union leave will accrue full seniority for all purposes, including salary, vacation, pension, and leave, and have the right to return to their Society positions at the conclusion of such leave(s). Current Union staff whose leave had previously expired shall be immediately restored to their status as Society employees on the above terms. Reasonable use of the Society's internal communication mechanisms shall be interpreted to mean the following: The Legal Aid Society will maintain an e-mail group that permits the President of ALAA and her designee to send communications to all ALAA members and permits individual members to respond to the President of ALAA and her designee as the sender(s) and not to the whole e-mail group. The Legal Aid Society has provided ALAA with a one-time payment of $12,000 so that ALAA can develop and implement a free-standing e-mail group of ALAA members that is not on The Legal Aid Society's computer network.

§ 1.6.   *PRESENCE OF UNION REPRESENTATIVES*.   Staff Attorneys may exercise their right to the presence of a Union representative, whenever practicable a person of their choice, during any discussion with managers concerning potential or actual disciplinary action.

§ 1.7.   *JOINT UNION-MANAGEMENT COMMITTEES*.   The Union will appoint its representatives to all "Union-Management" committees.

§ 1.8.   *GRIEVANCES*.   Except as otherwise provided herein, the following grievance procedure will apply to all disputes concerning interpretation or application of a specific provision of this Agreement.

   § 1.8.1.   *Initiation*.   Grievances must be filed in writing within ten [10] calendar days of the event giving rise to the grievance, or within ten [10] calendar days from when the event, with reasonable diligence, should have become known. The written statement must be sufficient to give notice that the matter is being grieved and should clearly articulate the issue(s) grieved, the relevant contract provision(s), and the relief sought.

   § 1.8.2.   *Time Limits*.   Once filed, each subsequent step in the grievance process must be completed or initiated, as appropriate, within ten [10] calendar days of the preceding event, except as extended by the parties' mutual agreement, which shall not be unreasonably withheld. If the Union fails to file within the allotted time, the grievance will be deemed resolved by the Society's most recent position. If the Society fails to respond within the allotted time, the Union may move the grievance to the next level.

   § 1.8.3.   *Presentation*.   Grievances will be presented and processed at a time and in a manner that does not materially interfere with work. Unless otherwise agreed, grievances will be heard outside of normal work hours.

   § 1.8.4.   *Due Process*.   Except in cases involving dishonesty or gross neglect of a client, no Staff Attorney will be discharged until completion of the First Step grievance process, until the grievance has been resolved by operation of time limits, or until the Staff Attorney has given written notice that she does not intend to file a grievance with respect to a proposed termination. The foregoing does not prevent the Society from placing a Staff Attorney on paid suspension pending resolution of the First Step grievance. A proposal to suspend or discharge a Staff Attorney must be made in a written notice of charges provided simultaneously to the Staff Attorney and Union President. Notice of charges may be amended or supplemented at any subsequent time, with the understanding that such changes may require an extension of time limits for further investigation.

   § 1.8.5.   *Steps*.

      (1) *First Step:  Immediate Supervisor*.   The First Step grievance will generally be to the immediate supervisor. If the action being grieved is discipline or termination taken in the name of a higher level supervisor, the First Step grievance will be to that person. The parties will seek resolution through discussion among the aggrieved Staff Attorney, her Union representative, or, in the appropriate case, the Union as the aggrieved party, and the aggrieved's immediate supervisor, who will issue a written decision.

      (2) *Second Step:  Practice Attorney-in-Charge*.   If the grievance is not settled in the First Step, the Union may file a written appeal to the Attorney-in-Charge of the practice to which the grieving Staff Attorney is assigned, or was assigned at the relevant time. Following a meeting among the interested parties, the Attorney-in-Charge will issue a written decision. If the

| 2016-2019 Contract | Article 1/Labor Relations | Page 6 |
|---|---|---|

practice Attorney-in-Charge decided the First Step grievance, her initial decision will be appealed directly to the Third Step.

(3) *Third Step: Attorney-in-Chief*. If the grievance is not settled in the Second Step, the Union may file a written appeal to the Attorney-in-Chief, who, following a meeting among the interested parties, will issue a written decision.

(4) *Fourth Step: Arbitration*. If the grievance is not settled in the Third Step, the Union may give written notice of arbitration to the Attorney-in-Chief. If the parties are unable to agree on an arbitrator within an additional ten [10] calendar days of such notice, the matter will be submitted to arbitration under American Arbitration Association rules, in the event of discharge on an expedited basis. The arbitrator's award will be final and binding on all parties. The Union and the Society will share equally in any costs of grievance arbitration.

§ 1.8.6. *Exclusive Remedy*. No Staff Attorney will have the right to independently institute or pursue any grievance or arbitration based upon this Agreement, the right of action being limited to the Union and the Society, and any agreement or adjustment between the Union and the Society with respect to such disputes will be final and binding upon the Staff Attorney.

§ 1.9. *MANAGEMENT RIGHTS*. The Society will at all times, subject to express provisions of this Agreement, have full control of management, personnel, and conduct of its operations, including any of the rights, powers and authority that the Society had prior to the signing of this Agreement.

§ 1.10. *FUTURE JOINT LOBBYING*. If there is any future joint lobbying, a plan for such future joint lobbying will be addressed in a side letter between the parties.

EEOC NY DISTRICT OFFICE
DATE 01/19/2021

# Article 2/Compensation

**§ 2.1.     SALARY.**

    **§ 2.1.1.     Salary Schedule.** The Basic Salary Schedule set forth in Appendix 1 will apply to all Staff Attorneys and be effective March 1, 2017 and July 1, 2018. Within thirty (30) days of ratification, The Legal Aid Society will increase the salary of each Staff Attorney in active status at that time in accordance with the levels specified in Appendix 1 and provide a retroactive payment to each such Staff Attorney reflecting the Staff Attorney's salary increase effective on March 1, 2017 and/or July 1, 2018 in accordance with the salary levels set forth in Appendix 1. For each Staff Attorney who is on an authorized leave when the Society implements the prospective and retroactive salary increase at the levels set forth in Appendix 1, the Society will make retroactive salary adjustments, if any are required, within thirty (30) days of the Staff Attorney's return from the authorized leave. In accordance with the Society's salary payroll procedures, retroactive salary increases are subject to applicable payroll deductions and are pensionable. During the life of this contract extension, if the City of New York provides additional funds that are not restricted from use for salary increases, within (30) days of the notification that such funds are available the parties shall reopen this agreement and shall then negotiate the distribution of any such funds to the ALAA/UAW 2325 bargaining unit in a fair and equitable manner for salary increases. The distribution of any such funds that can be used for salary increases would be effective as of the beginning of the period of time for which such funds have been allocated by the City. The Basic Salary Schedule may be increased during the term of this Agreement in accord with the above provision.

    **§ 2.1.1.1.     ADA Comparability.** Both ALAA and the LAS recognize and support a goal that staff attorneys receive total compensation which is comparable to that received by ADAs in Bronx, Brooklyn, New York and Queens Counties and that, due to the lack of sufficient funding, the economic terms contained herein narrows, but does not close, the comparability gap between the two groups. It is also recognized that LAS may receive funding increase(s) during the term of this contract which would allow it to narrow or close this gap. To that end, the parties agree that should the LAS receive, during the term of this contract, a funding increase sufficient to further narrow or close the comparability gap, the parties will, immediately upon learning of such increase, undertake to ascertain the four-borough average of total compensation received by non-managerial ADAs at yearly levels of service. After ascertaining such ADA compensation, the LAS agrees to pay staff attorneys as close to comparable total compensation as such additional funding allows.

    **§ 2.1.1.2.     Special     Wage     Reopener—Alternative     Defender Organizations.** If any organization other than the 18-B (assigned counsel) panel offers to furnish defender services for ten [10] percent or more of the clients served by the Criminal Practice or Juvenile Rights Practice in the City and/or State Courts in New York City, and if such organization offers to its Staff Attorneys, on an overall basis, higher salaries, superior terms of employment or working conditions, the Union may, upon ninety [90] days' written notice to the Attorney-in-Chief, reopen the contract as to those items where disparity exists. If the Society challenges the factual basis on which the reopener notice is predicated, such issue(s) will be submitted to arbitration and the relevant contract provision reopened only upon an appropriate finding by the arbitrator.

    **§ 2.1.1.3.     24-Pay Period System.** Effective April 1, 2012, the Society is implementing a 24 pay period system for each year that consists of two pay days per month on the

| 2016-2019 Contract | Article 2/Compensation | Page 8 |
|---|---|---|

15th and on the last day of the month. When the 15th or the last day of the month falls on a weekend or holiday, the pay day will be on the business day immediately before the weekend or holiday. Converting to the 24 pay period system will not affect the current negotiated annual step rates, but will increase the amount of the gross amount of pay per payroll period so that the gross annual salary remains the same in the 24 pay period system as it had been in the 26 pay period system.

§ 2.1.2. *Individual Placement on Salary Scale*.

§ 2.1.2.1. *Anniversary Date*. The anniversary date will be the date of first employment as a Staff Attorney. The Society, in consultation with the Union in regard to criteria and principles, may give credit for prior experience or service, and those hired with such credit will receive future increases based on their hiring level rather than their years of service with the Society. In the event of a break in service, any credit for prior service to establish salary, annual leave, retirement benefits, seniority, etc., will be as agreed upon by the Society and the attorney upon rehire.

§ 2.1.2.2. *Advancement to Step One*. Movement on the Salary Schedule from Law Graduate to Step 1 will be effective on bar admission.

§ 2.1.2.3. *Returned-to-Staff Supervisors*. Staff Attorneys who returned to staff from supervisory positions will be entitled to credit for all their experience as an attorney employed by the Society, including the time employed as a supervisory attorney.

§ 2.1.3. *Lobster Shift*. Attorneys working the New York County "lobster" shift that begins at 1:00 A.M. will be paid at the following rate: Tuesday-Friday—$300; Sunday and the day following a holiday—$400; Saturday, Monday and holidays—$350. Attorneys staffing the lobster shift will not be required to work the shift immediately prior or subsequent thereto.

§ 2.2. *TRANSITCHEKS*. Effective July 1, 2004, each Staff Attorney will have the individual option to use pre-tax compensation to purchase TransitCheks as administratively practical within the maximum amount permitted by law.

§ 2.3. *BAR REGISTRATION FEE*. The Society will pay Staff Attorney bar registration fees.

§ 2.4. *FELLOWSHIPS*. The Society may transmit or facilitate payments by fellowships for repayment of Staff Attorney education loans.

§ 2.5. *Loan Forgiveness*. The Union acknowledges that the Society created a one-time $250,000 loan forgiveness fund. The funds remaining will be distributed as described in Section 2.5.1. The Society will work with the Union to seek loan forgiveness funding from government. The Society will designate a staff person in the Human Resources Department to assist Staff Attorneys with the various loan forgiveness programs offered by governmental entities by collecting information on various programs which may apply to Staff Attorneys and providing updated information about such programs in a timely manner.

§ 2.5.1. *Loan Forgiveness Committee*. The Union and the Society agree to establish a joint Union-Management committee to make recommendations for educational loan reimbursements of the funds currently in the Archibald Murray Fund and to explore additional strategies for raising funds for educational loan reimbursement.

Case 1:21-cv-05960-KPF Document 24-1 Filed 09/01/21 Page 42 of 82

EEOC NY DISTRICT OFFICE
DATE 01/19/2021

**§ 2.6.**    *BAR ASSOCIATION DUES.*   To the extent that recurring funds can be allocated, the Attorney-in-Chief will appoint managers and Staff Attorneys to serve as a representative of The Legal Aid Society on relevant State and local bar association committees, with the required bar dues paid with funds. Any appointments of Staff Attorneys will be made in consultation with the Association of Legal Aid Attorneys through its President.

**§ 2.7.**    *COMPENSATORY, PERSONAL AND FLEX TIME*.
     **§ 2.7.1.**    *Compensatory Time (Criminal Defense Division)*.
         **§ 2.7.1.1.**    *Earnings*. Staff Attorneys in CDD will earn compensatory time for working certain institutional assignments outside of regular working hours. Staff Attorneys in the Community Justice Unit will be permitted to earn comp time for institutional assignments performed beyond the normal workday of 9 A.M. to 5 P.M.
         **§ 2.7.1.2.**    *Accumulation and Use*. Staff Attorneys may accumulate accrued compensatory days. Accumulated days may be taken as vacation in accordance with the CBA within one year of being earned but may not be carried over to a subsequent year. Effective April 1, 2005 Staff Attorneys entitled to compensatory days for working institutional assignments outside of regular working hours may, within a month of earning a compensatory day, opt to be paid at their regular hourly rate in effect during the pay period for each day of compensatory time earned to a maximum of 15 days in any fiscal year, provided, however that the maximum is 5 days in Fiscal Year 2005. Such payments are not pensionable. Effective December 12, 2007, Criminal Defense Staff Attorneys may opt to be paid a maximum of 17 compensatory days earned during any fiscal year at the regular hourly rate in effect during the pay period in which the compensatory time was earned, provided that such payments are not pensionable.
         **§ 2.7.1.3.**    *Cash-In*. Effective December 19, 2006, for unpaid leaves in the Criminal Defense practice, other than compensatory time that can be cashed in annually pursuant to paragraph 2.5.1.2, above, Criminal Defense staff compensatory time accumulated prior to April 1, 2005 will be paid out in a lump sum when a Criminal Defense staff attorney resigns or is terminated from LAS, is promoted to a supervisor, or transfers from the Criminal Defense practice. However, in order to reduce the accumulated April 1, 2005 compensatory time liability for the Society and to provide a transition for affected bargaining unit members taking unpaid leaves related to childcare and/or FMLA, on a fiscal year basis, the Society is allocating a fund of up to $250,000 to pay out accumulated pre-April 1, 2005 compensatory time to such affected Criminal Defense attorneys on unpaid leave in a lump sum that represents the duration of the leave and such staff attorneys will be permitted to pay for health care coverage at the applicable employee share while they are on such approved unpaid leave.
         **§ 2.7.1.4.**    *One Time Buy-Back*. In the first year of this contract, The Legal Aid Society will allow a one time buy-back opportunity for those attorneys with pre-2005 "frozen" comp days. LAS will allow those attorneys to cash in up to 5 days per eligible attorney for a total amount up to $250,000 by January 31, 2018 or allow those attorneys to use up to 10 days of "frozen" comp days during the course of one year, with the period to be determined.
         **§ 2.7.1.5.**    *Modification*. The Society may establish reasonable notice requirements in regard to exercise by Staff Attorneys of their right to cash in compensatory days and reasonable payment provisions, not more than two [2] months after such notification, in order to prevent cash-flow problems for the Society.

§ 2.7.1.6.    *Weekend and Holiday Arraignments in the Juvenile Rights Practice.*  Staff Attorneys in the Juvenile Rights Practice will be paid for a compensatory day for working a weekend or holiday arraignment shift, with such payment to be provided no later than on the second pay day following the shift that the Staff Attorney worked.

§ 2.7.2.    *Personal Days (Other Practices).*  Each full-time and part-time Staff Attorney in the Civil Practice, Special Litigation Unit of the Criminal Practice, Juvenile Rights Practice, and Criminal Appeals Bureau will receive five [5] personal days per calendar year, except that staff attorneys in the Criminal Appeals Bureau will receive no personal days as of the end of calendar year 2006; such days cannot be cashed-in or carried over from year to year. Effective January 1, 2007, the allocation of personal days for staff who work part time and are otherwise eligible for personal days shall be pro-rated.

§ 2.7.3.    *Special Longevity Personal Days.*  Effective October 1, 2013, the Society will provide a special longevity allocation of five [5] personal days for use either in the longevity year or in the subsequent years until the next longevity anniversary date:  1) 30 years of service; 2) 35 years of service; 3) 40 years of service; 4) 45 years of service; and 5) subsequent five [5] year intervals of service. These special longevity allocations of five [5] personal days can only be used during the twelve [12] months following these anniversary dates and cannot be carried over to any subsequent year and shall not affect the limitations on the accrual of vacation days, the use of compensatory time, or the annual allocation of personal days for eligible Staff Attorneys.

§ 2.7.4.    *Flexible Hours.*  The Society will continue to make reasonable adjustments in attorneys' hours at the workplace, subject to the demands of workload coverage, in consideration of such assignments as night-time tenant or other group meetings concerning clients, jury deliberations, late court time, line-ups, etc.

## § 2.8.    *HEALTH INSURANCE.*
§ 2.8.1.    *Administration.*  Staff Attorney health benefits, the current terms of which are detailed in Appendix 2, will be administered by the Society, with full Union access to all information concerning terms, costs, administration and application of those benefits to bargaining unit members.  A Joint Union-Management Health Benefits Committee will be established to discuss issues and concerns regarding administration of the benefit program. Effective January 1, 2008, Appendix 2 will be deemed amended to provide that co-payments for medical office visits shall be $20.

§ 2.8.2.    *Changes.*  There will be no change in any benefit without the Union's agreement.  If the Society's cost for Staff Attorney health benefits decreases during the term of the Collective Bargaining Agreement, disposition of the resulting savings will be discussed with the Union.

§ 2.8.2.1.    *Contributions.*  Effective January 1, 2005, ALAA members will make contributions to health care premiums in the amount of 3.5 percent of premium for the "low plan" and 7 percent for the "high plan".

§ 2.8.3.    *Eligibility.*

Case 1:21-cv-05960-KPF Document 24-1 Filed 09/01/21 Page 44 of 82

§ 2.8.3.1.    *Employment*.  Eligibility for health insurance coverage will require employment on both the first and fifteenth of that month.  Coverage will cease as of the last day of employment, subject to continued benefits under applicable law and insurance policies.

§ 2.8.3.2.    *Dependents*.  Employees wishing to change from single to dependent coverage, and new enrollees requesting dependent coverage, will be required to certify, and provide a summary plan description to demonstrate, that comparable coverage to that provided by the Society is not available through their spouse's employment.  Benefit comparability analysis will take into account, and assign appropriate weight to, both employee and/or spousal premium contributions.

§ 2.8.3.3.    *Lesbian and Gay Partners*.  The Society will provide health insurance coverage for domestic partners of lesbian and gay Staff Attorneys who sign an affirmation attesting to their relationship with a named domestic partner (qualifying standards for which will be taken from language contained in the New York City Executive Order), subject to availability, to reasonable eligibility requirements and to costs comparable with those incurred under then-current health insurance.  The Society will take all reasonable steps, excluding litigation, to bring about and maintain availability of such coverage.

§ 2.8.3.3.1    *Tax Reimbursement for Staff Attorneys with Same Sex Domestic Partners*.  In recognition of the added tax burden that results from the disparate treatment in federal and state tax laws of married heterosexual couples and same sex domestic partners, a Staff Attorney whose health insurance coverage is for herself or himself and a domestic partner shall be reimbursed in accordance with either one of these options: (a) the Staff Attorney will be reimbursed in an amount equivalent to 20% of the cost of the additional coverage for the domestic partner; or (b) LAS will "Gross Up" the tax liability such that the Staff Attorney shall be reimbursed in a net amount equivalent to the tax liability incurred by the Staff Attorney as a result of the treatment of the additional premium as income to the Staff Attorney.  If this second option is chosen, the Staff Attorney shall demonstrate the additional tax liability by providing exact copies of the filed tax returns of the Staff Attorney and the domestic partner, as well as a tax return prepared as a joint return for a couple that would be treated as married under the tax laws.  The tax returns shall be accompanied by an affirmation from the Staff Attorneys attesting to their financial accuracy.  Reimbursement under either option (a) or (b) shall be paid within 60 days of receipt of the required documentation by the LAS Human Resources Department.  Any tax liability resulting from the reimbursements for employees who select option (a) shall be the responsibility of the Staff Attorney.  At such time as the tax laws are modified to eliminate this disparate treatment which this provision is being adopted to address, this provision will expire.

§ 2.8.3.4.    *Enrollment*.  Each Staff Attorney may select from health plan options detailed in Appendix 2, or as may be otherwise agreed upon by the Union and the Society, during an annual open enrollment period, and/or throughout the year due to qualifying changes in family status.

§ 2.8.3.5.    *Retirees*.  Effective July 1, 2002, a Medicare supplement with prescription drug rider will be provided to Staff Attorneys who:  (1) retire on or after July 1, 2002; (2) have been employed by The Legal Aid Society for 25 years or more (time spent on long-term disability will be included in determining this period); and (3) will at retirement have reached age 65. A dependent of a retiree may purchase at the dependent's expense the same Medicare supplement with a prescription drug rider that will be provided to staff attorney retirees. If the dependent is not Medicare eligible, the dependent may purchase at the dependent's expense LAS health care coverage

that is provided to staff attorneys. Retiree health care coverage is limited to retirees who are not eligible for health care coverage from another employer or former employer, and the ability of a retiree's dependent to purchase a Medicare supplement or LAS health care coverage is similarly limited.

§ 2.8.3.6. *Opt Out.* LAS will implement a health care opt-out plan to provide a $2,500 annual incentive to Staff Attorneys who opt out of annual health care coverage provided that they submit written documentation demonstrating that they are covered for that year by another health care insurance plan.

§ 2.9. *LIFE INSURANCE.* The Society will provide Staff Attorneys with life insurance as detailed in Appendix 2 and will permit Staff Attorneys to voluntarily purchase additional group life insurance through check off, subject to the carrier's requirements.

§ 2.10. *PENSION.* The Society will, no later than seven [7] months from the close of the respective semiannual evaluation period, contribute 6.5% of covered salary, as defined in the Pension Trust Agreement and Pension Plan, to the Legal Aid Society Staff Attorney Pension Plan. Actual out-of-pocket expenses for legal counsel (not to exceed $50,000 per Plan year), consultants, accountants or others retained by the Plan will be payable from the Society's contributions. The LAS pension contributions to the Legal Aid Staff Attorney Pension Plan that are due and payable in Fiscal Year 2006 (July 1, 2005- June 30, 2006) shall be reduced to 3 percent of covered salary as defined by the Pension Trust Agreement and Pension Plan. LAS shall make two semi-annual pension payments by January 31 and July 31 of each year. Effective December 2004, ALAA hereby waives its claim based on LAS' alleged failure to make timely pension fund payments to the Legal Aid Staff Attorney Pension Plan prior to December 2004 in the amount of $381,000.

§ 2.11. *TAX SHELTERS.* The Society will make all necessary efforts to establish, maintain and offer to Staff Attorneys IRS-qualified plans for tax-deferred and/or tax-exempt annuities (overseen by a joint Union-Management committee of equal number), dependent care, excess unreimbursed medical expenses, health insurance premium contributions and long-term disability payments. The Society will arrange for a vendor to offer a Roth 403(b) to Staff Attorneys. The Society will provide an additional payroll deduction option for a New York State 529 Educational Savings Plan. Effective January 1, 2014, the Society will waive the administrative costs for flexible spending and dependant care accounts.

§ 2.12. *VACATION.*

§ 2.12.1. *Amount.* Staff Attorneys will receive annual leave with pay for vacation and religious observance in the amount of twenty [20] workdays for the first year of service; twenty-three [23] workdays for the second and third years of service; and twenty-seven [27] workdays for the fourth and subsequent years of service.

§ 2.12.2. *Eligibility.* Annual leave (except for religious holidays) will not ordinarily be granted until a Staff Attorney has been employed for at least six [6] months. Consistent with workload demands, supervisors will approve exceptions to this policy in response to plans or other specific and unusual circumstances which cannot be deferred.

§ 2.12.3. *Accrual.* Annual leave will be earned on an accrual basis calculated from employment anniversary date on the basis of one and two-thirds [12/3] days per month during the

# EEOC NY DISTRICT OFFICE
## DATE 01/19/2021

first year of employment; one and eleven-twelfths [11 1/12] days during the second and third years; and two and one-quarter [2 1/4] thereafter. By June 1 of each year, each Staff Attorney will be provided with a statement of her accrued vacation as of May 1 and/or when their respective accruals reach thirty-five [35] days.

     **§ 2.12.4.**    *Paychecks*. Paychecks due during vacation will be available on the last working day prior to the vacation, provided that the Society is given three [3] week's notice of any change in scheduled vacation.

     **§ 2.12.5.**    *Scheduling*. Vacation schedules will be subject to office and practice staffing requirements.

     **§ 2.12.6.**    *Illness or Accident*. If a Staff Attorney becomes ill or suffers an accident during a period of vacation, the Society will exercise reasonable discretion in converting vacation time to sick time.

     **§ 2.12.7.**    *Buy-Back*. Each full-time and part-time Staff Attorney in the Civil Practice, Juvenile Rights Practice, Parole Revocation Defense Unit and Special Litigation Unit of the Criminal Practice will have the option of selling back up to five [5] vacation days per calendar year and staff attorneys in the Criminal Appeals Bureau may sell back up to 10 vacation days per calendar year, to be paid at the rate in effect on June 30. Provided during the period July 1, 2004 through June 30, 2005 Staff Attorneys shall not have the right of selling back any vacation time during this year. Staff Attorneys in the Staten Island Criminal Office will be allowed to buy-back up to 17 vacation days per fiscal year minus the number of comp days bought back.

     **§ 2.12.8.**    *Forfeiture*. Any accrued leave will be waived if not used within six (6) months after the anniversary date. There will be a grace period for Staff Attorneys who forfeit accrued vacation time as a result of canceled scheduled vacation(s) due to scheduling beyond their control of trials, pre-trial hearings or appellate arguments.

     **§ 2.12.9.**    *Restoration of 1995 Vacation Accruals*. Effective January 1, 2004, the Society will restore the maximum vacation time accrual to all Staff Attorneys who in 1995 reduced their maximum vacation time accrual.

**§ 2.13.**    **Adoption & Fertility Treatments**. The Society will create a fund of $300,000 each year in order to offer financial assistance for adoption and the costs not covered by insurance to establish fertility at a maximum reimbursement of $15,000 per attorney.

**§ 2.14.**    *CHILDCARE*. Management will create a committee to explore the feasibility, cost and potential liability issues regarding the provision of childcare services or a childcare subsidy.

# Article 3/Employment Policy

§ 3.1.    *FAIR EMPLOYMENT PRACTICES*.

§ 3.1.1.    *Non-Discrimination*. The Society will continue its policy of not discriminating, as defined by law, against an employee on the basis of actual or perceived race, color, national origin, alienage or citizenship status, religion, creed, sex, gender (including "gender identity" -- which refers to a person's actual or perceived sex, and includes self-image, appearance, behavior or expression, whether or not different from that traditionally associated with the legal sex assigned to the person at birth), disability, age (18 and over), military status, prior record of arrest or conviction, marital status, genetic predisposition or carrier status, sexual orientation, or status as a victim of domestic violence, a sex offense or stalking, or membership in, or association with the activities of, any employee organization. The Joint Union-Management Staff Attorneys Affirmative Action and Diversity Committee provided for herein will establish written procedures to resolve bargaining unit discrimination complaints. Such procedures will include following elements:

§ 3.1.1.1.    *Individual Options*. If both the complainant and the target of the complainant voluntarily agree, they may submit to voluntary mediation. The Joint Union-Management Staff Attorney Affirmative Action and Diversity Committee will recommend to the Attorney-in-Chief a diverse panel of qualified mediators. When investigation of a complaint is required, the investigation will be conducted by the Director of Diversity and Inclusion or outside counsel with appropriation experience and training consistent with EEOC guidance.

§ 3.1.1.2.    *Confidentiality*. Information about the complaint will not be revealed except as required to complete a full and fair investigation and/or to attempt resolution.

§ 3.1.1.3.    *Due Process*. Employees accused of discrimination will have a full and fair opportunity to respond to the accusation. Both accuser and accused will be entitled to representation in the proceeding.

§ 3.1.1.4.    *Recommendation*. Individuals found to have engaged in discriminatory conduct will be disciplined up to and including possible termination.

§ 3.1.1.5.    *Retaliation*. Complainants and witnesses will be fully protected against retaliation.

§ 3.1.1.6.    *Alternate Remedies*. None of the provisions of this mechanism precludes access to other discrimination remedies.

§ 3.1.2.    *Affirmative Action*. The Legal Aid Society will continue to pursue affirmative action and diversity with regard to race, ethnicity, age, gender, sex, sexual orientation and disability and to pursue a truly inclusive workplace where colleagues of diverse backgrounds and lifestyles feel accepted, respected and encouraged to grow professionally. The Society recognizes that, given the high degree of diversity of its client population, it has a responsibility to continue its affirmative action efforts, in accordance with ABA standards, beyond simply meeting traditional utilization measures for the relevant labor pool. The Society will also continue to pursue diversity with respect to skills in languages commonly-spoken by the Society's eligible client population. Diversity will be considered a relevant criterion in hiring and selection decisions. The Joint Union-Management Affirmative Action and Diversity Committee will refine and articulate more specific objectives and strategies through the affirmative action planning process.

§ **3.1.2.1.**    *Discussion*.  The Society will consider and respond to the Union's concerns in regard to affirmative action, and the Union will participate in development of the annual Staff Attorneys' Affirmative Action Plan described below.

§ **3.1.2.2.**    *Joint Union-Management Staff Attorneys Affirmative Action And Diversity Committee*.  There will be a Joint Union-Management Staff Attorneys Affirmative Action and Diversity Committee consisting of the Attorney-in-Chief, the Attorneys-in-Charge of the Civil, Criminal, and Juvenile Rights Practices, the Society's Diversity Officer, the Society's Chief Human Resources Officer, and another representative of the Society's senior management, and the President of ALAA and six [6] ALAA representatives (including representatives of each Practice, a representative of the Attorneys of Color Caucus of Legal Aid, and the ALAA Affirmative Action Representative).  The Committee will be co-chaired by the Attorney-in-Chief or her designee and the ALAA President or her designee.  The purpose of the Committee is to foster workforce diversity in the bargaining unit, with particular reference to recruitment, retention and promotion of people of color, women, and a diverse staff as described in § 3.1.1.  The Committee will meet on the second Wednesday of each quarter.  The Committee will develop, monitor and evaluate an annual Affirmative Action and Diversity Plan, as described below, which will be the focal point around which these efforts are organized.  Based on the annual plan, the Society will periodically post and maintain Affirmative Action and Diversity data and information on its Website.

§ **3.1.2.3.**    *Society Resources*.  The Society will provide staff support for implementation of the Affirmative Action and Diversity Plan, and will maintain one [1] full-time Diversity Officer and appropriate supporting staff, whose principal responsibilities will include affirmative action and diversity.

§ **3.1.2.4.**    *Practice Committees*.  Practice Joint Union-Management Staff Attorney Affirmative Action and Diversity committees will be established at the initiative of either party to address concerns unique to the Practice.

§ **3.1.2.5.**    *Plan*.  The Society-wide Union-Management Staff Attorney Affirmative Action and Diversity Committee will develop an annual Staff Attorney Affirmative Action and Diversity Plan to foster workforce diversity.  The plan will include the following components:

§ **3.1.2.5.1.**    *Statistics*.  The Attorney-in-Chief will timely maintain statistics in a consistent format necessary to support the affirmative action objectives of the Society and the Committee's work.  Statistics will include, but not be limited to, recruitment, promotion and retention profiles for all protected classes as defined under the Federal EEO-1 process as well as other groups included in § 3.1.1.  Data will be collected, retained and reported for each organizational unit and for the bargaining unit as a whole.  This information will be included in each annual Staff Attorneys Affirmative Action and Diversity Plan, will be used as an analytical tool for identifying areas in need of particular attention in that year's plan, and will be used for determining progress relative to prior years' plans.  This information will be regularly distributed and made available to the Union upon request.

§ **3.1.2.5.2.**    *Recruitment*.  The Attorney-in-Chief will provide a recruitment plan to comply with the goals of the Committee prior to each recruitment period.  The Affirmative Action and Diversity Plan will include strategies to foster diversity in recruiting for bargaining unit positions.  At a minimum, the Plan will provide for:  1) emphasis in recruiting notices, literature and presentations on affirmative action and workforce diversity as a significant Society value; 2) strategies for expediting job offers as early as possible before January 1, in order to

compete more effectively for highly qualified and highly diverse entering classes; 3) continued diversity of attorneys who participate in the interview and follow-up processes in each practice, with particular emphasis on increasing the participation of attorneys described in § 3.1.1 in interviewing applicants; and 4) broad outreach in selecting locations for special recruitment efforts.

§ 3.1.2.5.3. *Retention*. The Affirmative Action and Diversity Plan will include ongoing strategies to recognize and eliminate institutional or personal barriers to retention of a diverse workforce. The Attorney-in-Chief will report retention data to the Committee, and identify institutional barriers that lead to the attrition of diverse attorneys. At a minimum, these strategies will include mandatory diversity training or similar programs for attorneys and managers to address the issues listed above.

§ 3.1.2.5.4. *Promotion*. The Affirmative Action and Diversity Plan will include strategies to assess and convey supervisory potential of bargaining unit members and to develop their supervisory skills, with special emphasis on reaching attorneys of color, women, and other groups included in § 3.1.1, and on addressing issues of particular concern to their career development.

§ 3.1.2.5.5. *Vacancies*. The Society will post and forward to the Union all Staff Attorney and Supervisory vacancies.

§ 3.2. *Hiring*. Consistent with the goals and procedures discussed above ("Fair Employment Practices"), each practice will establish a joint Union-Management committee to ensure Staff Attorney participation in regard to Staff Attorney and attorney management hiring.

§ 3.3. *EMPLOYMENT STATUS*.

§ 3.3.1. *Probationary Period*. During the first eight [8] months of employment, the employment relationship will be considered probationary and may be terminated upon one [1] month's notice with a statement of the reason for termination with recourse to the grievance procedure but not to subsequent arbitration. At the end of four [4], six [6], and eight [8] months of employment, the new attorney must be evaluated by his or her supervisor and receive a written report identifying those areas in which the employee should improve her professional performance. At the end of eight [8] months of employment, the probationary period will end, unless the supervisor, upon written notice to the attorney, extends probation by another four [4] months. The notice shall identify the particular reasons for the extension, and where appropriate shall identify the particular areas in need of improvement based on the previous evaluations and then-current concerns. Extension of the probationary period shall be subject to the grievance procedure, but not to subsequent arbitration. The probationary period may be extended a second time only in extraordinary circumstances, such as the excused absence of the probationary employee for such a lengthy period of time that the supervisor is unable to evaluate her.

§ 3.3.2. *Bar Examination*. A law graduate will not be discharged solely for a first failure to pass the bar examination. The Society will provide days off for those taking the bar for a second time, in order to permit participation in the Society-sponsored bar review course, the length and content of which will be determined by the Society in consultation with the Union. With respect to a law graduate whose employment is terminated because of her second failure to pass the bar examination, one [1] month's notice of termination will be deemed to have been given on the third day following the date on the notice of bar examination results issued to the law graduate by the Board of Law Examiners; provided that, if the third day falls on a Saturday, Sunday or contractual

holiday, then the notice will be deemed to have been given on the next business day that is not a Saturday, Sunday or contractual holiday. If the law graduate is successful in passing the bar examination on a third attempt, upon admission to the bar she will have recall rights to the job from which she was terminated for one [1] year following her date of termination, subject to hiring needs and conditioned on satisfactory probationary evaluations during her initial tenure. Staff Attorneys who are rehired after passing the bar examination following termination after two bar failures will be given service credit for each month actually worked as a law graduate prior to termination.

§ 3.3.3.     *Senior Staff*. A Senior Staff Attorney may be disciplined or terminated only for "just cause," with recourse to the grievance and arbitration procedures provided in § 1.8.

§ 3.4.     *LEAVE*.

§ 3.4.1.     *Illness or Disability*. The Society will continue full salary for up to ninety [90] days of employment for all attorneys on extended illness or disability. Thereafter, such attorneys will receive sixty [60] percent of salary up to a maximum of $3,000 per month, or, for attorneys who become disabled on or after January 1, 2001, $4,000 per month, or, for attorneys who become disabled on or after January 1, 2014, $8,000 per month, subject to the terms of the then-current insurance policy, which is incorporated by reference herein and which may be changed only if equivalent coverage and terms are provided. In accordance with the disability insurance policy, any social security benefit payable when disability occurs will be deducted from the insurance benefit, but the amount of deduction will not be increased because of a subsequent rise in social security benefits. In order to ensure that long-term disability benefits are paid on a tax-free basis, Staff Attorneys will have the individual option of paying any extra premium for such coverage, provided that this arrangement is cost-neutral to the Society. The Society will not terminate or modify the disability insurance policy during this Agreement without the Union's consent.

§ 3.4.2.     *Holidays*. Staff Attorneys will receive the paid holidays of New Year's Day; Martin Luther King Jr., Day; Lincoln's Birthday; Presidents' Day, Memorial Day; Independence Day; Labor Day; Indigenous Peoples' Day; Veteran's Day; Election Day; Thanksgiving Day; Christmas Day, and on such additional days as set forth by the Society. Indigenous Peoples' Day, the second Monday of October, will be designated as a floating holiday.

§ 3.4.3.     *Bereavement*. Staff Attorneys are entitled to paid bereavement leave of five [5] consecutive work days upon death of a Staff Attorney's and/or a qualifying domestic partner's parent, parent-in-law, child, child-in-law, sibling, spouse, grandparent, or domestic partner. All other bereavement leave will be charged against annual leave. However, each employee shall also receive an additional ten [10] days of discretionary bereavement leave for the purposes associated with the death of an individual not among the immediate family members listed, or for additional paid time off in association with the death of a listed family member. These days are to be used exclusively for bereavement purposes and are accrued as follows: five [5] days at the completion of the first year of employment; five [5] additional days upon completion of the fifth year of employment. Employees may use up to the amount of discretionary leave accrued at the time of the bereavement. Every ten years of a Staff Attorney's tenure, all exhausted discretionary bereavement leave will be replenished so that the Staff Attorney begins again with a maximum total of ten [days] of discretionary bereavement leave at each ten [10] year interval of tenure.

§ 3.4.4.     *Leaves of Absence*. The Society will provide the leaves of absence described below. Upon written request and payment of the premium by a Staff Attorney, the Society will continue her insurance coverage during such leave.

| 2016-2019 Contract | Article 3/Employment Policy | Page 18 |
|---|---|---|

§ **3.4.4.1.** *Sabbatical*. After each three [3] years of service, Staff Attorneys may request an unpaid sabbatical leave of absence for up to one [1] year. Sabbatical leaves may only commence on January 1, April 1, July 1, or October 1. A request for a sabbatical leave must be made at least 120 days prior to the proposed commencement date.

§ **3.4.4.1.1.** *Private Practice*. Staff Attorneys on sabbatical leave may engage in the practice of law when it does not present a legal or funding conflict with the Society, subject to case-specific prior Management approval.

§ **3.4.4.1.2.** *Return*. Upon her return from sabbatical leave, a Staff Attorney will be paid at the then-current salary level at which she was last employed prior to her leave, unless the Society, in consultation with the Union in regard to criteria and principles, determines that the Staff Attorney's work experience while on leave justifies a higher level. Absent a showing of reasonable necessity by the Society, an attorney will have the right to return to the practice from which she departed.

§ **3.4.4.2.** *Child Care*. A Staff Attorney may take an unpaid leave of absence for up to ten [10] months for the sole purpose of caring for an adopted or a newborn natural child of the Staff Attorney, or of her same- or opposite-sex domestic partner. When possible, requests for such leave will be submitted at least three [3] months in advance of the approximate starting date of such leave. A pregnant Staff Attorney may elect to use part of such leave prior and contiguous to her pregnancy disability leave.

§ **3.4.4.3.** *Parental Leave*. Subject to approval as to its legality, any parent of a newborn or newly-adopted child/children or a new step parent of a child/children who resides with the Staff Attorney-parent more than fifty [50] percent of the time, may take up to twelve [12] weeks (60 days, exclusive of paid holidays) of paid parental leave in order to care for and establish a relationship with the child/children. In concept, this leave is provided to assure paid time off during the period immediately following the birth, adoption, etc. Paid parental leave would therefore precede any vacation, comp. time or unpaid leave that the new parent/step-parent may wish to take in connection with the birth, or adoption, etc., and would run concurrently with any disability leave—maternity-related or otherwise—that may be appropriate for either parent during the initial eight [8] week period after the triggering event, exclusive of paid holidays. However, recognizing that individual circumstances may vary, the employee(s) may, in consultation with supervisor(s) involved, use the paid parental leave on a different schedule, provided that (1) it cannot extend beyond the first year after the triggering event; and (2) the total amount of paid time off associated with the commencement of the particular parenting relationship is not increased by the rescheduling. This section fully applies to all the enumerated categories of children of an attorney's domestic partner. For the purposes of adoption the child must be under 21 at the start of the adoption process.

§ **3.4.4.4.** *Other Leave*. The Society may, in consultation with the Union in regard to criteria and principles, extend or grant leaves for purposes other than those set forth above.

§ **3.5.** **FREE SPEECH**. The expression of personal religious, political, social or economic beliefs of each and every attorney is fully guaranteed and will never constitute grounds for discharge or relief from an individual assignment unless, in either instance, it can be demonstrated that such expression has, or will, directly interfere(d) with, and detract from, representation of a Society client so as to render said representation less than at the highest level of competence and effectiveness.

**§ 3.6.** ___INTERPERSONAL CONFLICT___. Where personality differences between an attorney and her supervisor threaten to adversely affect effective operation of an office and/or continued employment of the attorney, the Attorney-in-Charge will, wherever feasible, transfer personnel to a work unit in the same office or, if necessary, a different office.

**§ 3.7.** ___PART-TIME WORK SCHEDULES___. The Society will provide a flexible work environment, consistent with the Society's primary obligation to its clients.

**§ 3.7.1.** ___Definition and Workload___. A part-time schedule shall be any schedule of less than one hundred [100] percent of an ordinary schedule. A part-time attorney's workload will be adjusted in proportion to her schedule.

**§ 3.7.2.** ___Positions___. All Staff Attorneys may apply for a part-time schedule. Assuming the necessary demand, there will be a minimum of ten [10] positions in CAB, twenty [20] positions in CDD, nine [9] positions in Civil, and ten [10] positions in JRP. Many part-time positions in CDD and JRP must be worked in job share teams in order to be feasible from a workflow standpoint. A Staff Attorney who is working part-time as a transitional (less than ninety [90] days) accommodation for a disability shall not be counted towards these minimum numbers, although part-time schedules in accommodation of a disability that is expected to last in excess of ninety [90] days would be considered to be part of the practice's minimum allocation. The Society shall make reasonable efforts, subject to staffing considerations, to grant requests for part-time schedules above the minimum levels.

**§ 3.7.3.** ___Scheduling and Selection___. A request for a part-time schedule shall be submitted, to the extent possible, at least ninety [90] days in advance of the intended start date of the schedule. If the minimum number of positions for that attorney's practice are not filled, the request will be granted and the starting date will be arranged to match the request as closely as possible. If the minimum number of positions for that attorney's practice are filled, the Society may delay or deny commencement of a part-time schedule due to workload and staffing considerations. Any necessary delay or denial of a part-time schedule will be accompanied by a written statement of the workload and staffing considerations that are at issue, and the manager's best estimate of when they can be overcome. Wherever there is a surplus of outstanding applications, a first preference shall be given to those applicants who will use their non-work time to be an "at-home" parent with childcare responsibility during those hours; a second preference shall be given based on seniority.

**§ 3.7.4.** ___Hours and Compensation___. Staff Attorneys who job share will have the individual option to work more than 50% paid time, subject to prior Management approval. The Society shall not incur costs that are disproportionate to the Staff Attorney's reduced schedule. Part-time employees whose schedules fall within the eligibility requirements for our various lines of insurance (currently 17.5 hours per week for health coverages, long term disability and life insurance) will continue to have access to coverage, but will be required to pay a percentage of the premium that is equal to their percentage of non-work time, except that current Staff Attorneys on part-time schedules whose benefits payments have been set under the former contract will not have their current payment increased by operation of this agreement so long as they remain continuously in part-time status. While the Society will provide office space to part-time employees in accordance with current standards to the extent such space is available, increased use of part-time employees may call for reasonable accommodations in the use of space in order to avoid incurring costs that are

| 2016-2019 Contract | Article 3/Employment Policy | Page 20 |
|---|---|---|

disproportionate to part-time attorneys' schedules. Effective September 1, 2001, part-time employees will advance annually on the salary schedule.

§ 3.7.5. *Availability and Coverage*. During the non-work part of the work week, part-time attorneys will be available for emergencies, court appearances, conferences, or necessary telephone consultations. If a CDD part-time attorney works a night or weekend arraignment shift in addition to her regular hours, she will earn a comp day which may accrue and which may be cashed in; if, due to trial or other necessary commitments, a part-time trial attorney must work more days in the week than the attorney is scheduled to work, the attorney, in consultation with her supervisor, will make adjustments in her future work schedule to restore the balance and/or will have her pay adjusted for the relevant pay period(s) to reflect the work.

§ 3.7.6. *Other Employment*. Other gainful employment or professional activities, except for bar association or Union activities, are prohibited during non-work hours.

§ 3.7.7. *Return*. A qualifying attorney who holds one of the minimum number of part-time positions cannot be returned to full-time staff against her will. Except in JRP, an attorney who received one of the minimum number of part-time positions shall have the right to return to a full-time schedule on thirty [30] days notice. All part-time attorneys in JRP, and attorneys holding part-time positions in other practices above the allocated minimum number may return, subject to budgetary considerations, and in no event later than the starting date of the next available full-time vacancy following the notice. If there are more applications to return to full-time status from attorneys in part-time positions above the allocated minimum number than there are available full-time positions, preference for return will be based on seniority, except that all CAB attorneys on part-time schedules as of the ratification date shall have the right to return to a full-time schedule, even if their number is in excess of the practice's allocated minimum.

§ 3.8. *TELECOMMUTING*. Staff Attorneys will, in consultation with their supervisors, be permitted to telecommute to the extent consistent with the nature of their work and other staffing/work needs of the office. Although it has limited feasibility for many jobs, particularly in trial offices, Management will facilitate telecommuting by lending a limited number of laptop computers for limited time periods; seeking group discount buying/leasing opportunities; and maintaining and expanding the remote access properties of the network.

§ 3.9. *TRANSFERS AND PROMOTIONS*.

§ 3.9.1. *Voluntary*. The Society will promptly post and notify the Union of all expected Staff Attorney and supervisory vacancies. The Society shall give due consideration to 1) an attorney's request to work in a particular county because it is her county of residence or more convenient to her county of residence; 2) a senior Staff Attorney's request for a change of workplace or practice and for the appointment to new staff positions created by the Society. Every attorney who has completed her original commitment and who desires a transfer to another practice will be interviewed. Transfer requests and applications for promotion will be granted to Staff Attorneys whose qualifications are equal to those of outside candidates, subject to staffing needs and affirmative action considerations.

§ 3.9.2. *Involuntary*. Whenever possible, an attorney who is permanently transferred from one [1] office to another will receive three [3] weeks written notice of such transfer and, upon request, a written statement of the reasons therefore. Due consideration will be given to

Case 1:21-cv-05960-KPF   Document 24-1   Filed 09/01/21   Page 54 of 82

EEOC NY DISTRICT OFFICE
DATE 01/19/2021

the request of permanently transferred attorneys to complete specific cases in which the level of preparation is such that her removal may be detrimental to the client.

## § 3.10.    *EXPENSES*.

§ 3.10.1.    *Transportation*.  Staff Attorneys in all practices leaving evening and/or night institutional assignments will be fully reimbursed for taxi fare within the five NYC boroughs. Managers will approve taxi fare beyond NYC limits on a case-by-case basis. The Society will issue expense reimbursement checks within five [5] weeks from submission of expenses forms, if forms are submitted monthly.

§ 3.10.2.    *Additional Transportation Procedures – Civil Practice.*  Staff Attorneys in the Civil Practice will be reimbursed for the cost of car service or cab fare to travel home during the evening from community outreach and other assignments away from the office as specified in Section 3.10.1.  For community outreach and home visits to homebound clients conducted during other times of the day, staff members with safety concerns about travel to and from outreach sessions should discuss with their supervisors the most appropriate means of transportation, including car service or cab fare from a central subway location to the outreach assignment.  Staff Attorneys will be reimbursed for transportation methods approved by office supervisors under such circumstances. In an instance where an office supervisor determines not to approve car service or cab fare for daytime outreach, the supervisor will review that determination with the Attorney-in-Charge before a final decision is made as to the means of transportation in such cases.

§ 3.10.2.    *Additional Transportation Procedures – Criminal Practice.*  Staff Attorneys will be reimbursed for travel relating to arraignments as follows:  For Night Court: A Staff Attorney who works a night court arraignment shift will be reimbursed for parking and round-trip mileage if s/he chooses to drive to and from work.  Staff Attorneys are expected to produce receipts for their parking expenses so that the Society can comply with audit requirements.  For the first such reimbursement request seeking reimbursement for roundtrip travel from and to home under these circumstances, the Staff Attorney will generate a mapquest confirming the mileage which the Society will keep on file for future reimbursement requests.  If the Staff Attorney elects to travel to and from such a night shift by means other than her own vehicle the staff attorney will be reimbursed for cab fare home from night court as specified in Section 3.10.1.  For traditional taxis, the driver can provide the Staff Attorney with an electronic receipt to document such travel expenses.  For car services other than traditional cabs, the Staff Attorney is expected to obtain a receipt from the driver so that the Society can comply with audit requirements; if the driver refuses to provide a receipt, the Staff Attorney must attest to that fact unless the charge is less than $25.  The Society reserves the right to require Staff Attorneys to use specific car service companies which provide receipts and/or accept credit cards.   For Weekend Day Arraignments and Holiday Day Arraignments, the Society will reimburse roundtrip mileage and parking for a Staff Attorney when public transportation available to her is unreliable or the Staff Attorney is traveling from a remote location, including locations outside of the five boroughs of New York City.  Staff attorneys who seek such reimbursement must be pre-approved to do so by the Attorney-in-Charge of the Criminal Practice and such pre-approval shall continue for so long as the circumstances giving rise to the pre-approval remain in effect.

§ 3.10.4.    *Meals*.  Effective, October 4, 2017, Staff Attorneys in all practices will receive a meal allowance of upto $20.00 for performing mandatory work assignments that extend five [5] or more hours beyond the scheduled workday.  Meal allowance reimbursements up to $12.00

Case 1:21-cv-05960-KPF Document 24-1 Filed 09/01/21 Page 55 of 82

EEOC NY DISTRICT OFFICE
DATE 01/19/2021

will be given with no receipt. Meal allowances above $12 must be accompanied by a receipt to receive the full reimbursement.

§ **3.10.5.**     *Foreign Language Classes*.  The Society will maintain a $25,000 fund to reimburse individual Staff Attorneys a maximum of $500 annually for the cost of foreign language classes relevant to Legal Aid work.

§ **3.10.6.**     *Staten Island.*  In light of the unique circumstances that exist for Staten Island staff, the Society agrees to continue to pay for parking costs for Staten Island CDP attorneys and to begin to pay parking costs for Staten Island JRP and Civil attorneys.  The benefit will only apply to Staten Island staff and will not be expanded to staff in any other borough.

§ **3.11.**     ***PERSONNEL RECORDS***.

§ **3.11.1.**     *Review and Response*.  Attorneys have the right to: 1)  review their individual permanent personnel records;  2) receive a copy of any formal or informal document concerning her performance or character contained therein; and 3) have placed therein her statement concerning any such document.  A Staff Attorney will sign a receipt for every document provided under this provision, which will be attached to each such document in the file.

§ **3.11.2.**     *Disclosure to Third Party*.  During an attorney's current and immediate past employment, the Society will not disclose from such files to third parties, except with express or implied consent of the attorney, or under legal process.  An attorney who lists the Society as a current or past employer impliedly consents to the Society's disclosure of information to the person or organization to whom the fact of Society employment has been provided.

§ **3.12.**     ***PRO BONO REPRESENTATION***.  Staff Attorneys wishing to engage in *pro bono* legal services on their free time will inform the practice Attorney-in-Charge, who will approve activity that does not present a conflict of interest or otherwise make the attorney's services unavailable to the Society and its clients.

§ **3.13.**     ***SENIOR STAFF RETENTION***.  There will be a joint Union-Management committee to study the financial and other issues of retaining senior Staff Attorneys above step 13.  This committee shall provide findings to both ALAA and Management at least once per calendar year.

§ **3.14.**     ***JOB SECURITY***.

§ **3.14.1.**     *Plan*.  If economic retrenchment becomes necessary, the Society will work closely with the Union to ensure job security of every attorney then on staff.  Where retrenchment appears necessary, Union and Management will meet at least seventy-five [75] days in advance of the implementation date, or as soon thereafter as possible, to develop a plan.  In the course of such discussion, the Society will provide the Union with all information appropriate to an informed decision.  The Society will provide sixty [60] days' notice of the transfer or layoff of specific attorneys, or such lesser notice as is available to the Society.

§ **3.14.2.**     *Transfer*.  Where vacant Staff Attorney positions exist outside the affected practice, Staff Attorneys subject to layoff have the right to transfer to such vacant positions, under the terms below.

§ **3.14.2.1.**     *Scope*.  The right to transfer is to offices where like skills are required, e.g., trial to trial, appeal to appeal.  The Society, in consultation with the Union in regard to criteria and principles, will match attorneys and vacancies.

§ 3.14.2.2. *Definition of Vacancy*. During economic retrenchment, the Society must make available to Staff Attorneys threatened with layoff all vacancies in all practices that are, or will become, available within a reasonable time because of known resignations, normal attrition patterns, or discharges for cause. Such positions will be made available no later than the time that the position would normally be filled. Acceptance of a job offer by an outside applicant will not constitute filling of the position if the applicant has not yet commenced employment.

§ 3.14.2.3. *Implementation*. Where there are sufficient vacancies in the Society to place all of those subject to layoff, volunteers will be transferred first. Thereafter, transfers will be offered, on the basis of reverse seniority, to yearly groups that consist of all those whose anniversary dates, calculated in terms of continuous and unbroken bargaining unit membership, fall within the twelve [12] months from July 1 through June 30; all attorneys within a yearly group are considered to have the same anniversary date for these purposes. Attorneys in the subsequent yearly group will be transferred only when the previous group has been exhausted. If transfers must be made by choosing from among those within the same yearly group, the Society will determine the order of transfer based on merit, including affirmative action considerations. Where there are insufficient vacancies to accommodate all affected employees, transfers will be offered to yearly groups, as defined above, in seniority order.

§ 3.14.2.4. *Status*. Each transferred Staff Attorney will be deemed a new hire for probationary purposes, based on the date of transfer.

§ 3.14.2.5. *Refusal*. Staff Attorneys who refuse transfer will be deemed terminated because of economic retrenchment in their practice.

§ 3.14.3. *Layoff*. If the number of vacancies in other practices is insufficient, layoff will be imposed first on the least senior yearly group, as defined above. The Society will continue to provide medical benefits, in the form and amount existing on the date of such termination, for ninety [90] days from the termination date, at the conclusion of which laid off attorneys may exercise applicable COBRA rights.

§ 3.14.4. *Recall*. Staff Attorneys transferred or terminated under this provision have recall rights to the jobs from which they were transferred or terminated for eight [8] months from the date of transfer or termination, or until the following July 1, whichever is later. Recall will be issued in the following order, to those who were: 1) actually laid off without having been offered a transfer; 2) transferred; and 3) laid off after having rejected transfer.

§ 3.14.4.1 *2004 Layoffs*. ALAA acknowledges that in June 2004 the Society has granted the grievances filed on behalf of Staff Attorneys in the Criminal Appeals Bureau and the Prisoners Rights Bureau insofar as they objected to layoffs of Staff Attorneys in the Criminal Appeals Bureau and Prisoners Rights Project on the ground that the Criminal Defense Division, the Criminal Appeals Bureau, and the Prisoners Rights Project are part of one area of criminal practice within the Society. In accordance with this grievance, the Society shall consider criminal defense, criminal appeals, and prisoners rights Staff Attorneys as Staff Attorneys in the same criminal practice area, without regard to separate divisional distinctions. The Society shall also consider civil and volunteer Staff Attorneys as Staff Attorneys in the same Civil Practice area, without regard to separate divisional distinctions. Subsequent to the July 16, 2004 Memorandum of Understanding, the Prisoners' Rights Project has been moved from the Criminal Practice to the Civil Practice.

**§ 3.15.**  **_RESIGNATION_**.  Staff Attorneys will give at least thirty [30] days' notice of intent to resign, exclusive of vacation used during that period.

**§ 3.16.**  **_ONE-TIME EARLY RETIREMENT PROGRAM_**.

§ 3.16.1.  In 2017, The Legal Aid Society will fund a one time early retirement offering for up to ten staff attorneys who are on active payroll status and: a) have at least 25 years of services as of December 31, 2017; b) are 65 years of age or older as of December 31, 2017; and c) submit written application for the early retirement program on or before December 31, 2017 and thereby agree to retire from The Legal Aid Society effective as of the close of business on January 31, 2018. Each attorney accepting this offer will receive a one-time payment of $50,000, which is subject to any applicable payroll deductions.  If more than ten eligible staff attorneys apply for this benefit, it will be given based on seniority.

§ 3.16.2.  In 2018, The Legal Aid Society will fund a one time early retirement offering for up to ten staff attorneys who are on active payroll status and: a) have at least 25 years of services as of December 31, 2018; b) are 65 years of age or older as of December 31, 2018; and c) submit written application for the early retirement program on or before November 30, 2018 and thereby agree to retire from The Legal Aid Society effective as of the close of business on January 31, 2019. Each attorney accepting this offer will receive a one-time payment of $50,000, which is subject to any applicable payroll deductions.  If more than ten eligible staff attorneys apply for this benefit, it will be given based on seniority.

**§ 3.16.3.  The retirement buyout will be effective on or before January 31, 2018 during the first year of the contract, and between December 1, 2018 and January 31, 2019 for the second year of the contract.**

**§ 3.17.**  **_HEALTH AND SAFETY_**.

§ 3.17.1.  **_Generally_**.  The Society will provide employees with a work environment that is safe and conducive to good health.  It also has the goal of providing offices that are clean, in good repair and secure, and will continue efforts to improve the condition of offices in which its employees work. The Society will promptly clear the work place if, due to any circumstance, it is or becomes unhealthy or unsafe, and will rectify the problem prior to reoccupation. The Society will use all reasonable means to ensure that conditions at all off-site locations (e.g., courts, jails, etc.) are non-harmful, noninjurious, and that they comply with all applicable codes and regulations.

§ 3.17.2.  **_Specific Measures_**.

§ 3.17.2.1.  **_New Technology_**.  The Society will provide the Union with advance written notice of introduction into the workplace of new technology which may affect Staff Attorney health or safety.  Where feasible, such notice will be given before the Society makes a binding commitment to purchase specific equipment.

§ 3.17.2.2.  **_Security_**.  The Society will offer lockers or locking furniture to each Staff Attorney.

§ 3.17.2.3.  **_Infectious Disease_**.  The Society will take all reasonable steps to protect staff from unnecessary health risks and will pursue affirmative measures to assure that the Society's clients are not compelled to endure unnecessary health risks from infectious disease by virtue of their incarceration or poverty. These steps will include: 1) twice annual PPD tuberculosis

tests and any indicated follow-up procedures, at no cost to Staff Attorneys, administered by appropriate medical personnel, along with sufficient work time for necessary visits to a medical office; 2) payment of all unreimbursed out-of-pocket medical expenses related to diagnosis and treatment of TB; 3) medically-appropriate masks on request, accompanied by training and certification in their safe and appropriate use; 4) training in minimizing TB exposure; 5) "safe rooms" in which to conduct interviews with clients suspected of having TB; 6) litigation as appropriate to improve non-Society facilities and to make TB testing and care available to the Society's clients; 7) prompt response to requests for exemption from normal work requirements, including arraignments and homeless shelters, because of compromised immune systems or pregnancy, on a person-specific, symptom-specific, site-specific, and task-specific basis; and 8) appropriate inoculation of Staff Attorneys, at the Society's expense, against such contagious diseases as measles and hepatitis.

§ 3.17.3.    *Joint Union-Management Health and Safety Committee*.  The parties will establish a joint Union-Management committee to address workplace health, safety and physical working conditions, including, but not limited to heating, cooling, elevator service and security.

§ 3.17.3.1.  *Duties*.  Among its duties, the Committee will consider and make recommendations concerning:  1) problems or potential problems at any job site; 2) anticipatory maintenance (e.g., replacing systems which have exceeded expected years of use, or are nearing such time); 3) space procurement and lease renewal; and 4) other areas of health, safety and physical working conditions.

§ 3.17.3.2.  *Procedure*.  All non-emergency health and safety matters will be submitted to the Committee for investigation and resolution prior to filing of any grievance with regard to that subject.  If not resolved and/or grieved within 30 days, the Union may immediately proceed to expedited AAA arbitration.

§ 3.17.4.    *Office Space*.  The Society will provide approximately one hundred and fifty [150] square feet of office space per Staff Attorney, including support staff, of a caliber equal or superior to space presently provided in the Manhattan or Brooklyn Criminal Defense facilities, subject to availability of suitable space inside court buildings or other leased space.  Where compliance with any arbitration decision results in a staffing reduction, there will be a proportional reduction in office workload.

§ 3.18    *Record Keeping.*    ALAA acknowledges that LAS is implementing a time records system for Staff Attorneys for the purpose of assisting LAS in its efforts to maintain and obtain funding to support the work of LAS.

# Article 4/Quality of Representation

**§ 4.1.**    *STANDARD OF ADVOCACY*. The Society and its individual attorneys are deeply committed to the highest standards of professional competence and to vigorous representation in each and every case.

**§ 4.2.**    *CONTINUITY OF REPRESENTATION*.

    **§ 4.2.1.**    *Generally*. Continuity of representation is an important factor in realizing the most effective representation of clients, in that it: 1) enhances the attorney-client relationship; 2) provides the best opportunity for an attorney to initiate early case preparation; and 3) strengthens development of an integrated theory of representation.

    **§ 4.2.2.**    *Criminal Defense Division*

      **§ 4.2.2.1.**    *Scope*. The Society will maintain vertical continuity of representation from Criminal Court arraignment through filing of a notice of appeal and pursuit of a stay of execution after Supreme Court conviction. The Society's form notice of appeal will state that the Society represented the client in the trial court and, where consistent with the client's wishes, will request that representation by the Society continue on appeal.

      **§ 4.2.2.2.**    *Implementation*. Continuity in the Criminal Defense Division is neither monolithic nor inflexible, but rather adaptive to:

        **§ 4.2.2.2.1.**    *Location*. The various trial courts of our practice and other institutional and professional obligations;

        **§ 4.2.2.2.2.**    *Responsibilities*. Responsibilities of Supervisors, Staff Attorneys and special unit attorneys consistent with § 4.6.1 and with the goals of effective representation and service of the client's best interest;

        **§ 4.2.2.2.3.**    *Training*. Opportunities for Staff Attorneys to develop skills and gain experience through case or proceeding reassignments which enable less experienced Staff Attorneys to handle matters consistent with their skills and experience (misdemeanor trials and felony preliminary hearings). Cases will be reassigned for training purposes after consultation between Staff Attorneys and Supervisors, and except in unusual circumstances will not be transferred when an attorney wishes to retain a particular case;

        **§ 4.2.2.2.4.**    *Workload*. Reallocation of workload to assure timely preparation and effective representation, including:

          **(1)** *Experience*. Assignments consistent with an individual attorney's level of experience and workload, such as case transfer from non-certified to felony-certified attorneys, or from certified to special unit attorneys;

          **(2)** *Arraignment Balance*. Availability of Staff Attorneys with requisite experience to accept all assignments at intake without undue delay;

          **(3)** *Withdrawal and Reassignment*. Where there is a workload problem, the affected attorney will first be withdrawn from further intake. Should additional relief be necessary, cases will be reassigned to Staff Attorneys with the workload capacity and experience necessary to afford timely, effective representation. Neither of these steps will occur without consultation between the supervisor and the attorney. Nothing in this Article will operate to modify the grievance procedures contained in § 4.3;

      (4) *Consolidation*. Multiple cases with the same client pending in one [1] borough, handled by more than one [1] Staff Attorney; or

      (5) *Unavailability*.    Extended sickness, disability, or termination of employment.

    § 4.2.2.3.    *Review and Adjustment*. The Society's legal representation will be reviewed and adjusted as necessary to maintain continuity in the event of changes in court structure.

    § 4.2.3.    *Other Practices*. Practices other than the Criminal Defense Division shall maintain continuity of representation. Any modification of continuity must first be negotiated with the Union.

## § 4.3. *WORKLOAD*.

### § 4.3.1. *General*.

    § 4.3.1.1.    *Standards*. Within six [6] months of this agreement, standing joint Union-Management workload committees in each practice will set provisional guidelines, subject to ongoing revision and refinement, for maximum individual attorney workload consistent with high-quality representation for each LAS client. Where that guideline is exceeded, the attorney will be relieved through such steps as reduced intake, case transfer, and/or other appropriate measures. Acknowledging that this committee was not established in the last contract, the Union and the Society will establish this committee during the term of this agreement.

    § 4.3.1.2.    *Negotiations of Society Contracts*. The Society will, in consultation with the Union, use its best efforts to negotiate for all practices contracts that provide sufficient resources to handle the workload contemplated, and that further provide for necessary adjustments of resources and/or workload over the term of the contract. Whenever feasible, Management will solicit the Union's views regarding submission of narrative reports for funders or other oversight bodies concerning Legal Aid performance under its contracts.

    § 4.3.1.3.    *Monitoring*. The Union will participate with Management in regular monitoring of workload in all practices, including, but not limited to, monthly counts of Staff Attorneys, caseload, institutional assignments and filings per office. In some practices, current technology lacks the necessary capacity to fully maintain this information; the Society will make its best effort to manually maintain the information and to update the technology as soon as practicable. The Society will provide the reports of said monitoring to a union representative on a monthly basis, or provide access to this information at any time on Law Manager, or other technology used for this purpose.

    § 4.3.1.4.    *Consultants*. The Union will participate in decisions as to whether outside consultant expertise is appropriate to assist in workload and other analysis related to client representation, and in the selection of such consultants when they are to be retained.

### § 4.3.2. *Grievances*.

    § 4.3.2.1.    *Standard*. The standard against which workload grievances are evaluated is whether further cases can be accepted consistent with professional responsibility. The following are among the relevant factors to be used in applying that standard to a given situation: 1) court structure; 2) character of cases assigned to the grievant (individual or office); 3) efficiency, productivity and diligence of the grievant (individual or office) in handling those cases; 4) Code of Professional Responsibility; 5) ABA standards; 6) NLADA standards; and 7) level of services currently provided by other quality indigent defense providers in major urban jurisdictions.

### § 4.3.2.2. *Procedure*.

**(1) *Individual Grievance*.** Informal discussion with the grievant's complex or office head or her designee will be held within twenty-four [24] hours of the request for a meeting, excluding weekends and holidays. Immediately thereafter, the grievant may file a written appeal with the boro or office head, practice Attorney-in-Charge and the Attorney-in-Chief (or their designees), in that order, each of whom will have no more than two [2] work days to respond in writing.

**(2) *Office Grievance*.** The Union may initiate an office-wide workload grievance on the basis that two-thirds [2/3] of the Staff Attorneys in the office believes the standard, as defined above at § 4.3.2.1., has been, or is about to be, met. The practice Attorney-in-Charge may attempt to rectify the problem through personnel adjustments, including new attorneys or support staff, temporary transfer of attorneys or support staff from other Society offices for a specifically limited duration, reallocation or reduction of work load, transfer of a limited number of cases to supervisors consistent with their own responsibilities, or any other measure consistent with this Agreement which may alleviate the condition. Except as a last resort, the Society will not permanently transfer attorneys from other offices, and only then if warranted by long-range demands in each office. If no plan is presented, or if two-thirds [2/3] of the affected Staff Attorneys does not vote to accept the plan, the matter will be submitted to a panel, as hereafter described within ten [10] working days (which period may be extended by mutual agreement between the Attorney-in-Charge and the Union). The plan need not be implemented within the ten-day period, but will, at a minimum, specify the dates by which its various aspects will be implemented.

**(3) *Arbitration*.** If the grievance is not disposed of through the above process, the Union may, within two [2] work days after the Attorney-in-Chief has rendered her decision, file a written demand for arbitration with the Attorney-in-Chief on behalf of the grievant. An arbitration will be convened within five [5] working days of receipt by the Attorney-in-Chief of the demand for arbitration. The parties and the arbitrator will regard such proceeding as an urgent matter requiring expeditious disposition. The arbitrator will be selected from the appropriate panel of fifteen [15] names established and/or modified by the parties' mutual agreement, from which each party may strike three [3] names. If, after such elimination, the next prospective arbitrator panel member cannot adhere to the expeditious schedule set forth herein, the following panel member will be selected. The panel will hand down its decision as expeditiously as possible, but in any event within thirty [30] days after the close of hearings. Where a grievance is upheld, the office will stop accepting cases within fifteen [15] working days of the panel's action and will resume intake only within the framework of the panel's decision.

**§ 4.4.     *INTERVIEW CONDITIONS*.** Private attorney-client interviews are essential to delivery of effective representation. Whenever interview facilities in any court lack privacy, the parties will first seek to rectify such conditions by administrative action. If, within ninety [90] days after inception of administrative action, there is no objective indication of effective remedial action, the Society, in consultation with the Union, will take appropriate legal or other action to ensure availability of private interview facilities. The Society will also support necessary and proper actions taken by Staff Attorneys in the defense of their clients' right to confidential interviews.

**§ 4.5.** *OFFICE DAY.* An attorney will not be called away from pressing non-courtroom professional activities in the office, unless her supervisor has no reasonable alternative thereto. In the Criminal Defense Division, upon five [5] days notice by a Staff Attorney, supervisors will approve requests for an office day on which the Staff Attorney does not have conflicting assignments or cases scheduled. A supervisor will interrupt the office day for an unscheduled institutional assignment only after exhausting her best efforts to substitute other members of complex staff. Should the supervisor have no choice but to interrupt the office day, the Staff Attorney will be permitted to reschedule under the above criteria. In practices other than Criminal Defense, Management will make every effort to maintain a court coverage schedule which provides Staff Attorneys with at least one [1] office day each week free from such institutional assignments as intake and part coverage.

**§ 4.6.** *ATTORNEY-CLIENT-SUPERVISOR RELATIONSHIP.*
    **§ 4.6.1.** *Supervisory Responsibilities.* Supervisors will provide effective, constructive oversight of staff and the work of their offices, including availability for consultation with Staff Attorneys, consistent with their own caseload responsibilities.
    **§ 4.6.2.** *Professional Differences.* Practice Attorneys-in-Charge or their designees will be available for immediate consultation to resolve any professional differences between a Staff Attorney and supervisor in regard to handling a specific case. If these differences cannot be resolved consistent with applicable professional standards, the attorney will either follow the supervisor's decision or be relieved, after which the attorney may grieve the decision in question.
    **§ 4.6.3.** *Evaluations.* A committee will be formed to explore staff participation in manager evaluations.
    **§ 4.6.4.** *Case Coverage.* It will be Legal Aid Society policy for managers to arrange case coverage when staff attorneys are out on medical leave, on bereavement, or conducting or second-seating hearings and trials. These changes will be reflected in the Employee Handbook.

**§ 4.7.** *TRAINING, EDUCATION AND CERTIFICATION.*
    **§ 4.7.1.** *Committee.* There will be a joint Union-Management committee in each practice to develop and monitor training and education programs for Staff Attorneys.
        **§ 4.7.1.1.** *Initial Training.* Each practice shall provide full initial training for new attorneys in the practice's basic practice areas. For the Juvenile Rights Practice, there shall be initial substantive training in all non-primary practice areas.
        **§ 4.7.1.2.** *Annual Training.* Each practice will provide at least one comprehensive (8 hours or more) training/CLE per year, targeted toward experienced staff, addressing issues relevant to their practice.
        **§ 4.7.1.3.** *Resources.*
            **§ 4.7.1.3.1.** *Individual Materials.* The Society will exercise reasonable efforts to ensure reliable computer access for individual Staff Attorneys and provide individual Staff Attorneys with timely distribution of all appropriate legal resource materials, including the following.

            **(1)** *Criminal and Juvenile Rights Practices.* Each attorney in the Criminal and Juvenile Rights Practices will receive a copy of the: 1) Penal Law (PL); 2) Criminal Procedure Law (CPL); 3) Vehicle and Traffic Law (VTL); and 4) up-to-date

Case 1:21-cv-05860-KPF Document 24-1 Filed 09/01/21 Page 63 of 82

manuals containing forms used by police, defense, leading cases, statutes, etc., which will be expeditiously distributed.

(2) *Civil Practice*. Appropriate manuals and textbooks will be distributed to each Civil Practice Staff Attorney. The civil practice deskbook, federal rules, and federal and local court procedures will be provided to any Staff Attorney who requires them.

§ 4.7.1.3.2.     *Central Resources*. The Society will make available all necessary centralized legal resources, including: 1) office-level law libraries; 2) brief and motion banks; 3) important new decisions; 4) one [1] set of New York Supplement reports for every ten [10] attorneys; 5) a non-Staff Attorney responsible for coordinating, maintaining and/or circulating the above materials; and 6) Staff Attorney library privileges at law schools and bar associations.

§ 4.7.2.     *Orientation*. The following orientation will be provided to newly employed attorneys, including, where appropriate, inter-practice transferees. Within the first seven [7] to ten [10] days of employment, each new attorney will participate in discussions led by supervising attorneys and/or experienced Staff Attorneys concerning the Society's goals and indigent representation, and observation and rotation through the courts. Initial on-the-job training will include observation of, and participation in, various parts of the Criminal and Family Courts, under guidance of supervisory and/or Senior Staff Attorneys. Civil Practice attorneys will be given an opportunity to observe Housing Court trials, commercial actions and administrative hearings. Civil Practice client interviews and initial work placement will take place in the third through tenth week.

§ 4.7.3.     *Felony Certification*.

§ 4.7.3.1.   The Society's goal is for Criminal Defense Practice Staff Attorneys to be limited felony certified by 12 months of active practice while employed by the Society (including the new hire training) and fully certified by 36 months of active practice while employed by the Society (including the new hire training).

§ 4.7.3.2.   Limited Felony Certification allows a Staff Attorney to handle all Class E felonies where the client is either a non-predicate or a nonviolent/violent predicate, Class D felonies where the client is either a non-predicate or nonviolent predicate, and Class B and C drug felonies where the client is a non-predicate or non-violent predicate. Based on experience and effective representation in prior cases, a Criminal Defense Practice Staff Attorney may be granted permission in advance by her immediate supervisor(s) to represent a client above these levels.

§ 4.7.3.3.   Full Felony Certification allows a Staff Attorney to handle all felony cases which are handled by The Legal Aid Society, except homicide cases for which additional experience is required and with the recognition that, given the severity of A-I felonies, a supervisor will review with the Staff Attorney when it is appropriate to handle an A-I felony as lead counsel.

§ 4.7.3.4.   All internal transfers or lateral hires to the Criminal Defense Practice, including from other Practices or units within the Criminal Defense Practice, will have an individualized analysis at the start of their Criminal Defense Practice tenure utilizing the criteria in §§ 4.7.3.5. and 4.7.3.6. When applicable, based on the individual's prior experience, an internal transfer or lateral hire should reach limited and full certification in advance of the 12 and 36 month benchmarks. In all other cases, the below procedure will apply.

§ 4.7.3.5.   After 12 and 36 months of employment, each uncertified or limited certified Staff Attorney, respectively, will have a meeting with her immediate supervisor(s),

EEOC NY DISTRICT OFFICE
DATE 01/19/2021

**2016-2019 Contract**  **Article 4/Quality of Representation**  **Page 31**

with the right to have a union representative present. At this meeting, the Staff Attorney's hearing, trial and case resolution practice will be discussed and a decision will be made as to whether the Staff Attorney will be advanced in certification.

§ **4.7.3.6.** Although hearing, trial, motion and case resolution practices are relevant to the certification decisions, the entirety of the Staff Attorney's work will be considered and discussed.

§ **4.7.3.7.** The Society will provide specific reasons as to why an individual Staff Attorney should not be advanced in certification.

§ **4.7.3.8.** When a Staff Attorney is certified, a written notice of such shall be provided to her within 30 days of such decision. A Staff Attorney who becomes certified remains so regardless of a subsequent transfer to a different complex/cluster or borough.

§ **4.7.3.9.** Should a Staff Attorney not be certified at the 12 and 36 month benchmarks, a written plan must be devised between the supervisor and the Staff Attorney to lead to certification.

§ **4.7.3.10.** Follow-up meetings must occur every three months until the Staff Attorney is certified.

§ **4.7.3.11.** Nothing in this section prevents a Staff Attorney from being certified prior to the time periods contained herein. This section shall apply to all current Criminal Defense Practice Staff Attorneys as well as new hires and new transfers. A Staff Attorney shall have the option to dispense with the various written forms, plans, and notices contained in this section in which event all such proceedings shall only be conducted orally.

§ **4.7.3.12.** All Criminal Defense Practice Staff Attorneys shall be entitled to felony training within 12 months of hire or transfer to the Criminal Defense Practice.

§ **4.7.4.**    ***Continuing Legal Education***.

§ **4.7.4.1.**    ***Internal***. Notwithstanding the above provisions, the Criminal Practice training program, attended, where appropriate by attorneys from the Juvenile Rights Practice, will include:  1)  two [2] attorneys devoted full-time to training and education; and 2) instruction in the Code of Professional Responsibility and in contempt proceedings. Subject to budgetary considerations, the Civil Practice will hire a full-time trainer and develop a continuing education program that includes expert *pro bono* speakers. The Society will designate staff to provide Society-wide information on an ongoing basis regarding the Society's Continuing Legal Education (CLE) programs that are available for all Staff Attorneys

§ **4.7.4.2.**    ***External***. Subject to court staffing and funding, Staff Attorneys will continue, at the Society's expense, to attend appropriate PLI or other approved professional courses in New York City that directly relate to the attorneys' work, subject to court staffing and budgetary considerations. The Society will inform staff about, and seek to expand the availability of, tuition-free law school courses.

§ **4.7.5**    **Professional Development.** The Society and the Union will establish a joint Union-Management Staff Attorney Professional Development Committee with the aim to create rotator and other professional development positions both society-wide and within each practice and borough.

§ **4.8.**    *MALPRACTICE INSURANCE*.  The Society will defend and hold harmless Staff Attorneys sued for malpractice under the terms and conditions contained in the NLADA policy, to the extent of $1,000,000/$1,000,000.  The Society, in its discretion, may either purchase such coverage from an insurance carrier or self-insure.

§ **4.9.**    *OUTSIDE COUNSEL*.  The Society and the Union will each provide matching amounts up to $5,000 per contract year for Staff Attorneys who require outside counsel in matters arising solely from their Society employment.  The Union and the individual Staff Attorney will have complete discretion as to whether outside counsel is justified, and in selection of, and fees for, such counsel, but the Society will pay outside counsel only after its designated representative has, prior to retention of outside counsel, had the opportunity to fully discuss each of the above discretionary issues with the Union President or her designee.  These benefits will not be funded, and all payments by the Society will be made directly to the outside retained counsel upon receipt of her statement reflecting the amounts charged to each party.

§ **4.10.**    *SPECIAL LITIGATION*.
        § **4.10.1**    *Special Litigation.*  Each practice will assign lawyers on a full-time basis to special litigation projects that address matters of substantial client interests that are unsusceptible to customary trial and appellate processes, such as challenges to complex legal decisions and to statutory provisions; initiation of prisoners' rights test cases; and implementation of post-conviction remedies.
        § **4.10.2**    *Rotator Position.*  Each practice will create at least one rotator position for their special litigation/law reform unit (if applicable) that will allow current staff attorneys to join the unit for a period of two years.

§ **4.11.**    *SUPPORT SERVICES*.  The Society will provide support staff of adequate number and quality.  The Society will complete the computerization of all offices by June 30, 2000.

§ **4.12.**    *LAW ENFORCEMENT ISSUES*.
        § **4.12.1.**    *Police Conduct Committee*.  There will be a Joint Union-Management Police Conduct Committee representative of all Society practices.
        § **4.12.2.**    *Programs and Materials*.  The Society will provide the Joint Police Conduct Committee with the resources to develop and implement a Society-wide plan to seek out, maintain, update, and make available the following programs and materials in relation to the New York City Police Department and all other relevant law enforcement agencies (e.g., PAPD, FBI, DEA, BATF, etc.):  1) computerized citywide records of individual police misconduct, abuse and brutality, accompanied by a mechanism through which such records can be routinely input and accessed; 2) manuals and other statements of police policy, including the NYPD *Patrol Guide, Administrative Guide, Detective Guide, OCCB Investigative Guide, Narcotics Division Manual of Procedures, Legal Bulletins, Special* and *Interim Orders* and all other such materials which exist for specialized units within the NYPD and other law enforcement agencies; 3) guides to all police forms, annotated by case type; 4) preprinted or computer-formatted subpoenas designed to procure appropriate police reports by case type; 5) complete reference sets of police reports and procedures, at least one [1] copy of which will be maintained in each relevant Society office; 6) checklists to ensure the earliest possible transmittal of police reports from trial to appellate offices; 7) rosters of current and former

EEOC NY DISTRICT OFFICE
DATE 01/19/2021

members of law enforcement agencies available to educate attorneys about police practices; 8) form motions and sample memoranda of law that discuss the legal basis for discovery of police reports and personnel records at the earliest possible stage; 9) incorporation of the above police practice issues into the Society's training programs; and 10) referral of individual clients to appropriate agencies.

§ **4.12.3.**     *Police Abuse Project*.  The Joint Police Conduct Committee will examine the mission of, and available funding for, a dedicated Society-wide unit to address police misconduct, abuse and brutality through litigation (such as broad injunctive relief and damage claims) and other means.  Funding will be subject to final approval by the Society's Board of Directors.

§ **4.13.**     *SOCIETY POLICY POSITIONS*.  The Society and the Union will confer and consult closely in regard to all areas that involve professional responsibilities and obligations of Staff Attorneys and on all questions of public interest about which the Society plans, or has been requested, to express an opinion.  The Society will notify and seek participation from the Union as early as possible regarding any potential changes envisioned by management that may impact on provision of client service delivery methods, and/ or the structure of a practice, office or program.

Addendum – Recent Historical Memoranda Of Understanding Provisions

1. Effective for the December 15, 2006 payroll, the Society will pay a lump sum of $1,950 to each member of the bargaining unit who is on staff on steps 5-30 as of the date of ratification.

2. Effective February 17, 2012, the Society will make a one-time lump sum payment to each ALAA member who was in active status as of February 2, 2012. This one-time lump sum payment consists of 2 percent of salary with fringe benefits for the active ALAA membership, ALAA's proportionate share of the total health care savings for the period January 1 - June 30, 2012 with fringe benefits, and an additional $22.50 per member. Because ALAA chose to aggregate these funds and distribute equal shares, such shares equal $2,000 before fringe is netted.

3. Within thirty (30) days of ratification of the January 28, 2013 Memorandum of Understanding, the Society will make a one-time supplemental payment to each ALAA member who was in active status as of the January 31, 2013 ratification vote. The Society will make such a one-time supplemental payment to each ALAA member who was on an authorized leave on January 31, 2013 within thirty (30) days of the member's return from the authorized leave. The one-time supplemental payment consists of 4.3 percent of gross annual salary as set by the ALAA member's step on the date of ratification, subject to applicable payroll deductions. This one-time supplemental payment is pensionable. Within thirty (30) days of ratification of the January 28, 2013 Memorandum of Understanding, The Legal Aid Society will make a one-time longevity payment to each ALAA member who is on Step 26 or higher and in active status as of the January 31, 2013 ratification vote. The Society will make such a one-time longevity payment to each ALAA member who is on Step 26 or higher and on an authorized leave on January 31, 2013 within thirty (30) days of the member's return from the authorized leave. The one-time longevity payment consists of a payment of $1,000, subject to applicable payroll deductions. This one-time longevity payment is pensionable.

4. All compensation and benefits for the period October 1, 2008 through September 30, 2009 shall be subject to negotiations that shall commence no later than July 1, 2008. In the event those negotiations do not lead to an agreement on compensation and benefits changes for the October 1, 2008 through September 30, 2009 period, the parties will be free to take such economic action as would be available upon the expiration of the contract. The parties have agreed to recommence bargaining when the Society's funding from the City has been determined for the July 1, 2012 – June 30, 2013 fiscal year, and subsequently have extended the term of the collective bargaining agreement through September 30, 2013. During the life of this agreement the parties shall continue to use their best efforts to secure any and all funds from the City of New York and other funders that are not restricted from use for salary increases. Upon notification of receipt of any such funds that can be used for salary increases from the City of New York, within (30) days, the parties shall reopen this agreement for all purposes (covering economic and non-economic terms) and shall negotiate the distribution of any such funds to the ALAA/UAW 2325 bargaining unit in a fair and equitable manner for salary increases. The distribution of any such funds that can be used for salary increases would be

effective as of the beginning of the period of time for which such funds have been allocated by the City.

5. The Society will offer a one-time early retirement program for all Staff Attorneys who: (a) are 60 years or older as of January 31, 2008; and (b) have at least 20 years of service as of January 31, 2008. A Staff Attorney who meets these two eligibility criteria who informs the Society in writing by or before January 2, 2008 that she or he will retire from the Society effective January 31, 2008 shall be eligible thereafter for health benefits provided in each subsequent year to employed Staff Attorneys at the employee rate in effect in each subsequent year for employed Staff Attorneys until such a participant in this early retirement program reaches the age of 65, at which point the participant shall be eligible for retiree health care benefits provided pursuant to Section 2.6.3.5 of this collective bargaining agreement and/or any amendments or modifications to that section in effect when the participant attains the age of 65.

6. Effective April 1, 2015 all staff attorneys will receive a cost of living adjustment (COLA) equivalent to 2.5% of their base salary and be paid in accordance with the salary step schedule listed under "Effective 4/1/2015" in Exhibit 1. Effective October 1, 2015 all staff attorneys will be paid in accordance with the salary step schedule listed under "Effective 10/1/2015" in Exhibit 1. Within thirty (30) days of ratification of the October 14, 2015 Memorandum of Understanding, The Legal Aid Society will implement the retroactive salary increases set forth above for each Staff Attorney in active status at that time. For each Staff Attorney who is on active leave when the Society implements the retroactive salary increases at the levels set forth in Exhibit 1, the Society will make retroactive salary adjustments, if any are required, within thirty (30) days of the Staff Attorney's return from authorized leave. In accordance with the Society's salary payroll procedures, retroactive salary increases are subject to applicable payroll deductions and are pensionable.

# Signature Page

Executed this 7th day of May , 2018

| The Legal Aid Society | Association of Legal Aid Attorneys, UAW Local 2325 (AFL-CIO) |
|---|---|
| By: _____ | By: _____ |
| Mr. Seymour W. James, Jr. | Ms. Deborah Wright |
| Attorney-in-Chief | President |

# Appendix 1
## ALAA/ LAS Salary Chart
Effective 3/1/17

| STEP | Effective 3/1/2017 | Effective 7/1/2018 |
|------|-------------------|--------------------|
| LG | $52,531 | $53,582 |
| 1 | $61,500 | $62,730 |
| 2 | $62,525 | $63,775 |
| 3 | $63,550 | $64,821 |
| 4 | $66,489 | $67,819 |
| 5 | $69,095 | $70,477 |
| 6 | $74,307 | $75,793 |
| 7 | $78,020 | $79,580 |
| 8 | $81,090 | $82,712 |
| 9 | $83,640 | $85,313 |
| 10 | $88,436 | $90,205 |
| 11 | $93,920 | $95,798 |
| 12 | $98,033 | $99,994 |
| 13 | $103,390 | $105,457 |
| 14 | $104,210 | $106,294 |
| 15 | $105,030 | $107,130 |
| 16 | $105,850 | $107,967 |
| 17 | $106,670 | $108,803 |
| 18 | $107,490 | $109,639 |
| 19 | $108,310 | $110,476 |
| 20 | $109,130 | $111,312 |
| 21 | $109,950 | $112,149 |
| 22 | $110,770 | $112,985 |
| 23 | $111,590 | $113,821 |
| 24 | $112,410 | $114,658 |
| 25 | $113,230 | $115,495 |
| 26 | $113,335 | $115,602 |
| 27 | $113,441 | $115,710 |
| 28 | $113,700 | $115,974 |
| 29 | $114,006 | $116,286 |
| 30 | $115,638 | $117,951 |
| 31 | $115,800 | $118,116 |
| 32 | $115,992 | $118,312 |
| 33 | $116,298 | $118,624 |
| 34 | $116,604 | $118,936 |
| 35 | $116,910 | $119,248 |

EEOC NY DISTRICT OFFICE

DATE 01/19/2021

| 2016-2019 Contract | Appendix 2/Benefits Summary | Page 39 |

## Appendix 2
## Benefits Summary

| Life and Accidental Death & Dismemberment Insurance | |
|---|---|
| **Benefit (Employee Only)** | **Amount** |
| Life Insurance | An amount equal to 2 times your basic annual earnings, as determined by your Employer |
| Maximum Life Benefit | $100,000 |
| Accidental Death or Dismemberment | An amount equal to 1 times your basic annual earnings, as determined by your Employer to a maximum benefit of $25,000 |

EEOC NY DISTRICT OFFICE
DATE 01/19/2021

# Index

ABA Standards.................................15, 27
Access to Financial Records, by Union.......4
Accidental Death & Dismemberment
    Insurance.....................................39
Advancement to Step One .....................8
Affirmative Action .........................14, 15, 16
Agency Shop....................................43
Alternative Defender Organizations ............7
Anniversary Date ...............8, 10, 12, 24
Appendices:
    Appendix 1/Salary Scale......................38
    Appendix 2/Benefits Summary
    Life and Accidental Death &
        Dismemberment Insurance..............39
Arraignments...................................26
Continuity of Representation ...........26, 27
Lobster Shift....................................8
Night Court ..................................21, 22
Tuberculosis...................................25
Assistant District Attorneys ....................7
Attorney-Client Relationship.....................29
Bar Examination ................................17
Bar Registration Fee .............................8
Bereavement Leave...........................17, 18
Brief and Motion Banks.........................30
Child Care ......................................18
Civil Practice:
    Part-Time Work...............................19
    Personal Days................................10
    Training......................................27
    Vacation Buy-Back ...........................11
COBRA..........................................23
Collective Bargaining Agreement:
    Headings and Terms............................3
    Negotiation....................................3
    Reopener ......................................7
    Reproduction and Distribution.................4
    Term ..........................................4
    Health Insurance ..............................10
Dues and Fees, Union ............................4

Comparability ...............................7, 11
Compensation:
    Bar Registration Fee ..........................8
    Compensatory, Personal and
        Flex-Time.................................9
    Health Insurance ...........................10, 11, 12
    Life Insurance ...............................12
    Loan Forgiveness..............................8
    Pension.......................................12
    Salary .....................................7, 38
    Tax Shelters..................................12
    TransitCheks ..................................8
    Vacation.....................................12
Compensatory Time...........................9, 10
Continuing Legal Education ....................32
Continuity of Representation ...............27, 28
Criminal Appeals Bureau:
    Part-Time Work...............................19
    Personal Days................................10
    Vacation Buy-Back ...........................12
Criminal Defense Division:
    Compensatory Time...........................9, 10
    Continuity of Representation ............26, 27
    Education ..................................29, 31
    Felony Certification .........................30
    Office Day....................................29
    Office Space...............................20, 25
    Part-Time Work...............................19
    Personal Days................................10
    Training......................................26
Criminal Procedure Law (CPL).................29
Dependents.....................................11
Disability.........................17, 18, 20, 21
Disciplinary Action ..............................5
Discrimination.................................14
Domestic Partner:
    Bereavement Leave.........................17, 18
    Child Care Leave .............................18
Education Programs.............................31
Employment Policy.............................15

**2014-2016 Contract**          Index          **Page 41**

Employment Status ....................................16
Expenses ....................................21
Fair Employment Practices .................14, 16
Felony Certification .....................................30
Fellowships .....................................8
Financial Records..........................................4
Flex-Time.....................................10
Foreign Language Classes, Reimbursement for...........................................................22
Free Speech..................................................19
Future Joint Lobbying.…………………………………6
Grievances:
    General..................................5, 23, 24, 28
    Continuity....................................26
    Health and Safety....................................24
    Probationary Period, of....................16
    Professional Differences .......................29
    Workload....................................27
Health and Safety....................................24, 25
Health Insurance:
    Administration .......................................10
    Changes......................................................10
    Contagious Diseases ...............................25
    Dependents.................................................11
    Eligibility................................................10, 11
    Employment..........................................11
    Enrollment..............................................11
    Lesbian and Gay Partners ......................11
    Part-Time Work.....................................20
    Tax Shelters.............................................12
Hepatitis ..................................................25
Hiring:
    Affirmative Action ..........14, 15, 16, 20, 23
    Anniversary Date ..............8, 10, 12, 13, 23
    Bar Examination .....................................17
    Joint Committee for .................................15
    Transfer, due to economic retrenchment ..................................................22,23
    Union Dues and Fees ................................3
Holidays:
    Layoff..................................................22, 23, 24
Leave:
    Anniversary Date ..............8, 10, 12, 13, 23
    Bereavement .......................................17, 18

Enumerated ...............................................19
Lobster Shift Pay for...................................8
    Vacation...........................................12, 13
Illness or Disability.....................................17
Individual Placement on Salary Scale.........8
Infectious Disease .......................................25
Interpersonal Conflict .................................19
Interview Conditions...................................28
Job Security (Layoff) ............................22, 23
Joint Union-Management Committees:
    Affirmative Action ..........14, 15, 16, 20, 23
    Felony Certification................................30
    Health and Safety..............................24, 25
    Health Benefits..........................10, 24, 25
    Hiring..................................8, 14, 15, 16
    Police Conduct........................................33
    Representatives to .....................................5
    Senior Staff Retention..............................22
    Tax Shelters.............................................12
    Training and Education...............29, 30, 31
    Workload...........................9, 10, 19, 27, 28
Juvenile Rights Practice:
    Part-Time Work........................................19
    Personal Days...........................................10
    Training............................26, 28, 29, 30, 31
    Vacation Buy-Back ..................................13
Labor Relations:
    Collective Bargaining Agreement.............3
    Grievances.....................................5, 23, 24
    Joint Union-Management Committees...5, 10, 14, 15, 16, 19, 20, 23, 25, 27, 28, 29, 30, 31
    Management Rights ....................................6
    No Strike or Lockout .................................4
    Union Access to Financial Records .........4
    Union Activities ..........................................4
    Union Recognition and Agency Shop.......3
    Union Representative, Right to.................3
Law Enforcement Issues.......................32, 33
Law Graduate......................................3, 8, 17
Law Libraries...............................................30
Legal Resource Materials ....................30, 31
Lesbian and Gay Partners ..........................11
Life Insurance .............................................12
Loan Forgiveness.........................................8

Case 1:21-cv-05960-KPF   Document 24-7   Filed 09/01/21   Page 75 of 82
DATE 01/19/2021

Lobster Shift.......................................8
Lockers............................................25
Lockout .............................................4
Long-Term Disability.................11, 12, 17
Malpractice Insurance.............................32
Management Rights ................................6
Manuals.....................................29, 30
Meal Allowance ....................................22
Measles ...........................................25
NYC Police Department .....................32, 33
New York Supplement ..................29, 30, 31
Night Court .................................21, 22
NLADA Standards .........................28, 30, 31
No Strike ...........................................4
Office Day.........................................29
Office Space.......................................25
Parental Leave.....................................18
Part-Time Work:
    Generally.................................19, 20
    Personal Days...............................10
    TransitCheks .................................8
    Vacation Buy-Back .............................13
Penal Law (PL) ...................................30
Pension.....................................12, 24
Personal Days.....................................10
Personnel Records.............................22, 31
Police........................................32, 33
Post-Conviction Remedies.........................33
Preamble ...........................................2
Pregnancy...................................18, 23
Prisoners' Rights............................25, 33
Private Interview Facilities .................28, 29
Private Practice ..................................18
Pro Bono Representation ..........................22
Probationary Period ..............................16
Professional Differences ..........................29
Promotions....................................20, 21
Quality of Representation:
    ABA Standards...........................14, 15, 27
    Attorney-Client Relationship ......26, 28, 29
    Code of Prof. Responsibility......27, 31
    Continuity of Representation .........26, 27
    Education ................................7, 11, 29, 31
    Felony Certification .............................30
    Interview Conditions..............................28

Law Enforcement Issues .........................32
Recall from Layoff....................17, 22, 23
Record Keeping.............................…...25
Release Time, for Union staff ....................4
Reopener, Salary .................................7
Resignation ......................................24
Sabbatical…....…...…...…...…...…......18
Salary:
    Basic Salary Schedule/ Scale .............. 7, 8
    Credit for Prior Service..........................8
    Union Officers .......................4, 5, 6, 7, 8
Security .........................................25
Senior Staff .....................17, 20, 21, 22, 31
Seniority:
    Credit for Prior Service..........................8
    Layoff...................................22, 23
    Part-Time Work................................19, 20
    Supervisors, Returned to Staff..................8
    Transfers...................8, 20, 23, 32, 33
    Union Staff...................................4
Society Policy Positions..........................33
Special Litigation ........................10, 13, 32
Standard of Advocacy ............................26
Step/Year, and Salary ..............................7, 8
Subpoenas, of Police Reports ............32, 33
Supervisor, Conflict with .........................19
Supervisory Responsibilities.....................29
Support Services .................................32
Tax Shelters......................................12
Technology, Introduction of New .............24
Telecommuting ...................................20
Training, Ed. and Certification ..……....26, 29, 30, 31
Transfer:
    Interpersonal Conflict ..........................19
    Involuntary ...............................21
    Job Security...................................23
    Orientation in New Practice...................32
    Recall from Layoff...............................23
    Voluntary .....................................20
    Workload Grievance .........................27, 28
TransitCheks .......................................8
Travel Reimbursement........................21, 22
Tuberculosis .....................................25
Union:

**2014-2016 Contract**                    Index                    **Page 43**

Access to Financial Records ....................4
Activities ............................................4, 20
Agency Shop ...........................................3
Collective Bargaining Agreement.3, 10, 24
Dues and Fees ..........................................3
Joint Union-Management Committees......5,
   10, 14, 15, 16, 19, 20, 23, 25, 27, 28, 29,
   30, 31
Leave.....................4, 7, 8, 9, 10, 12, 13 23
Membership .............................................3
No Strike or Lockout ................................4
Officers ............................................4, 5, 6
Recognition .............................................3
Release Time............................................4
Representatives ...............................4, 6, 15
Staff........................................................4
Vacation...............12, 139, 10, 12, 13, 18, 24
Vertical Rep. (Continuity)..........................26
Wage Reopener ............................................7
Workload:
   Continuity of Representation ...........26, 27
   Generally...................................27, 28
   Flex-Time...............................................9, 10
   Grievance ................................................27
   Office Space............................................25
   Part-Time Work.......................................19
   Standards................................................28
   Vacation...............................................12, 13

EEOC NY  DISTRICT OFFICE
DATE 01/19/2021

# EXHIBIT D

# EEOC NY DISTRICT OFFICE
# DATE 01/19/2021





- Home
- Explore
- Notifications 1
- Messages
- Bookmarks
- Lists
- Profile
- More

**Tweet**

---

The Legal Aid Society ✔
@LegalAidNYC

**LAS Statement on the Critical Need to Acknowledge White Fragility and Organizations to Become Anti-Racist**

"To be anti-racist, to dismantle racism here at LAS... we must all recognize that white supremacy drives every policy and law, every opportunity and every advantage."



👤 Janet Sabel and 3 others

6:12 PM · Jul 27, 2020 · Twitter Web App

**55** Retweets   **37** Quote Tweets   **189** Likes

---

The Legal Aid Society ✔ @LegalAidNYC · Jul 27, 2020
Replying to @LegalAidNYC
Read our full statement here: legalaidnyc.org/wp-content/upl...

💬 7        4        ♡ 19

---

Patrick J. Sullivan @PSulliv · Jul 28, 2020
Replying to @LegalAidNYC @JanetSabel and 3 others
There are many of us who don't believe "white supremacy drives every policy and law". An elected school board president like @MaudMaron must represent all people.

💬 3        1        ♡ 49

---

Tim Positive Subway Tweets 🧒 Smith @PositiveSub... · Jul 28, 2020
Yes, Donald Trump is my president and Lee Zeldin proudly serves all of the Dreamers he wants to expel from the country; you make a great point here. Thank you for letting us know where you stand

💬 1        ♡ 1

Show replies

---

👠 Urban Moms | C-Suite | Wall Street | Consultant ... · Jul 27, 2020
Replying to @LegalAidNYC @JanetSabel and 3 others
❤️💙🤍🟦🌎 Courageous & Bold Conversations which requires humility, self-inquiry and an open mind. Our community bookclub is awesome. Mentor, Grow, Glow & Network.
Keep Going 💙

💬        ♡ 1

---

### Relevant people

The Legal Aid Soci... ✔
@LegalAidNYC
The nation's oldest and firm for low-income individuals. Making humanity in NYC sin
#publicdefender

Janet Sabel ✔
@JanetSabel
Attorney In Chief at former Chief Deputy the Attorney Genera

Tina Luongo (They...
@TMLuongo
Queer GNC Chief De Criminal Practice of and Baba to very cu lazy pitbull.

### What's happening

US elections · 🔴 LIVE
House Democrats unveil ar impeachment against Trum

#GMExhibitZero 📣
We are at an inflection point. invited.
📣 Promoted by General Motors

Trending in United States
**70,000 QAnon**
39.2K Tweets

Politics · Trending
**House GOP**
103K Tweets

COVID-19 · LIVE
**COVID-19: News and updat**
Massachusetts

Show more

Terms of Service  Privacy Policy
Ads info  More •••  © 2021 Twitte

---


Jay Marshall Wolman
@wolmanj

**Messages**  ✉️➕  ⏶



July 27, 2020

Contact:

Alejandra Lopez
The Legal Aid Society
ailopez@legal-aid.org
(917) 294-9348

## ***FOR IMMEDIATE RELEASE***

## *Legal Aid Statement on the Critical Need to Acknowledge White Fragility and Organizations to Become Anti-Racist*

**(New York, NY)** – **The Legal Aid Society** released the following statement in response to a recent New York Post Op Ed:

"In a recent New York Post Op Ed, the author, a public defender, takes the position that an anti-racist agenda is a chilling doctrine because it invites discrimination and that the theory of 'white fragility' is a 'small minded book which relentlessly insists all white people are racist and need to think about race all the time.' She denies the existence of structural and institutional racism. Unfortunately, the author is not alone in her view, especially those in public interest. Their position-that by the mere nature of working in public interest and being a public defender you get a pass at looking at your privilege, your role in social dominance and white supremacy. This racist perspective is disgusting and results in Black and Brown people being harmed by individuals in public interest roles, who are entrusted with serving Black and Brown clients and their communities. By virtue of the endemic nature of white supremacy, racism, and anti-Blackness in this country, Black and Brown people are routinely denied access to resources, face state violence, and are exploited by capitalist structures that ensure their marginalization. By ignoring these facts as someone who claims to work in this field, the author shows how they are not only complicit in this system of oppression, but seeks to gaslight communities of color who are vocally demanding change in this country.

As New York City's oldest and largest social justice law firm and the citywide public defender, founded over 140 years ago, we fight for justice for our clients, low income Black and Brown people, day in and day out. In all three of our practice areas, Civil, Juvenile Rights and Criminal Defense, we advocate against and litigate policies and laws that silence and oppress BIPOC and communities of color. Our staff dedicate their entire careers to the service of others. Yet, despite this work and history, despite the dedication and zealous representation, we have not taken on the internal work needed to build a truly anti-racist workplace. The time to change is now and as an organization we are committing to bravely have the much needed, and long overdue, conversations and engaging in the critical dialogue and discourse concerning racism, transphobia, sexism and intersectionality. Our BIPOC staff and clients deserve nothing less.

The mandate is a simple one. To be anti-racist, to dismantle racism here at LAS, and in every organization, we must all recognize that white supremacy drives every policy and law, every opportunity and every advantage.

Case 1:21-cv-05960-KPF Document 24-X Filed 09/01/71 Page 80 of 82

For those of us who are white, it is a recognition that access and privilege has been granted merely because we are white. While you have dedicated your life to public interest, you cannot do this work effectively and fully unless and until you face that reality and own that you are part of the problem. You cannot stop there, you must actively work to dismantle the systems that lend you privilege and oppress BIPOC people and communities. To push against the deep work needed to change and be threatened by the conversation, is the exact definition of white fragility. It exists, it is not simply a way for an author to sell books. It is used to make excuses for behavior, practice and treatment, and it is a tool used to promulgate white supremacy and the subjugation of BIPOC people. White people have a duty to no longer be silent and a responsibility to confront these systems of oppression and to shun all forms of white supremacy in our society, in our workplaces, and within our hearts and minds. Enough is enough."

Janet Sabel, Attorney in Chief and CEO

Adriene Holder, Attorney in Charge, Civil Practice

Dawne Mitchell, Attorney in Charge Juvenile Rights Practice

Tina Luongo, Attorney in Charge, Criminal Defense Practice

Archana Jayaram, Chief Operating Officer

Scott Rosenberg, General Counsel

Allan Fox, Chief Human Resources Officer

Ciara Walton, Director of Diversity, Equity and Inclusion

Janelle Roundtree, Director of Employee Relations

Lou Satori, Pro Bono Counsel and Director

###

*The Legal Aid Society exists for one simple yet powerful reason: to ensure that New Yorkers are not denied their right to equal justice because of poverty. For over 140 years, we have protected, defended, and advocated for those who have struggled in silence for far too long. Every day, in every borough, The Legal Aid Society changes the lives of our clients and helps improve our communities. https://www.legalaidnyc.org*

EEOC NY DISTRICT OFFICE
DATE 01/19/2021

# **EXHIBIT E**

Home

Explore

Notifications

Messages

Bookmarks

Lists

Tweet

**BlackAttysofLegalAid**
@BALA_NYC

"You cannot oppose anti-racism and effectively represent Black and Brown people. It's impossible." @MaudMaron has no business having a career in public defense, and we're ashamed that she works for the Legal Aid Society.

## Retweeted by

@Mzsma
WAKANDA FOREVER! 💪🏾✊🏾Hard core library user. Doesn't sleep well at night. "It is what it is" Michelle Obama-2020. Back to sanity!!!!!!
Follow

**M.J. Williams**
@_mjwilliams_
Attorney Supporter Defender Abolitionist | @MPJInstitute Board | @MJWilliams_Law for ™ and © law, FOIA/FOIL and surveillance | Tweets ≠ legal advice | she/they
Follow

**The Legal Aid Society**
@LegalAidNYC
The nation's oldest and largest law firm for low-income families and individuals. Making the case for humanity in NYC since 1876. #legalaid #publicdefender
Follow

**Taylor McGraw**
@taylor_mcgraw
Brooklynite but still a Mississippian at heart. Writer, podcaster, teacher, organizer, chess player. Director of The Bell (@BellVoices)
Follow

**koupe tet, boule kay! 🇭🇹**
@lindsoux
⚖️ I argue 🗣️ I speak like this, comme ça, e tankou sa 🇭🇹I believe in mermaids 🧜
Follow

**Liv Gee**
@livmgee
Appellate defender, angry optimist, @UW @BerkeleyLaw & Oakland.
Follow

…clusionist hiding behind the …ist or trans/homophobic!" …ious problem with their

· Jul 27, 2020

…s no business serving our …dent either and she is unfit …schools @nycpa @galeabrewer
@LegalAidNYC

1 5 21

**The New Three Rs** @TheNew3Rs · Jul 27, 2020
Replying to @BALA_NYC and @MaudMaron
Thank you for protecting Black and Brown children from Maude and her associates.

1 7

**NancyZazulka** @NancyZazulka · Jul 27, 2020
Replying to @BALA_NYC and @MaudMaron
On public schools in NYC...
Schools in affluent communities would NEVER have to deal with their kids' school bathrooms that lack soap, toilet paper, hot water...

Ask MOST schools in communities of color and here's what you'll get: "Wait, some schools have all of these things..."

**Modi's puppet** @xkbdc · Jul 27, 2020

Search Twitter

## Relevant people

**BlackAttysofLegalA**
@BALA_NYC
Find us on Instagrar
Facebook:
Facebook.com/blacl
LinkedIn: Black Atto
✊🏾

**Maud**
@MaudMaron
Unrepentant free th
beautiful kids, publi
Candidate for City C
ardent believer in al
#downtowntogethe

## What's happening

US elections · LIVE
**House Democrats unveil ar impeachment against Trum**

**#GMExhibitZero**
We are at an inflection point. invited.
Promoted by General Motors

Technology · Trending
**70,000 QAnon**
39.4K Tweets

Politics · Trending
**Censure**
146K Tweets

COVID-19 · LIVE
**COVID-19: News and updat Massachusetts**

Show more

Terms of Service Privacy Policy
Ads info More ··· © 2021 Twitt

**Jay Marshall Wolman**
@wolmanj

**Messages**



# **Exhibit G**

Notice of Right to Sue

Equal Employment Opportunity Commission
EEOC No. 520-2021-02801

EEOC Form 161-B (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Maud Maron**<br>**Randazza Legal Group Pllc**<br>**100 Pearl St 14th Floor**<br>**Hartford, CT 06103** | From: | **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |
| --- | --- | --- | --- |

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| **520-2021-02801** | **Perry Canales,**<br>**Investigator** | **(929) 506-5318** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):**  You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

Enclosures(s)

Perry A. Canales

Digitally signed by Perry A. Canales
Date: 2021.04.26 12:27:08 -04'00'

On behalf of the Commission

For

**Judy A. Keenan,**
**District Director**

04/26/2021

*(Date Issued)*

cc:

**LEGAL AID SOCIETY**
**199 Water Street**
**New York, NY 10038**

Enclosure with EEOC
Form 161-B (11/2020)

# Information Related to Filing Suit
## Under the Laws Enforced by the EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**Private Suit Rights**   --   **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**the Genetic Information Nondiscrimination Act (GINA), or the Age**
**Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you** *receive* **this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *issued* **to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

## Private Suit Rights   --   Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

## Attorney Representation   --   Title VII, the ADA or GINA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

## Attorney Referral and EEOC Assistance   --   All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

*If you file suit, please send a copy of your court complaint to this office.*

Enclosures(s)

cc:

# **<u>Exhibit H</u>**

Notice of Right to Sue

Equal Employment Opportunity Commission
EEOC No. 520-2021-02802

EEOC Form 161-B (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Maud Maron**<br>**Randazza Legal Group Pllc**<br>**100 Pearl St 14th Floor**<br>**Hartford, CT 06103** | From: | **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2021-02802** | **Perry Canales,**<br>**Investigator** | **(929) 506-5318** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Perry A.
Canales
Digitally signed by
Perry A. Canales
Date: 2021.04.26
12:52:44 -04'00'

For     4/26/2021

**Judy A. Keenan,**
**District Director**

*(Date Issued)*

Enclosures(s)

cc:

**ASSOCIATION OF LEGAL AID ATTORNEYS**
**50 Broadway**
**Suite 1600**
**New York, NY 10004**

Enclosure with EEOC
Form 161-B (11/2020)

# Information Related to Filing Suit
## Under the Laws Enforced by the EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**Private Suit Rights   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**Private Suit Rights   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**Attorney Representation   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**Attorney Referral and EEOC Assistance   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Enclosures(s)

cc: