**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
   MAUD MARON, an individual,          :
                                      :
                 Plaintiff,     :
                                      :
       -against-            :   Civil Action No. 1:21-cv-05960
                                      :
   THE LEGAL AID SOCIETY and    :
   ASSOCIATION OF LEGAL AID    :
   ATTORNEYS,               :
                                      :
               Defendants.   :
-------------------------------------------------------x

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT**

Jay M. Wolman
RANDAZZA LEGAL GROUP, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
Tel: (978) 801-1776
Fax: (305) 437-7662

Marc J. Randazza, Esq. (*Pro Hac Vice*)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, Nevada 89117
Tel:  (702) 420-2001
Fax: (305) 437-7662
Email: ecf@randazza.com

# TABLE OF CONTENTS

1.0    FACTUAL BACKGROUND.............................................................................................1

2.0    LEGAL STANDARD ..................................................................................................9

3.0    ARGUMENT...............................................................................................................9

   3.1    THE LEGAL AID SOCIETY UNLAWFULLY DISCRIMINATED AGAINST MS. MARON
       BECAUSE OF HER RACE .............................................................................................9

     3.1.1    The Discriminatory Publications were Made Because of Ms. Maron's Race...........10

     3.1.2    The Discriminatory Publications Subjected Ms. Maron to a Hostile Work
          Environment .......................................................................................................12

     3.1.3    The Discriminatory Publications Constructively Terminated Ms. Maron's
          Employment.......................................................................................................16

     3.1.4    The Discriminatory Publications were Made by The Legal Aid Society as the
          Information Content Provider..............................................................................18

     3.1.5    The Discriminatory Publications Do Not Implicate Constitutional Concerns .........21

   3.2    THE ALAA UNLAWFULLY DISCRIMINATED AGAINST MS. MARON BECAUSE OF
       HER RACE ...............................................................................................................24

     3.2.1    The ALAA's Discriminatory Statement Created a Hostile Work Environment.......25

     3.2.2    The ALAA Breached its Duty of Fair Representation .............................................26

4.0    CONCLUSION .........................................................................................................28

5.0    CERTIFICATE OF SERVICE..................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Agosto v. Correctional Officers Benevolent Ass'n,*
   107 F. Supp. 2d 294 (S.D.N.Y. 2000) ...................................................................................24

*Air Line Pilots Ass'n, Int'l v. O'Neill,*
   499 U.S. 65 (1991) ........................................................................................................................27

*Alfano v. Costello,*
   294 F.3d 365 (2d Cir. 2002) ...................................................................................................14

*Amusement Indus. v. Stern,*
   693 F. Supp. 2d 327 (S.D.N.Y. 2010) ...................................................................................19

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .....................................................................................................................9

*Barella v. Vill. of Freeport,*
   16 F. Supp. 3d 144 (E.D.N.Y. 2014) .....................................................................................16

*Barnes v. Yahoo!, Inc.,*
   570 F.3d 1096 (9th Cir. 2009) .................................................................................................19

*Baughn v. Dep't of Forestry & Fire Prot.,*
   246 Cal. App. 4th 328, 200 Cal. Rptr. 3d 764 (2016) ...........................................................23

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte,*
   481 U.S. 537 (1987) ...................................................................................................................22

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .....................................................................................................................9

*Bonilla v. City of N.Y.,*
   2019 U.S. Dist. LEXIS 198817 (S.D.N.Y. Nov. 15, 2019) .............................................13, 14

*Cherry v. N.Y.C. Hous. Auth.,*
   No. 15-CV-6949 (MKB), 2021 U.S. Dist. LEXIS 191353 (E.D.N.Y. Sep. 30, 2021) .............15

*Chertkova v. Conn. Gen. Life Ins. Co.,*
   92 F.3d 81 (2d Cir. 1996) .........................................................................................................17

*Chevron Corp. v. Donziger,*
   833 F.3d 74 (2d Cir. 2016) .......................................................................................................20

*Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.,*
   347 F.3d 448 (2d Cir. 2003) ........................................................................20

*Cowan v. City of Mount Vernon,*
   No. 14 Civ. 8871 (KMK), 2017 U.S. Dist. LEXIS 45812, 2017 WL 1169667 (S.D.N.Y. Mar.
   28, 2017).......................................................................................................13

*Creacy v. BCBG Max Azria Grp., LLC,*
   No. 14 Civ. 10008 (ER), 2017 U.S. Dist. LEXIS 49523, 2017 WL 1216580, (S.D.N.Y. Mar.
   31, 2017).......................................................................................................17

*Cully v. Milliman & Robertson, Inc.,*
   20 F. Supp. 2d 636 (S.D.N.Y. 1998) ...........................................................15

*DiFolco v. MSNBC Cable L.L.C.,*
   622 F.3d 104 (2d Cir. 2010) ..........................................................................9

*Doe v. City of New York,*
   583 F. Supp. 2d 444 (S.D.N.Y. 2008) ..........................................................19

*Du Charme v. International Brotherhood of Electrical Workers,*
   110 Cal.App. 4th 107 [1 Cal. Rptr. 3d 501] (Cal. App. 2003) ....................23

*EEOC v. Mississippi College,*
   626 F.2d 477 (5th Cir. 1980) ........................................................................21

*Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC,*
   194 F. Supp. 3d 263 (S.D.N.Y. 2016) ..........................................................20

*Fair Hous. Council v. Roommates.com, LLC,*
   521 F.3d 1157 (9th Cir. 2008) ......................................................................19

*Feingold v. New York,*
   366 F.3d 138 (2d Cir. 2004) ........................................................................14

*Fowlkes v. Ironworkers Local 40,*
   790 F.3d 378 (2d Cir. 2015) ...................................................................26, 27

*Gallagher v. Delaney,*
   139 F.3d 338 (2d Cir. 1998) ........................................................................12

*Graziano v. Pataki,*
   689 F.3d 110 (2d Cir. 2012) ..........................................................................9

*Green v. Jacob & Co. Watches, Inc.,*

    248 F. Supp. 3d 458 (S.D.N.Y. 2017) ...................................................................14

*H Roller Grp. v. C & S Glob.*,

    No. 20-CV-5268 (NGG) (RER), 2021 U.S. Dist. LEXIS 123932 (E.D.N.Y. July 1, 2021).....25

*Harris v. Forklift Sys., Inc.,*

    510 U.S. 17 (1993) .................................................................................................12

*Henderson v. United Student Aid Funds, Inc.,*

    918 F.3d 1068 (9th Cir. 2019) ...............................................................................20

*Holcomb v. Iona College,*

    521 F.3d 130 (2d Cir. 2008) ..................................................................................11

*Howley v. Town of Stratford,*

    217 F.3d 141 (2d Cir. 2000) ..................................................................................14

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston,*

    515 U.S. 557 (1995) ..............................................................................................21

*Johnson v. J. Walter Thompson U.S.A., LLC,*

    224 F. Supp. 3d 296 (S.D.N.Y. 2016) ...................................................................13

*Katz v. Beth Isr. Med. Ctr.,*

    95 Civ. 7183 (AGS), 2001 U.S. Dist. LEXIS 29, (S.D.N.Y. Jan. 3, 2001)...............16

*La Liberte v. Reid,*

    966 F.3d 79 (2d Cir. 2020) ....................................................................................22

*Leibowitz v. Cornell Univ.,*

    584 F.3d 487 (2d Cir. 2009) ..................................................................................10

*Lewis v. Roosevelt Island Operating Corp.,*

    246 F. Supp. 3d 979 (S.D.N.Y. 2017) ...................................................................13

*Littlejohn v. City of N.Y.,*

    795 F.3d 297 (2d Cir. 2015) ..................................................................10, 12, 13

*Maraschiello v. City of Buffalo Police Dep't,*

    709 F.3d 87 (2d Cir. 2013) ....................................................................................11

*McDonald v. Santa Fe Trail Transp. Co.,*

    427 U.S. 273 (1976) ..............................................................................................15

*N.Y. State Club Ass'n v. City of New York*,

    487 U.S. 1 (1988) .................................................................................................22

*Nat'l Acad. of TV Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*,

    No. 20-CV-7269 (VEC), 2021 U.S. Dist. LEXIS 142733, (S.D.N.Y. July 30, 2021) ..............22

*Newman v. Piggie Park Enters., Inc.*,

    390 U.S. 400 (1968) .................................................................................................22

*NLRB v. Local 282, Int'l Bhd. of Teamsters*,

    740 F.2d 141 (2d Cir. 1984) ....................................................................................27

*Olaes v. Nationwide Mutual Ins. Co.*,

    135 Cal.App.4th 1501 [38 Cal. Rptr. 3d 467] (Cal. App. 2006) ...............................23

*Ongsiako v. City of N.Y.*,

    199 F. Supp. 2d 180 (S.D.N.Y. 2002) ....................................................................17

*Patane v. Clark*,

    508 F.3d 106 (2d Cir. 2007) ....................................................................................13

*Pealo v. AAF McQuay, Inc.*,

    140 F. Supp. 2d 233 (N.D.N.Y. 2001).....................................................................15

*Pena v. Brattleboro Retreat*,

    702 F.2d 322 (2d Cir. 1983) ....................................................................................16

*Petrosino v. Bell Atl.*,

    385 F.3d 210 (2d Cir. 2004) ....................................................................................17

*Pines v. Tomson*,

    160 Cal. App. 3d 370 (1984) ...................................................................................21

*Raspardo v. Carlone*,

    770 F.3d 97 (2d Cir. 2014) ......................................................................................13

*Redd v. N.Y. Div. of Parole*,

    678 F.3d 166 (2d Cir. 2012) ....................................................................................13

*Rivero v. American Federation of State, County, and Municipal Employees*,

    AFL-CIO, 105 Cal.App.4th 913 [130 Cal.Rptr.2d 81] (Cal. App. 2003) .................23

*Riviello v. Waldron*,

    47 N.Y. 2d 297, 391 N.E.2d 1278, 418 N.Y.S. 2d 300 (1979) ................................20

*Roberts v. Clark Cnty. Sch. Dist.*,

    215 F. Supp. 3d 1001 (D. Nev. 2016).......................................................................15

*Roberts v. U.S. Jaycees*,

    468 U.S. 609 (1984) .................................................................................................22

*Robesky v. Qantas Empire Airways, Ltd.*,

    573 F.2d 1082 (9th Cir. 1978).................................................................................27

*Rosenblatt v. Bivona & Cohen, P.C.*,

    946 F. Supp. 298 (S.D.N.Y. 1996) .........................................................................11

*Ross v. Commc'n Workers*,

    91 Civ. 6367 (LAP), 1995 U.S. Dist. LEXIS 7959 (S.D.N.Y. June 9, 1995) ...........26

*Rumsfeld v. Forum for Acad. & Inst. Rights*,

    547 U.S. 47 (2006) ...................................................................................................21

*Sanderson v. Leg Apparel LLC*,

    No. 19-CV-8423, 2020 WL 7342742 (S.D.N.Y. Dec. 14, 2020)..............................14

*Shiamili v. Real Estate Grp. of New York, Inc.*,

    17 N.Y.3d 281, 952 N.E.2d 1011, N.Y.S. 2d 19 (2011) .........................................18

*Sorrell v. IMS Health Inc.*,

    564 U.S. 552 (2011) .................................................................................................21

*Soto v. CDL (N.Y.) L.L.C.*,

    2020 U.S. Dist. LEXIS 78736, (S.D.N.Y. May 5, 2020). ........................................17

*Stern v. Trustees of Columbia Univ.*,

    131 F.3d 305 (2d Cir. 1997) ...................................................................................15

*Stetson v. NYNex Serv. Co.*,

    995 F.2d 355 (2d Cir. 1993) ...................................................................................16

*Terry v. Ashcroft*,

    336 F.3d 128 (2d Cir. 2003) ...................................................................................17

*Ticali v. Roman Catholic Diocese of Brooklyn*,

    41 F. Supp. 2d 249 (E.D.N.Y. 1999)......................................................................15

*Vaca v. Sipes*,

    386 U.S. 171 (1967) .................................................................................................26

*Vega v. Hempstead Union Free Sch. Dist.*,

    801 F.3d 72 (2d Cir. 2015) ....................................................................................12

## STATUTES

42 U.S.C. § 2000e-2 ....................................................................................9, 24, 26

47 U.S.C. § 230 ....................................................................................................9, 18

N.Y. Lab. Law § 704 .................................................................................................20

NY. Civ. Rights L. § 70-a.........................................................................................22

NY. Civ. Rights L. § 76-a.........................................................................................22

## RULES

Fed. R. Civ. P. 12......................................................................................................9, 22

Fed. R. Civ. P. 5.1.....................................................................................................22

Fed. R. Civ. P. 56......................................................................................................22

Defendants The Legal Aid Society and the Association of Legal Aid Attorneys made public statements critical of Plaintiff Maud Maron based on her race.  The statements of her union coworkers, amplified and expanded upon by her employer, are replete with race-based vitriol, and it is astounding that they think she should swallow their bitter pills and return to the openly hostile work environments no reasonable person should be expected to endure.  Plaintiff hereby opposes the motions to dismiss filed by these defendants (ECF Nos. 32 & 37).

## 1.0    Factual Background

As set forth in the First Amended Complaint ("FAC", ECF No. 24), Maud Maron has had a long and successful career with The Legal Aid Society ("LAS").  Ms. Maron has been an advocate for the disadvantaged and disenfranchised, serving as a public defender with LAS from 1998-2006 and again from 2017, having been a staff attorney and Director of Training.  *See* FAC ¶¶ 7 & 9.  From 2011 to 2015, she was a lecturer with LAS's Trial Advocacy Program.  *See id.* at ¶ 7.  At all relevant times, Ms. Maron has been a member in good standing of her union, the Association of Legal Aid Attorneys ("ALAA").  *See id.* at ¶ 8.

In 2020, Ms. Maron took a sabbatical in furtherance of her candidacy for the New York City Council.  *See id.* at ¶¶ 8 & 10.  Her candidacy promoted protecting communities from hate crimes and prejudice, seeking police and prosecutorial reforms to address bias in law enforcement and prosecution.[1]  *See id.* at ¶ 11.

Prior to taking leave, Ms. Maron began experiencing racial harassment at work when a colleague, Rigodis Appling, sent a disparaging email office-wide, containing links to racially-

---

[1] Subsequent to the filing of the FAC, the election was held and Ms. Maron did not prevail.  *See 2021 NYC Election Results,* Daily News, available at <https://www.nydailynews.com/election-results/> (**Exhibit 1**.)  The discriminatory statements that are the subject of this litigation damaged her reputation and likely contributed to the electoral loss, the impact of which is included in her damages in this matter.

charged materials that criticized and distinguished Ms. Maron from her racially "diverse constituents",[2] that called her "racist",[3] and that saw Ms. Maron, a Caucasian, having to defend herself from accusations of racism on account of her race.[4]  As ALAA included a copy of this e-mail in their motion to dismiss,[5] it must be noted that Appling explicitly associated these accusations of racism with Ms. Maron's employment with LAS, saying that she should not mention LAS in her campaign because "[i]t's not a good look for us."  ECF 34-1 at 3.  Although the rest of the e-mail chain was not incorporated into the FAC, it must be observed that Ms. Maron initiated the chain by announcing her sabbatical, stating the purpose (her campaign), and praising her colleagues; she did not use it as a platform to campaign.  ECF 34-1 at 3.  Appling chose to reply to all, rather than privately to Ms. Maron, spreading the race-based attacks throughout the workplace.  After Ms. Maron was forced to defend herself office-wide, Appling, as an agent of ALAA, inviting her to the union hall, then called her a segregationist.  *Id*. at 2.  Around that same time, members of ALAA's Black Attorneys of Legal Aid caucus ("BALA") initiated a baseless investigation into their Caucasian coworker, Ms. Maron.  FAC at ¶ 13.  After a thorough investigation, on January 13, 2020, Ms. Maron received a full clearance on these complaints.  *Id*. at ¶¶ 14-17.  Because of concerns that this racially-charged baseless investigation would be leaked, Ms. Maron requested and was promised a statement that would acknowledge her exemplary record, but LAS failed to fulfill its promise.  *Id*. at ¶¶ 18-22.

---

[2]      <https://www.change.org/p/maud-maron-protect-cre-in-schools-maud-maron-resign-from-cec2?> (**Exhibit 2**.)
[3]      <https://www.nydailynews.com/new-york/education/ny-petition-resignation-cec-district-2-20190731-fxxeqarhlfecfm3h7x223ddegq-story.html> (**Exhibit 3**.)
[4]      *See*      <https://www.nytimes.com/2019/10/18/the-weekly/nyc-schools-segregation.html?> (**Exhibit 4**.)
[5] Ms. Maron concurs with ALAA that the referenced e-mail may be considered as it was otherwise incorporated into the FAC.  *See* ECF 33 at 13 n.4.

As all of Ms. Maron's colleagues knew, she has been the elected president of the largest school district in New York City, community education council D2, and had been repeatedly elected to the leadership teams of multiple schools. ECF 34-1 at 2. During her campaign, on July 23, 2020,[6] Ms. Maron published an opinion piece in the New York Post, entitled "Racial obsessions make it impossible for NYC schools to treat parents, kids as people".[7] FAC at ¶ 23. The article makes no mention of LAS and makes only a fleeting reference to her work as a public defender. FAC at ¶ 25.

The article discussed her experience at a training with the Department of Education unrelated to her employment. *Id.* In the article, Ms. Maron spoke out against having to refer to herself as a "white woman" under the putative guise of a so-called "anti-bias" training. FAC ¶ 26 and FAC Ex. A. Ms. Maron noted that, in the training, race-neutral attributes, like "objectivity" were, oddly, labeled as part of "white-supremacy culture", tied to material that labels all white people as racist. FAC ¶ 27. The opinion piece was published after her testimony before the City Council and an interview with Nikole Hanna-Jones, all of which focused on inclusivity and diversity of thought in the public schools. FAC ¶ 28.

Notwithstanding the fact that the article had nothing to do with her employment at LAS, Ms. Maron's union, ALAA, acting through its BALA caucus, issued a statement regarding Ms. Maron, the article, and the interview. FAC ¶ 29 & FAC Ex. B. LAS amplified the broadcasting of this statement by its employees in BALA. FAC ¶ 30 & FAC Ex. C.

The statement of BALA, which was endorsed without reservation by The Legal Aid Society, contains numerous race-based falsehoods and false statements that injured Plaintiff. The

---

[6] The FAC erroneously identifies the date as June 23, 2020, but the cited article at p. 5 n. 4 and attached as Exhibit A to the FAC gives the correct date. The actual date is immaterial.
[7] Available at <https://nypost.com/2020/07/23/racial-obsessions-make-it-impossible-for-nyc-schools-to-treat-parents-kids-as-people/> (**Exhibit 5**.)

ALAA/BALA members are LAS's own agents and employees, and the republication was LAS's ratification of that statement and demonstrated that the statement was in the course and scope of the ALAA/BALA members' employment with LAS.  FAC at ¶ 44.  But for Ms. Maron being white, the statements would not have been made.  FAC ¶ 31.  Without limitation, as set forth in the FAC, those include:

    i.    "she pretends to favor integration while fighting against it and denying the existence of racism in education".  Ms. Maron does not oppose integration and she has never denied racism exists in any context.

    ii.    Repeatedly refers to Ms. Maron as "racist".  Ms. Maron denies this and opposing racist "anti-bias" training is not itself racist if words continue to have meaning.  But for Ms. Maron being white, she would not have been referred to as a racist.

    iii.    "no public defender can legitimately claim to be a proponent of racial justice if they are lax in how they do the work; and we know for a fact that Maud's commitment to zealous representation of poor people of color is questionable at best."  Ms. Maron's work has never been lax nor her commitment questionable.  As set forth above, Ms. Maron was cleared of this very same baseless accusation on January 14, 2020.

    iv.    Ms. Maron did not call the educational points raised "chilling", but rather the inaptly named "anti-racism" training doctrine, which is, in fact, rooted in racism.

    v.    "she religiously advances a false dichotomy between an adequate education and a culturally inclusive education."  This statement is entirely disingenuous as her actual City Council testimony was to the opposite.[8]

---

[8] Ms. Maron's testimony is available online at:
https://www.youtube.com/watch?v=7xfu9mvwPvE

vi.    "Maud's argument: the problem isn't racism, but a 'culture of laziness and stupidity among African Americans and Hispanic Americans.'"  Ms. Maron has never made this argument and finds it repugnant.  Ms. Maron is married to a Hispanic immigrant and she takes deep offense at the wholly fictitious characterization of her views.

vii.   "She does not use racial slurs in discourse.  At least not publicly."  The implication that Ms. Maron does so privately is false.

viii.  "Maud is racist, and openly so.  She attacks efforts to end racism by claiming there is no racism."  Ms. Maron has never made any such claim.  But for Ms. Maron being white, she would not have been referred to as racist.

ix.    It compares her involvement with PLACE NYC (Parent Leaders for Accelerated Curriculum Education in NYC) to the 1960s group PAT ("Parents and Taxpayers"), yet omits that PLACE is co-chaired by two individuals of color.

x.     It says she has "no regard for" her clients, which lacks any basis in reality.

xi.    "She is one of many charlatans who took this job not out of a desire to make a difference, but for purposes of self-imaging."  This is false—The Legal Aid Society has been her primary employer since graduation from law school in 1998, after having interned there while a law student.

xii.   "You cannot oppose anti-racism and effectively represent Black and Brown people. It's impossible."  Ms. Maron opposes a racist ethos that falsely brands itself "anti-racism".  Her representation of all of her clients, including but not limited to people of color, has always been exemplary.

FAC ¶ 31.  The false statement ALAA's BALA caucus wrote, as employees of LAS, and The Legal Aid Society endorsed, which states "Maud Maron has no business having a career in public defense, and we're ashamed that she works for the Legal Aid Society" in connection with asserting she opposes actual anti-racism, constitutes irreparable damage to her professional reputation and, for all intents and purposes, terminated her employment in violation of § 1.8.4 of the governing collective bargaining agreement.  FAC ¶ 32 & FAC Exhibit D.

Not only was ALAA the author and publisher of the BALA statement, it failed to advocate for Ms. Maron in response to LAS's aforesaid violations of the Collective Bargaining Agreement. FAC at ¶ 36.  Ms. Maron is currently promised a return from sabbatical pursuant to § 3.4.4.1.2 of the agreement, but The Legal Aid Society has made it impossible for her to do so.  FAC ¶ 33.  The Legal Aid Society also violated the guarantee of free speech per § 3.5, taking race-based adverse action against Ms. Maron for her expression on personal political and social beliefs without evidence that her speech has or will directly interfere with and detract from the representation of her clients. FAC at ¶ 34.  Upon information and belief, but for Ms. Maron being white, the Legal Aid Society would not have opposed Ms. Maron's personal or social beliefs and, thereupon, so took adverse action against her.  *Id.*   An employer who says, publicly, it is ashamed she works there and has no business working there, is not an employer any reasonable person could be expected to work for, in violation of § 4.11.2 of the collective bargaining agreement.  *Id*. at ¶¶ 35 & 36.  The misconduct of The Legal Aid Society has also violated § 3.1.1 of the governing collective bargaining agreement; since BALA is a unit of the ALAA, the ordinary grievance procedure has been rendered unavailable to Ms. Maron.  *Id*. at ¶ 45.  The Legal Aid Society denied Ms. Maron the due process to which she is entitled under § 3.1.1.3 and failed to maintain confidentiality under § 3.1.1.2 on account of her race (white).  *Id.*  At no time did ALAA make

any effort to assist Ms. Maron, its member, in enforcing her rights under the CBA; to the contrary, they instigated the violations and supported LAS's violations thereof.

Separate and apart from the racist attack by her coworkers, creating a hostile work environment, on July 27, 2020, the LAS administration issued its own statement in response to Ms. Maron's article.  FAC at ¶ 38 & FAC Ex. E.  This statement was co-signed by the leadership of The Legal Aid Society, including Janet Sabel, Attorney in Chief and CEO, Adriene Holder, Attorney in Charge, Civil Practice, Dawne Mitchell, Attorney in Charge, Juvenile Rights Practice, Tina Luongo, Attorney in Charge, Criminal Defense Practice, Archana Jayaram, Chief Operating Officer, Scott Rosenberg, General Counsel, Allan Fox, Chief Human Resources Officer, Ciara Walton, Director of Diversity, Equity and Inclusion, Janelle Roundtree, Director of Employee Relations and Lou Sartori, Pro Bono Counsel and Director.  FAC at ¶ 39.  Anyone and everyone to whom Ms. Maron could have complained about the ALAA or LAS administration statements were the signatories of the LAS administration statement.

The Legal Aid Society's administration's statement contains numerous race-based false statements that injured Ms. Maron, lambasting Ms. Maron on account of her race and/or color. FAC ¶¶ 40 & 41.  But for Ms. Maron being white, the statements would not have been made.  FAC ¶ 41.  Without limitation, these include:

      i.    Ms. Maron "takes the position that an anti-racist agenda is a chilling doctrine".  This is false; she takes the position that using the name 'anti-racism' as cover for overtly racist practices, such as those at the Dept. of Education's "anti-bias" training, is chilling.

     ii.    "She denies the existence of structural and institutional racism."  Ms. Maron denies no such thing and opposes structural and institutional racism.

iii.    It says that she views working as a public defender as a "pass" for "white supremacy" and has such a "disgusting" "racist perspective" that harms her clients of color.  Ms. Maron has no such view and has never harmed her clients, no matter the color.  The Legal Aid Society, as noted above, specifically cleared her of this baseless accusation previously.

iv.    "By ignoring these facts as someone who claims to work in this field, the author shows how they are not only complicit in this system of oppression, but seeks to gaslight communities of color who are vocally demanding change in this country."  Ms. Maron has ignored none of the racism her clients experience and herself vocally demands change.

v.    "we have not taken on the internal work needed to build a truly anti-racist workplace."  This statement falsely asserts Ms. Maron is racist and is racist in the workplace.

vi.    "While you have dedicated your life to public interest, you cannot do this work effectively and fully unless and until you face that reality and own that you are part of the problem."  Ms. Maron has always worked effectively, irrespective of her race.

FAC ¶ 41.  Although Ms. Maron was a city council candidate, these were statements about her private employment, unrelated to any matter of public interest.

As a result of the ALAA and LAS administration statements, Ms. Maron was subjected to a hostile work environment on account of her race and was constructively terminated.  Ms. Maron filed a timely charge with the EEOC.  FAC ¶ 47 & FAC Ex. F.  On April 26, 2021, Ms. Maron

received her requested notices of right to sue.  FAC ¶ 48, FAC Ex. G & FAC Ex. H.  This litigation was commenced within 90 days thereafter.

## 2.0    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (Rule 12(b)(6)); *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) (Rule 12(c)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Ms. Maron pleaded sufficient factual content that demonstrates that the defendants are liable for unlawful workplace discrimination on account of race.

## 3.0    Argument

In her First Amended Complaint, Ms. Maron raised claims of race-based hostile work environment discrimination against LAS and ALAA (Counts I & II, respectively) and race-based constructive termination against LAS (Count III).  Ms. Maron properly pleaded all elements of these claims and has stated sufficient claims.  Further, LAS is not immune for the statement of ALAA (let alone its own administration's statement) under Section 230 of the Communications Decency Act.  Neither is ALAA excused by virtue of its claim of not having violated its duty of fair representation.  The motions to dismiss must be denied.

### 3.1    The Legal Aid Society Unlawfully Discriminated Against Ms. Maron Because of Her Race

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To establish a prima

facie case of discrimination that can survive a motion to dismiss, a plaintiff must plausibly allege

that he or she "[i] is a member of a protected class, [ii] was qualified, [iii] suffered an adverse

employment action, and [iv] has at least minimal support for the proposition that the employer was

motivated by discriminatory intent."  *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015).

There is no dispute Ms. Maron is a member of a protected class (white) and is qualified for the

position.  As set forth below, she has suffered adverse employment actions of hostile work

environment and constructive termination, and these were motivated by discriminatory intent.

### 3.1.1   The Discriminatory Publications were Made Because of Ms. Maron's Race

LAS spends the majority of its argument on the fourth factor, claiming that Ms. Maron's

status as a white person had nothing to do with the statements against her.  *See, e.g.,* LAS Motion

at 13 ("the Complaint does not contain a single allegation from which this Court can infer that

Legal Act acted against Plaintiff on the basis of her race, rather than her insidious views."  The

FAC and the record belie this argument.  "An inference of discrimination can arise from

circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance

in ethnically degrading terms; or its invidious comments about others in the employee's protected

group; or the more favorable treatment of employees not in the protected group; or the sequence

of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v.

Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).  The statements at issue criticized Ms. Maron in

ethnically degrading terms and made invidious comments about white employees in general.

Ms. Maron's article in the NY Post was on July 23, 2020.  A mere three days later, LAS's

employees in ALAA's BALA caucus publish their racist screed, with LAS administration

publishing their racist statement the day after.  LAS ignores that it was specifically the "Black"

attorneys caucus that authored the statement in response to Ms. Maron talking about opposing being forced to refer to herself as a "white woman" and the ideologies of so-called "anti-bias" training she was forced to undergo based on ideologies that "relentlessly insists all white people are racist." FAC Exhibit A.

The ALAA/BALA statement repeatedly calls Ms. Maron "racist" and challenges her ability to "effectively represent Black and Brown people." FAC ¶ 31. Ms. Maron recognizes that "a statement that someone is a 'racist,' while potentially indicating unfair dislike, does not indicate that the object of the statement is being rejected because of his race." *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013) (citing *Holcomb v. Iona College*, 521 F.3d 130, 139 (2d Cir. 2008)). However, unlike the plaintiff in *Maraschiello,* Ms. Maron is being rejected because of her race. The Court in *Holcomb, supra,* looked favorably on *Rosenblatt v. Bivona & Cohen, P.C*, which observed "Plaintiff has alleged discrimination as a result of his marriage to a black woman. Had he been black, his marriage would not have been interracial. Therefore, inherent in his complaint is the assertion that he has suffered racial discrimination based on his own race." *Rosenblatt v. Bivona & Cohen, P.C.*, 946 F. Supp. 298, 300 (S.D.N.Y. 1996). By the same token, the ALAA/BALA statement that specifically asserts it is "impossible" for Ms. Maron to "effectively represent Black and Brown people" has the same inherent assertion: the reason she cannot effectively represent clients of color is because she is white. But for Ms. Maron being white, she would not be labeled a racist in this context—an employee of color would have been labeled a "race traitor" or "Uncle Tom". "Racist" is a pejorative of a different quality than "race traitor".[9] A plaintiff can allege discrimination through a "'mosaic' of intentional

---

[9] The panel in *Maraschiello* generally erred when it determined that calling someone a racist is not discrimination based on race. White individuals may be called the N-word and straight individuals may be called the F-word, but there would be no doubt using these epithets against an African

discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination". *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998)).

This inherent race-based assertion is further brought forth in the LAS administration statement that, like ALAA's, falsely accuses her of being a racist. It directly calls out Ms. Maron for allegedly being a white supremacist. FAC at ¶ 41 (iii). It accuses her, as a white woman, of "gaslight[ing] communities of color." *Id.* at ¶ 41(iv). Once again, but for Ms. Maron being white, the LAS administration would not have made its statement.

LAS makes much of Ms. Maron's extrajudicial statements about this lawsuit. It is correct that Ms. Maron noted that her viewpoints were targeted, but she was targeted because she is white. Neither ALAA nor LAS offer anything to suggest that either statement would have been published if Ms. Maron were a person of color. Simply put, the statements were published only because Ms. Maron is white. Thus, her claims are actionable under Title VII.

### 3.1.2   The Discriminatory Publications Subjected Ms. Maron to a Hostile Work Environment

As the Court is aware, "[t]o establish a hostile work environment under Title VII, ... a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Littlejohn, 795 F.3d at 320-21 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). The Second Circuit has explained that a prima facie

---

American or homosexual respectively would be actionable based on membership in the protected class. Black coworkers calling a white employee "racist" is of the same flavor—based on her membership in the protected class. To the extent *Maraschiello* is not distinguishable and might control here, Plaintiff has a good faith basis on which to ask the *en banc* Second Circuit or the Supreme Court to overrule it.

hostile work environment claim under Title VII has three elements — "a plaintiff must plead facts that would tend to show that the complained of conduct":

> [i] is objectively severe or pervasive — that is, ... creates an environment that a reasonable person would find hostile or abusive; [ii] creates an environment that the plaintiff subjectively perceives as hostile or abusive; and [iii] creates such an environment because of the plaintiff's [protected characteristic].

*Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321 (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)).

As this Court has stated, "[s]ignificantly, to survive a Rule 12(b)(6) motion to dismiss, a Title VII complaint need not establish every element of a prima facie hostile work environment claim." *Bonilla v. City of N.Y.*, 2019 U.S. Dist. LEXIS 198817, at *42 (S.D.N.Y. Nov. 15, 2019). "At the motion to dismiss stage, ... 'a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" *Cowan v. City of Mount Vernon*, No. 14 Civ. 8871 (KMK), 2017 U.S. Dist. LEXIS 45812, 2017 WL 1169667, at *4 (S.D.N.Y. Mar. 28, 2017) (internal quotation marks and alterations omitted) (quoting Patane, 508 F.3d at 113). Ms. Maron has pleaded sufficient facts.

"In evaluating whether the circumstances" set forth in a complaint "suffice to find a hostile work environment, the [Second Circuit] has 'repeatedly cautioned against setting the bar too high.'" *Lewis v. Roosevelt Island Operating Corp.,* 246 F. Supp. 3d 979, 990 (S.D.N.Y. 2017) (quoting *Patane*, 508 F.3d at 113). In general,

> a court tasked with determining whether a work environment was actionably hostile "must consider the totality of the circumstances including [i] the frequency of the

> discriminatory conduct; [ii] its severity; [iii] whether it is threatening and
> humiliating, or a mere offensive utterance; and [iv] whether it unreasonably
> interferes with an employee's work performance." *Littlejohn*, 795 F.3d at 321
> (internal quotation marks omitted). This analysis is "highly context-dependent,"
> and courts assessing a workplace's hostility "should evaluate the facts holistically
> rather than 'view individual incidents in isolation' or in a 'piecemeal fashion.'"
> *Johnson v. J. Walter Thompson U.S.A., LLC,* 224 F. Supp. 3d 296, 306 (S.D.N.Y.
> 2016) (quoting *Redd v. N.Y. Div. of Parole,* 678 F.3d 166, 176 (2d Cir. 2012)).

*Bonilla*, *supra*, at *42-43. Notably, "'a single act can create a hostile work environment if it in

fact works a transformation of the plaintiff's workplace.'" *Green v. Jacob & Co. Watches, Inc.,*

248 F. Supp. 3d 458, 470 (S.D.N.Y. 2017) (quoting *Feingold v. New York,* 366 F.3d 138, 150 (2d

Cir. 2004)). "[T]hat single act must be 'extraordinarily severe'" to violate Title VII. *Id.* (quoting

*Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).

    Here, Ms. Maron faced two severely, publicly humiliating acts in rapid succession,

following two incidents of race-based attacks by BALA and Appling the prior year. "In the right

circumstances, a single comment can be severe enough to create a hostile work environment."

*Sanderson v. Leg Apparel LLC*, No. 19-CV-8423, 2020 WL 7342742, at *6 (S.D.N.Y. Dec. 14,

2020) (citing *Howley v. Town of Stratford,* 217 F.3d 141, 154 (2d Cir. 2000))). These are those

unfortunate "right circumstances." Her workplace has been transformed and she cannot

reasonably be expected to return. A significant number of Ms. Maron's clients, as a public

defender, are individuals of color—a majority of those arrested by the New York Police

Department are individuals of color.[10] How can these clients trust that they will get their

constitutionally-guaranteed right to effective assistance of counsel or that Ms. Maron will abide

---

[10] *See* Shea, Dermot, "Crime and Enforcement Activity in New York City (Jan 1 – Dec 31, 2020)", New York Police Department, available at <https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/year-end-2020-enforcement-report-20210721.pdf > (**Exhibit 6**.)

her duties of competence and diligence if her employer, coworkers, and union all have publicly disavowed her ability to do so?

LAS ignores the public nature of these events, likening them to cases of minimal harassment. Appling's attack was made to all of her colleagues. The original ALAA/BALA-prompted investigation was made by a coordinated group of coworkers. The ALAA/BALA statement was made to the public without any legitimate association to her work as a public defender; there was especially no need for such a vicious, racist attack when she was on sabbatical. And, the LAS administration statement was not merely made by a coworker or one supervisor—it was made by practically the entire leadership of LAS. These are hardly akin to the matters cited by LAS in its defense. To the contrary, single statements made in public about private matters can be severe enough to meet the hostile work environment threshold. *See, e.g., Cherry v. N.Y.C. Hous. Auth.,* No. 15-CV-6949 (MKB), 2021 U.S. Dist. LEXIS 191353, at *85-86 (E.D.N.Y. Sep. 30, 2021) (public discussion of medical condition giving rise to hostile work environment claim for disability discrimination); *Roberts v. Clark Cnty. Sch. Dist*., 215 F. Supp. 3d 1001, 1017 (D. Nev. 2016) (public discussion of gender transition giving rise to hostile work environment). The statements by coworkers and administration are sufficiently severe to create a hostile work environment to which Ms. Maron cannot be forced to return.

There is no reason this Court should adopt a standard for reverse discrimination (*i.e.*, discrimination against white employees), urged by LAS, that is any different from discrimination against any member of any protected class. A heightened standard is not "appropriate in light of the Supreme Court's instruction that Title VII 'proscribe[s] racial discrimination … against whites on the same terms as racial discrimination against nonwhites.'" *Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F. Supp. 2d 249, 261 (E.D.N.Y. 1999) (quoting *McDonald v. Santa Fe Trail*

*Transp. Co.*, 427 U.S. 273, 279 (1976)); *Cully v. Milliman & Robertson, Inc.*, 20 F. Supp. 2d 636,

640-641 (S.D.N.Y. 1998) (same)."  *Pealo v. AAF McQuay, Inc.*, 140 F. Supp. 2d 233, 238-39

(N.D.N.Y. 2001).  As a result, the *Pealo* Court stated that it "like so many others, is unwilling to

apply the heightened burden analysis absent clear direction from the Second Circuit – especially

in light of existing, albeit bladed, precedent." *Id.* at 239 (noting that *Stern v. Trustees of Columbia*

*Univ.*, 131 F.3d 305, 314 (2d Cir. 1997) did not apply a heightened standard).  Notably, in *Barella*

*v. Vill. of Freeport*, the District Court also rejected the heightened standard.  *Barella v. Vill. of*

*Freeport*, 16 F. Supp. 3d 144, 160-61 (E.D.N.Y. 2014).  In the appeal of the judgment in *Barella,*

the Second Circuit made no distinction between discrimination against a member of a minority

and reverse discrimination, implicitly adopting the District Court's analysis on the issue.  *Vill. of*

*Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2016).  That said, the "background circumstances"

are in the foreground—the statements are centered on Ms. Maron's status as a white woman

representing clients of color.

### 3.1.3   The Discriminatory Publications Constructively Terminated Ms. Maron's Employment

Ms. Maron was constructively terminated while on sabbatical.[11]  To establish constructive

termination, a plaintiff must show that the employer "deliberately made [her] working conditions

---

[11] ALAA includes an argument against the claim for constructive termination in its motion, but no such claim is brought against it and it has no standing to argue on behalf of LAS.  Moreover, ALAA's argument fails as Ms. Maron pleaded that the grievance procedure is futile, as it is her own union's statement that was endorsed and expanded upon by her employer that gave rise to her injury.  FAC at ¶ 45.  To survive a constructive discharge claim, the employer must show the grievance procedure is a "viable alternative".  *Katz v. Beth Isr. Med. Ctr.*, 95 Civ. 7183 (AGS), 2001 U.S. Dist. LEXIS 29, at *40 (S.D.N.Y. Jan. 3, 2001).  A grievance is not viable here where the union caused the discrimination.  Although Ms. Maron was previously cleared in the ALAA/BALA-prompted investigation, the assistance by an ALAA representative then does not demonstrate that there would have been any benefit to grieving the statements.  Ms. Maron was cleared because her record was clear; the ALAA representative's assistance was not dispositive. In contrast, Ms. Maron could not expect ALAA to successfully obtain BALA and LAS administration's publicly recanting their statements and the reputational harm cannot be undone by the grievance process.

so intolerable that [she] was forced into an involuntary resignation." *Stetson v. NYNex Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (cleaned up)).  Anyone in Ms. Maron's shoes would resign.

First, as set forth above, Ms. Maron was subjected to a hostile work environment.  *See* Section 3.1.2, *supra*.  Second, the public humiliation made her employment conditions so intolerable she is compelled to resign.  Working conditions are intolerable when, "viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"  *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir. 1996)).  As even LAS admits, "significant verbal abuse" is sufficiently intolerable.  *See also Ongsiako v. City of N.Y.*, 199 F. Supp. 2d 180, 187 (S.D.N.Y. 2002).  There is no reason to suggest that when that abuse occurs in writing, as opposed to being oral, and published to the world at large, that is any less intolerable.

Third, the ALAA/BALA statement endorsed by LAS and the LAS administration statement were made with the requisite intent.  As this Court has noted:

> constructive discharge claims require a showing of intent.  *See Creacy v. BCBG Max Azria Grp., LLC,* No. 14 Civ. 10008 (ER), 2017 U.S. Dist. LEXIS 49523, 2017 WL 1216580, at *12 (S.D.N.Y. Mar. 31, 2017). However, this does not require a showing that the employer had the specific intent to force an employee to quit; instead, "a plaintiff needs to 'at least demonstrate that the employer's actions were deliberate and not merely negligent or ineffective.'"  *Id.* (internal quotation marks omitted) (quoting *Petrosino v. Bell Atl.,* 385 F.3d 210, 229-30 (2d Cir. 2004)). "Therefore, ... a plaintiff need only establish ... that there remains a genuine issue of material fact as to whether a defendant acted deliberately in engaging in conduct that created the workplace conditions at issue."  *Id.*

*Soto v. CDL (N.Y.) L.L.C.,* 2020 U.S. Dist. LEXIS 78736, at *50 (S.D.N.Y. May 5, 2020).  LAS acted intentionally.  LAS and ALAA are not educational organizations, so they were not weighing in on the propriety of racist training sessions by the Department of Education.  LAS is an Internal Revenue Code § 501(c)(3) entity and, therefore, could not have made the statements in opposition

to her political campaign, which prohibits them from "participat[ing] in, or interven[ing] in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office."  "Contributions to political campaign funds or public statements of position (verbal or written) made on behalf of the organization in favor of or in opposition to any candidate for public office clearly violate the prohibition against political campaign activity."  The Restriction of Political Campaign Intervention by Section 501(c)(3) Tax-Exempt Organizations, IRS (Sept. 23, 2020).[12]  The only purpose, therefore, for the statements was to publicly humiliate Ms. Maron so much that she would have no choice but to disassociate herself from her employment.  The statements were intentional.

And, fourth, although she had been on leave, this does not mean that conditions have made it possible for her to return.[13]  That she cannot return from the sabbatical is tantamount to her resignation.  *See* FAC at ¶ 88.  Thus, Ms. Maron has properly stated a claim for constructive termination.

### 3.1.4   The Discriminatory Publications were Made by The Legal Aid Society as the Information Content Provider

LAS suggests it cannot be held liable for the statements made by its employees in the course and scope of their employment and to otherwise engage in intentional, unlawful discrimination against any employee.  This is erroneous; Section 230 of the Communications Decency Act (47 U.S.C. § 230(c)(1)) offers no defense.  Section 230(c) of the CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Thus, no

---

[12] <https://www.irs.gov/charities-non-profits/charitable-organizations/the-restriction-of-political-campaign-intervention-by-section-501c3-tax-exempt-organizations> (**Exhibit 7**.)
[13] LAS's citation to FAC ¶ 8 is immaterial.  The "at all relevant times" refers to the time of her employment.

claim can be brought against a defendant if: "(1) it is a 'provider or user of an interactive computer service'; (2) the complaint seeks to hold the defendant liable as a 'publisher or speaker'; and (3) the action is based on 'information provided by another information content provider.'" *Shiamili v. Real Estate Grp. of New York, Inc.*, 17 N.Y.3d 281, 286, 952 N.E.2d 1011, 929 N.Y.S.2d 19 (2011) (quoting 47 U.S.C. § 230(c)(1)) (collecting cases).

Section 230 does "not immunize [defendants] with respect to any information [they] developed or created entirely by [themselves]." *Doe v. City of New York,* 583 F. Supp. 2d 444, 449 (S.D.N.Y. 2008).   Section 230(c)(1) only applies where "the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content *provided by another*." *Barnes v. Yahoo!, Inc*. 570 F.3d 1096, 1102 (9th Cir. 2009)(emphasis added).   "To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Id*.   When a service provider's own conduct violates applicable law, it does not enjoy the protections of Section 230. *See, e.g*., *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1164-65 (9th Cir. 2008) (in claims for violation of state and federal housing laws, finding web site not immune under Section 230 because it made decision to require subscribers to provide information which facilitated unlawful discrimination, even though web site did not actually provide such information).   Thus, if agents of a defendant create the information, the defendant is not immunized. *See Amusement Indus. v. Stern*, 693 F. Supp. 2d 327, 344-45 (S.D.N.Y. 2010) ("[T]o survive a motion to dismiss …, a plaintiff need only raise[] a sufficient inference that some sort of agency relationship existed between the purported principal and agent. … [W]here the circumstances alleged in the pleading raise the possibility of a principal-agent relationship, and no written authority for the agency is established, questions as to the existence and scope of the agency are issues for the jury." (internal

quotation marks and citations omitted)).   Here, there is no legitimate question of agency relationship.

The ALAA/BALA members are undisputedly employees (and, therefore, agents) of LAS. An employer is liable for the acts of an employee or agent committed while acting within the scope of his employment or within the agent's actual or apparent authority.  *See, e.g.*, *Riviello v. Waldron*, 47 N.Y. 2d 297, 302, 391 N.E.2d 1278, 418 N.Y.S.2d 300 (1979).  As noted by LAS, "[u]nder New York law, an express agency is created through (1) "the principal's manifestation of intent to grant authority to the agent," (2) "agreement by the agent," and (3) the principal's "control over key aspects of the undertaking."  *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 274 (S.D.N.Y. 2016) (quoting *Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (collecting cases)).  LAS attempts to avoid its liability for the acts of its employees by suggesting that it lacked "control over key aspects of the undertaking" by virtue of Section 8(a)(2) of the National Labor Relations Act.[14]  This argument is non-sensical— the undertaking is the public defense function; if the BALA members are not LAS's public defenders, then they are not employees and no relationship would exist between them at all.  Moreover, ratifying and republishing statements by a union is not the unfair labor practice of "dominating" a union, which LAS suggests it would be without any support.

By retweeting the ALAA/BALA statement, LAS ratified and adopted as its own the statement of its employees.  A principal ratifies his or her agent's acts "either by manifesting assent that the act shall affect the person's legal relations or through conduct that justifies a reasonable assumption that the person so consents."  *Chevron Corp. v. Donziger,* 833 F.3d 74, 150 (2d Cir.

---

[14] In actuality, the NLRA does not apply; ALAA is recognize pursuant to New York State labor law.  *See* FAC, Ex. D.1 at § 1.1.1 (ECF No. 24-4 at 5).  However, N.Y. Lab. Law § 704(3) contains an analogous prohibition.

2016) (quoting Restatement (Third) of Agency § 4.01(2)). A plaintiff must allege an "objectively or externally observable indication that the principal has exercised choice and has consented to the acts of the purported agent." *Henderson v. United Student Aid Funds, Inc.,* 918 F.3d 1068, 1073 (9th Cir. 2019) (quoting Restatement (Third) of Agency § 4.06). As the *Enigma* Court noted, all that is sufficient to survive a motion to dismiss is for the plaintiff to raise a sufficient inference of an agency relationship, rendering questions as to the existence and scope thereof as issues for the jury. 194 F.Supp. 3d at 175. A sufficient inference has been raised. As a result, LAS can be found liable both for the statement of its administration and of the BALA members.

### 3.1.5   **The Discriminatory Publications Do Not Implicate Constitutional Concerns**

LAS suggests that the First Amendment prohibits Ms. Maron's claim of hostile work environment discrimination. It does not. In fact, the U.S. Supreme Court directly held, in discussing Massachusetts anti-discrimination law, that such is of the type "well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston,* 515 U.S. 557, 572 (1995). LAS is asking this Court to overrule Supreme Court precedent.

That pronouncement comports with numerous other cases upholding anti-discrimination laws in the face of First Amendment challenges. For example, the First Amendment does not preclude claims under California's Unruh Civil Rights Act, which is similar in scope to Mass. Gen. Laws, ch. 272, § 98. *See Pines v. Tomson*, 160 Cal. App. 3d 370, 388-392 (1984) (rejecting First Amendment challenge to injunction issued under the Unruh Act; "[a]s a general proposition, 'government has a compelling interest in eradicating discrimination in all forms.'") (quoting *EEOC v. Mississippi Colleg*e, 626 F.2d 477, 488 (5th Cir. 1980)). Complying with an anti-

discrimination law does not require a business to adopt any position and does not compel any speech; compliance does not "approach[] a Government-mandated pledge or motto that the [business] must endorse," and thus does not violate a business's First Amendment rights. *Rumsfeld v. Forum for Acad. & Inst. Rights*, 547 U.S. 47, 62 (2006).  Content-neutral laws, even if they have an incidental impact on speech, does not violate a business's constitutional rights. *See, e.g., Sorrell v. IMS Health Inc*., 564 U.S. 552, 567 (2011) (finding that "the First amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech").  Anti-discrimination laws have thus consistently held up against First Amendment challenges. *See, e.g., Newman v. Piggie Park Enters., Inc*., 390 U.S. 400 (1968); *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984); *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987); *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1 (1988).  Title VII is, therefore, constitutional.

LAS argues that finding the statements to constitute a hostile work environment would have a chilling effect on legitimate employee complaints about discrimination in the workplace or the investigation thereof.  This is purely speculative.  Setting aside the issue of quid pro quo harassment, Title VII regularly permits finding of liability against an employer for otherwise-protected speech.  Racial epithets routinely serve as grounds for hostile work environment harassment, but it is perfectly legal to call someone a racial epithet.  Pornography is protected, but its display in the workplace gives rise to claims of a hostile work environment.  Jokes about someone's sexuality or physical impairment also give rise to viable claims.  Notably, co-defendant ALAA does not argue that the First Amendment prohibits Ms. Maron's claims.  And, it is apparent that LAS does not truly believe that Title VII violates the First Amendment, else it would have filed the required notice under Fed. R. Civ. P. 5.1(a)(1)(A).

LAS also appears, albeit in a footnote, to bring its motion pursuant to New York's anti-SLAPP statute,[15] NY. Civ. Rights L. §§ 70-a, 76-a.  However, its argument is entirely conclusory. Ms. Maron's campaign may be a matter of public interest, but her employment with LAS is not, a requirement under Section 76-a.  New York's anti-SLAPP statute is not well-litigated; California's is, and New York's statute borrows heavily from California's.  "[A] dispute among a small number of people in a workplace does not implicate a broader public interest subject to" an anti-SLAPP motion.  *Baughn v. Dep't of Forestry & Fire Prot.*, 246 Cal. App. 4th 328, 338, 200 Cal. Rptr. 3d 764, 770 (2016) (quoting *Olaes v. Nationwide Mutual Ins. Co.,* 135 Cal.App.4th 1501, 1510-1511 [38 Cal. Rptr. 3d 467] (Cal. App. 2006)).  In order to satisfy the "public issue/issue of public interest" requirement, "in cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion".  *Id.* at 336, quoting *Du Charme v. International Brotherhood of Electrical Workers*, 110 Cal.App. 4th 107, 119 [1 Cal. Rptr. 3d 501] (Cal. App. 2003).  Ms. Maron's employment with LAS was not part of any ongoing controversy, dispute, or discussion. Moreover, "merely publishing a statement [does] not convert the statement into a matter of public concern; If the mere publication of information in a union newsletter distributed to its numerous members were sufficient to make that information a matter of public interest, the public-issue limitation would be substantially eroded, thus seriously undercutting the obvious goal of the

---

[15] Such a motion, even if it had merit, has no place in this court.  As Judge Caproni recently found, "because Federal Rules of Civil Procedure 12 and 56 answer the same question as New York's anti-SLAPP provision, they 'govern … in federal court, unless Rules 12 and 56 violate the Rules Enabling Act.' … Because is undisputed that Rules 12 and 56 comply with the Rules Enabling Act, *id.,* § 70-a of New York's anti-SLAPP law is inapplicable in federal court."  *Nat'l Acad. of TV Arts & Scis., Inc. v. Multimedia Sys. Design, Inc*., No. 20-CV-7269 (VEC), 2021 U.S. Dist. LEXIS 142733, at *32 (S.D.N.Y. July 30, 2021) (quoting *La Liberte v. Reid*, 966 F.3d 79, 88 (2d Cir. 2020)).

Legislature that the public-issue requirement have a limiting effect.'" *Id.* at 337, quoting *Rivero v. American Federation of State, County, and Municipal Employees*, AFL-CIO, 105 Cal.App.4th 913, 926 [130 Cal.Rptr.2d 81] (Cal. App. 2003)).   In fact, in *Rivero,* the California Court of Appeals rejected the argument "that any time a person criticized an unlawful workplace activity, the statements concerned a public issue because public policy favors such criticism." *Id.*  Thus, even if the BALA members were criticizing Ms. Maron's representation of clients as somehow violating her duties, it is not a public issue, especially where she was on sabbatical and not actually representing any clients.  As a result, New York's anti-SLAPP statute has no application and there is no barrier to Ms. Maron's discrimination claims against LAS.

### 3.2    The ALAA Unlawfully Discriminated Against Ms. Maron Because of Her Race

ALAA asserts many of the same arguments as LAS, but just as LAS is liable for discrimination on the basis of race, so, too, is ALAA.  Title VII prohibits labor organizations such as ALAA from "discriminat[ing] against [] any individual because of his race [or] color" and from "caus[ing] or attempt[ing] to cause an employer to discriminate against an individual".[16]  42 U.S.C. § 2000e-2(c)(1) & (3).  ALAA racially harassed Ms. Maron and caused LAS to discriminate against her.

Although ALAA argues, with respect to Section 2000e-2(c)(3), that it did nothing to cause an adverse action, this is incorrect.  As discussed above and below, ALAA's BALA caucus authored and published the July 26, 2020 statement.  It allowed LAS to retweet it.[17]  Its statement laid the groundwork for the LAS administration's statement.  To prove a claim under this theory,

---

[16] LAS does not appear to dispute that it is a labor organization within the meaning of 42 U.S.C. § 2000e(d) &/or (e)(2).  As noted above, it is a local labor organization recognized as the representative of employees of LAS.  LAS is engaged in an industry affecting commerce.
[17] ALAA acknowledges that its settings on the BALA account allowed LAS to do so.  *See* ECF 33 at 15 n. 3.  ALAA could have blocked LAS or otherwise adjusted settings to prevent it.

a plaintiff must show (1) the existence of a hostile work environment, (2) that a union representative caused or attempted to cause the hostile work environment, and (3) that the representative's conduct may properly be imputed to the union. *See Agosto v. Correctional Officers Benevolent Ass'n,* 107 F. Supp. 2d 294, 307 (S.D.N.Y. 2000). "In sum and to reiterate, all that is required to state a Title VII claim against a union is a breach of the duty of fair representation because of race, color, religion, sex, or national origin." *Id.* at 305. These elements are met.

ALAA's discriminatory conduct was part of the pattern of race-based hostility that began on the last days Ms. Maron was physically in the office. ALAA cannot avoid liability, and its discriminatory conduct breached the duty of fair representation, to the extent applicable.

### 3.2.1   The ALAA's Discriminatory Statement Created a Hostile Work Environment

The ALAA's argument on the issue of hostile work environment parallels the arguments by their members' employer, LAS, who endorsed and ratified their discriminatory statement. They argue that their discrimination was not on account of race nor that it was sufficiently severe or pervasive. Thus, to avoid unnecessary repetition, Ms. Maron generally refers to her response to the arguments of LAS above.

However, there are a few specific arguments by ALAA that do not overlap. ALAA points to the single incident issue, but then brings to the fore the other discriminatory conduct by ALAA members. To the extent the Court does not believe the racially-hostile statements in July 2020 alone can give rise to a hostile work environment claim, it is part of a pattern. ALAA/BALA initiated a race-based investigation into Ms. Maron only a few months prior and Appling's office-wide e-mail, attaching articles that criticized Ms. Maron on account of her race, were part of this pattern.

The fact that Ms. Maron was on leave does not mean she did not experience a hostile work environment.  In the summer of 2020, an unusually large number of white-collar workers found themselves working from home due to the COVID-19 outbreak.  *See, e.g., H Roller Grp. v. C & S Glob.*, No. 20-CV-5268 (NGG) (RER), 2021 U.S. Dist. LEXIS 123932, at *20 (E.D.N.Y. July 1, 2021) ("Notably, the COVID-19 pandemic forced the employees of many law offices to work remotely" and collecting cases).  Merely because they are at home does not mean they cannot experience a hostile work environment.  If that were the case, then remote workers everywhere could be subjected to racist and sexist messages from their colleagues without any recourse, even if the same messages would have been actionable if they were sitting in a cubicle.  Neither should the fact that she was not then-performing services matter; the racist statements were about her employment and addressed her future performance of her job.  By ALAA's argument, a job applicant would have no recourse because they had not started, yet Title VII covers applicants.  ALAA created a hostile work environment and it is liable to Ms. Maron for it.

### 3.2.2    The ALAA Breached its Duty of Fair Representation

As noted above, the caselaw tends to require that a Title VII claim against a union necessarily include a showing that the union breached its duty of fair representation.  The cases generally discuss this in the context of claims under Section 2000e-1(c)(3), where it is "concerning representation by a union of its members' interests".  *Ross v. Commc'n Workers*, 91 Civ. 6367 (LAP), 1995 U.S. Dist. LEXIS 7959, at *17 (S.D.N.Y. June 9, 1995).  It is less clear that the "duty of fair representation" requirement should apply to claims under Section 2000e-2(c)(1), as that requirement would not be warranted in claims where a union directly excludes or expels a member

on account of race or sex, and Plaintiff does not agree that it should apply here, where the union itself engages in unlawful racial harassment through creating a hostile environment.[18]

To the extent Ms. Maron is required to demonstrate a breach of the duty of fair representation, ALAA breached that duty. The duty of fair representation requires a union "to serve the interests of all members without hostility or discrimination ..., to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). "A union breaches its duty of fair representation if its actions with respect to a member are arbitrary, discriminatory, or taken in bad faith." *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387-88 (2d Cir. 2015) (citing *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). ALAA failed to "serve the interest of all members without hostility or discrimination toward any". *Air Line Pilots Ass'n. Int'l*, 499 U.S. at 76. Publishing a statement maliciously accusing your own member of being unable to do her job because of her race is arbitrary "behavior so far outside a wide range of reasonableness as to be irrational". *Id.* at 67.

In *Fowlkes,* the Second Circuit found a breach of the duty of fair representation where the union, which administered a hiring hall, refused to refer the plaintiff for work due to transgender status. 70 F.3d at 388. "[A]rbitrary conduct amounting to a breach is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, 'may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary.'" *NLRB v. Local 282, Int'l Bhd. of Teamsters*, 740 F.2d 141, 147 (2d Cir. 1984)(quoting *Robesky v. Qantas Empire*

---

[18] Compare, for example, a union hall where racial epithets abound, but the representatives provide perfect representation in the bargaining and grievance process.

*Airways, Ltd.,* 573 F.2d 1082, 1089-90 (9th Cir. 1978)).[19]  Although it is not *limited* to intentional conduct, it includes, as in *Fowlkes* and in the instant case, the invidious intentional misconduct. As ALAA itself notes, discrimination on the basis of race is invidious and actionable.  ECF No. 33 at 12.  As discussed above, the discrimination was on the basis of race.[20]

There is nothing to suggest the publication by ALAA and its support of LAS was anything but intentional conduct.  It was a direct attack on one of its own members, the epitome of bad faith. That ALAA can attempt to justify a direct attack on a member as possibly being in good faith is disturbing.  ALAA points to nothing in the complaint, the exhibits, or anything else to show there was good faith.  Simply put, ALAA breached its duty of fair representation, having targeted Ms. Maron because she is white.

4.0    **Conclusion**

ALAA and LAS coordinated a race-based attack on Ms. Maron because she was a white woman who would not passively submit to a racist outside training.  Even though it was unrelated to her employment, her union and employer betrayed her, taking to public forums to humiliate her and brand her as a racist white woman, unable to represent clients of color, about her employment, a matter of private concern.  There is no excuse or justification.  She was subjected to hostile environment harassment and forced out of her job because of her race.  LAS is liable for the statements of its administrators and its employees, and it cannot hide behind Section 230 or N.Y. law.  ALAA is liable for its BALA caucus and for enabling LAS, breaching its duty of fair representation in the process.  The motions to dismiss must be denied.

---

[19] ALAA, in its brief, truncates this citation in a misleading fashion, omitting the part about intentional conduct and requiring egregiousness for all breaches, not simply omissions not calculated to harm.

[20] Although ALAA refers to a passage in Ms. Maron's article purportedly about a Chinese-American sharing a viewpoint on education, this has nothing to do with the attacks by BALA, and again by LAS, that directly refer to Ms. Maron's race and the purported inability to represent clients of color.

Dated November 10, 2021.                    Respectfully Submitted,

                                            /s/ Jay M. Wolman
                                            Jay M. Wolman
                                            RANDAZZA LEGAL GROUP, PLLC
                                            100 Pearl Street, 14th Floor
                                            Hartford, CT 06103
                                            Tel: (978) 801-1776
                                            Fax: (305) 437-7662

                                            Marc J. Randazza (*pro hac vice*)
                                            RANDAZZA LEGAL GROUP, PLLC
                                            2764 Lake Sahara Drive, Suite 109
                                            Las Vegas, Nevada 89117
                                            Tel:  (702) 420-2001
                                            Fax: (305) 437-7662
                                            Email: ecf@randazza.com

                                            Attorneys for Plaintiff

Civil Action No. 1:21-cv-05960

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 10, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a true and correct copy of the foregoing document is being served via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Jay M. Wolman
Jay M. Wolman