UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAUD MARON,

                              Plaintiff,

                -v.-

THE LEGAL AID SOCIETY and
ASSOCIATION OF LEGAL AID ATTORNEYS,

                              Defendants.

---

21 Civ. 5960 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

On July 23, 2020, Plaintiff Maud Maron, a career public defender at Defendant The Legal Aid Society ("LAS"), penned an op-ed in the *New York Post* entitled "Racial Obsessions Make it Impossible for NYC Schools to Treat Parents, Kids As People" (the "Op-Ed").  Speaking simultaneously in her capacities as a mother, public defender, elected public school council member, and then-candidate for New York City Council, Plaintiff recounted in the Op-Ed her experience at an anti-bias training run by the New York City Department of Education ("DOE").  She decried what she perceived as DOE's endorsement of the "chilling doctrine called anti-racism," which she asserted "insists on defining everyone by race, invites discrimination[,] and divides all thought and behavior along a racial axis."  Responding to the Op-Ed, the Black Attorneys of Legal Aid ("BALA"), a caucus of Defendant Association of Legal Aid Attorneys ("ALAA," or the "Union," and together with LAS, "Defendants"), issued a public statement denouncing Plaintiff's "racist" views and characterizing her "as a classic example of what 21st century racism looks like."  LAS followed with its

own statement, which similarly rebuked Plaintiff's "racist perspective" and questioned the ability of any public defender to "effectively and fully" engage in public interest work if they do not embrace an anti-racist mandate.

Plaintiff alleges that Defendants' statements were riddled with falsehoods and singled her out because she is white.  For such conduct, Plaintiff brings this civil rights suit, asserting claims of hostile work environment and constructive termination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, on the grounds that Defendants' statements were so permeated with discriminatory intimidation that they altered the terms and conditions of Plaintiff's employment and made it impossible for her to return to LAS from the sabbatical she took to run for City Council.  Defendants have each moved to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons outlined in the remainder of this Opinion, the Court grants Defendants' motions in their entirety.

## BACKGROUND[1]

### A.    Factual Background

### 1.    Plaintiff's Employment at LAS and Campaign for City Council

For most of her legal career, Plaintiff has served as a public defender with LAS, first from 1998 to 2006 and then from 2017 through at least the

---

[1]    This Opinion draws its facts from the Amended Complaint ("Am. Compl." (Dkt. #24)), the well-pleaded allegations of which are taken as true for purposes of this motion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies on the exhibits appended to the Amended Complaint ("Pl. Ex. [ ]"), which exhibits are deemed part of Plaintiff's pleading.  *See* Fed. R. Civ. P. 10(c).  The Court draws additional facts from the exhibits attached to the Declaration of Allyson Belovin in support of ALAA's motion to dismiss the Amended Complaint ("Belovin Decl., Ex. [ ]" (Dkt. #34)); as well as the exhibits attached to the Declaration of Jay M. Wolman in support of Plaintiff's

initiation of the instant lawsuit in 2021. (Am. Compl. ¶ 7). During her time at LAS, Plaintiff held the titles of staff attorney and Director of Training and received invitations to serve as a faculty lecturer at LAS's trial advocacy programs. (*Id.*).

On December 30, 2019, Plaintiff circulated an officewide email announcing that she would be taking a leave of absence from LAS in 2020 to campaign full time for City Council. (Belovin Decl., Ex. 1).[2] Several hours after sending this email, Rigodis Appling, an LAS staff attorney, replied to Plaintiff's message, copying the office listserv, and stated in full: "Requesting that you please leave the Legal Aid Society's name and recognition out of your campaign materials and speeches." (*Id.*). The message continued, "[i]t's not a good look for us." (*Id.*). Underneath the text of this message, Appling included several links to materials criticizing Plaintiff for her position on New York City's efforts to expand "Culturally Responsive Education" in public schools and calling for

---

opposition to Defendants' motion to dismiss ("Wolman Decl., Ex. [ ]" (Dkt. #43-8)). *See United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (describing materials extraneous to a complaint that a court may consider on a motion to dismiss).

For ease of reference, the Court refers to LAS's memorandum of law in support of its motion to dismiss as "LAS Br." (Dkt. #38); ALAA's memorandum of law in support of its motion to dismiss as "ALAA Br." (Dkt. #33); Plaintiff's consolidated memorandum of law in opposition to Defendants' motions to dismiss as "Pl. Opp." (Dkt. #43); LAS's reply brief as "LAS Reply" (Dkt. #45); and ALAA's reply brief as "ALAA Reply" (Dkt. #44).

[2]    Plaintiff concedes that at least one of the emails in the chain that proceeded from Plaintiff's announcement of her political campaign is incorporated by reference in the Amended Complaint. (Pl. Opp. 2 n.5). The Court deems it appropriate to consider the entirety of this email chain, as it provides necessary context for and is intimately related to material that is quoted in the Amended Complaint. *See Jones* v. *Harris*, 665 F. Supp. 2d 384, 393 (S.D.N.Y. 2009) (collecting cases for the proposition that in deciding a motion to dismiss courts "may consider the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit"); *accord Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015).

Plaintiff to resign from her elected position as a public school council member. (*Id.*; *see also* Wolman Decl., Ex. 2-4).[3]  Plaintiff replied to Appling's email explaining that these sources were part of "the smear campaign by people who disagree with [her] and think the way to conduct public discourse is to attack people instead of engaging in constructive conversation."  (Belovin Decl., Ex. 1). Appling responded in the final email of the chain by affirming her belief in "engaging in constructive public discourse" and inviting Plaintiff to "discuss [her] position on school segregation with union members[.]"  (*Id.*).

### 2.    LAS's Investigation into Plaintiff's Work Performance

Plaintiff alleges that at the end of 2019, BALA prompted LAS to open a baseless investigation into her.  (Am. Compl. ¶ 13).  The investigation entailed a wholesale review of Plaintiff's caseload and interviews of three of her supervisors concerning her work as a public defender.  (*Id.* at ¶ 15).  None of Plaintiff's supervisors identified any concerns regarding the quality or nature of her client representations, and the investigation was ultimately deemed unfounded.  (*Id.* at ¶ 16).  Plaintiff learned of the results of this investigation on January 13, 2020, during a meeting with her union representative and Tina Luongo, the Attorney-in-Charge of LAS's Criminal Defense Practice.  (*Id.* at ¶ 17).  In addition to informing Plaintiff that she had been fully cleared of any

---

[3]     Appling included three links in her email.  The first link is a change.org petition calling for Plaintiff's resignation from her education council post, endorsed by eighteen current and former students from the school district in which Plaintiff served.  (Wolman Decl., Ex. 2).  The second link is a *New York Daily News* article summarizing the contents of the students' petition.  (*Id.*, Ex. 3).  The third link is a summary of a *New York Times* podcast on desegregation efforts in New York City schools, which discussed Plaintiff's criticism of the City's education policies.  (*Id.*, Ex. 4).

wrongdoing, Luongo warned Plaintiff that the same attorneys who initiated the investigation portended to "leak" the fact of the investigation to the press to harm Plaintiff's campaign. (*Id.* at ¶ 18). Concerned about the risk to her reputation, Plaintiff requested that LAS issue an approbative statement if information concerning the investigation were leaked, prompting Luongo to interrupt and state that "IT WILL be leaked." (*Id.* at ¶¶ 19-20). Luongo then acceded to Plaintiff's request that LAS release a statement acknowledging Plaintiff's exemplary record when the attempt to damage her reputation materialized. (*Id.* at ¶ 21). Plaintiff does not allege that the investigation was leaked, and LAS never released the statement discussed during Plaintiff's meeting with Luongo and her union representative. (*Id.* at ¶ 22).

### 3. Plaintiff's Op-Ed in the *New York Post* and Defendants' Responses

On July 23, 2020, while on sabbatical from LAS, Plaintiff published the Op-Ed in the *New York Post.* (Am. Compl. ¶¶ 8, 23; Pl. Ex. A ("Op-Ed")).[4] In the Op-Ed, Plaintiff took issue with a DOE anti-bias training that she attended, at which she was instructed to refer to herself as a "white woman," and which classified concepts such as "worship of the written word," "individualism," and "objectivity" as "white-supremacy culture." (Op-Ed 1). Drawing from this experience, Plaintiff took aim at the City's push to instill in public schools the "benign-sounding but chilling doctrine called anti-racism, which insists on defining everyone by race, invites discrimination[,] and divides all thought and

---

[4]   The Amended Complaint erroneously states that the Op-Ed was published on June 23, 2020. (Am. Compl. ¶ 23). The Op-Ed is, in fact, dated July 23, 2020. (Pl. Ex. A).

behavior along a racial axis." (*Id.*).  Plaintiff highlighted her perception that "[t]hose who oppose this ideology are shunned and humiliated, even as it does nothing to actually improve our broken schools." (*Id.*).  Plaintiff expressed support for "more integrated schools, regardless of whether integration is an academic booster," but urged people to "think through all this with nuance, not by vilifying some parents or setting parents against each other." (*Id.* at 2).

Three days after the publication of the Op-Ed, on July 26, 2020, BALA issued a statement "respond[ing] to [Plaintiff's] recent anti-racism philippic" and "denounc[ing] [her] as the racist that she is." (Pl. Ex. B ("BALA Statement") at 1).  According to BALA, that Plaintiff finds anti-racism to be chilling "tells true racial advocates all they need to know: she's racist, and wants the school system … to remain unequal." (*Id.*).  Plaintiff is, in BALA's eyes, one of the "many white practitioners" who subscribes to the "common myth … that being public defenders preclude[s] them from being racist." (*Id.*).  Relatedly, the authors professed that "we know for a fact that [Plaintiff's] commitment to zealous representation of poor people of color is questionable at best" (*id.* at 1), and that she has been "tasked with representing a constituency she clearly has no regard for" (*id.* at 3).  The statement proclaimed that one "cannot oppose anti-racism and effectively represent Black and Brown people," and concluded by saying that Plaintiff "has no business having a career in public defense, and we're ashamed that she works for the Legal Aid Society." (*Id.*).

LAS's official Twitter account retweeted the BALA Statement, without any commentary.  (Am. Compl. ¶ 30; Pl. Ex. C).  Thereafter, on July 27, 2020, LAS

released its own statement responding to the Op-Ed, co-signed by LAS leadership, including the organization's Attorney-in-Chief and CEO, General Counsel, Chief Human Resources Officer, and Chief Operating Officer, as well as the Attorneys-in-Charge of the Civil, Juvenile Rights, and Criminal Defense Practices.  (Am. Compl. ¶¶ 38-39; Pl. Ex. E ("LAS Statement")).[5]  The LAS Statement claimed that Plaintiff "denies the existence of structural and institutional racism," and ascribed to her the position that "by the mere nature of working in public interest and being a public defender you get a pass at looking at your privilege, your role in social dominance and white supremacy." (LAS Statement 1).  "This racist perspective," according to LAS, "is disgusting and results in Black and Brown people being harmed by individuals in public interest roles[.]"  (*Id.*).  On LAS's view, Plaintiff revealed that she is "not only complicit in this system of oppression, but seeks to gaslight communities of color who are vocally demanding change in this country."  (*Id.*).

The LAS Statement went on to declare the organization's commitment to anti-racism.  According to LAS, anti-racism requires recognizing "that white supremacy drives every policy and law, every opportunity and every advantage."  (LAS Statement 2).  LAS explained that it has "not taken on the internal work needed to build a truly anti-racist workplace" and that "as an organization we are committing to bravely have the much needed, and long overdue, conversations and engaging in the critical dialogue and discourse

---

[5]     Tina Luongo, the Attorney-in-Charge of LAS's Criminal Defense Practice and the supervisor who attended the January 13, 2020 meeting concerning the results of the investigation into Plaintiff, was a signatory to this statement.  (*See* LAS Statement).

concerning racism, transphobia, sexism and intersectionality." (*Id.* at 1).  LAS specified that "[f]or those of us who are white, it is a recognition that power and privilege has been granted merely because we are white.  While you have dedicated your life to public interest, you cannot do this work effectively and fully unless and until you face that reality and own that you are part of the problem." (*Id.* at 2).  LAS added that, "[t]o push against the deep work needed to change and be threatened by the conversation, is the exact definition of white fragility." (*Id.*).  As a closing note, LAS explained that "[w]hite people have a duty to no longer be silent and a responsibility to confront these systems of oppression and to shun all forms of white supremacy in our society, in our workplaces, and within our hearts and minds.  Enough is enough." (*Id.*).

Based on the foregoing events, Plaintiff alleges that LAS and ALAA have discriminated against her on the basis of her race.  Although Plaintiff is currently promised a return from sabbatical under the governing collective bargaining agreement, Plaintiff asserts that LAS has made it impossible for her to return.  (Am. Compl. ¶ 33; Pl. Ex. D ("Collective Bargaining Agreement"), § 3.4.4.1.2).  Furthermore, Plaintiff alleges that LAS's endorsement of BALA's statement and issuance of its own statement are tantamount to terminating her employment, because "[a]n employer who says, publicly, it is ashamed she works there and has no business working there, is not an employer any reasonable person could be expect[ed] to work for." (Am. Compl. ¶¶ 34-35).  Plaintiff also alleges that LAS violated several provisions of the Collective Bargaining Agreement — including her rights to due process, free speech, and

confidentiality — by constructively terminating her in this fashion. (*Id.* at ¶¶ 32, 34, 45). Lastly, Plaintiff asserts that ALAA breached the duty it owed her as her bargaining representative by making its own statement denouncing her, allowing LAS to retweet the statement, and prompting LAS to publish its own subsequent statement. (*Id.* at ¶ 72; Pl. Opp. 24).

## B.   Procedural Background

Plaintiff initiated this lawsuit with the filing of the underlying complaint on July 12, 2021. (Dkt. #1).[6] On August 4, 2021, LAS filed a pre-motion letter indicating its intent to move to dismiss the case. (Dkt. #18). The following day, ALAA filed its own pre-motion letter stating its intent to move to dismiss the complaint. (Dkt. #20). On August 9, 2021, Plaintiff submitted a letter opposing both proposed motions. (Dkt. #22). On August 18, 2021, the Court dispensed with its usual practice of holding a pre-motion conference and set a briefing schedule for Defendants' motions to dismiss, which schedule included an opportunity for Plaintiff to amend her pleadings. (Dkt. #23).

On September 1, 2021, Plaintiff filed the Amended Complaint, which is the operative pleading in this matter. (Dkt. #24). On October 1, 2021, Defendants filed their motions to dismiss and supporting papers. (Dkt. #32-34 (ALAA); Dkt. #37-39 (LAS)). On November 10, 2021, Plaintiff filed her opposition papers. (Dkt. #43). Finally, on November 24, 2021, Defendants

---

[6]     Prior to commencing this action, on January 19, 2021, Plaintiff filed a charge with the United States Equal Employment Opportunity Commission, pursuant to 42 U.S.C. § 2000e-5. (Pl. Ex. F). Approximately three months later, on April 26, 2021, Plaintiff received right-to-sue letters as to both Defendants. (*Id.*, Ex. G, H).

filed their reply briefs.  (Dkt. #44 (ALAA); Dkt. #45 (LAS)).  Accordingly, Defendants' motions to dismiss are fully briefed and ready for consideration.

## DISCUSSION

As noted, Plaintiff asserts Title VII claims for (i) hostile work environment against LAS (Am. Compl. ¶¶ 49-61); (ii) hostile work environment and discrimination against ALAA (*id.* at ¶¶ 62-79); and (iii) constructive termination against LAS (*id.* at ¶¶ 80-92).  Defendants seek to dismiss Plaintiff's claims on the grounds that Plaintiff has failed to allege that any of the conduct at issue was motivated by her race, as opposed to her viewpoint, which is not a protected characteristic under the federal civil rights law.  (LAS Br. 10-16; ALAA Br. 9-10).  Defendants additionally argue that even if they acted against Plaintiff because of her race, her allegations do not satisfy the pleading standards for either a hostile work environment or constructive termination. (LAS Br. 16-24; ALAA Br. 10-15).  ALAA makes a separate argument, specific to the union context, that it did not breach the duty of fair representation owed to Plaintiff.  (ALAA Br. 5-9).

In resolving this motion, the Court begins by enunciating the legal standards under Federal Rule of Civil Procedure 12(b)(6).  It then discusses the content of BALA's and LAS's statements to ascertain whether either was motivated, even if only in part, by Plaintiff's race.  After finding that Plaintiff has plausibly alleged that her race factored into these statements, the Court ultimately concludes that her allegations nevertheless fall short of stating a claim for hostile work environment or constructive discharge because she has

not alleged that she experienced a sufficiently hostile work environment to make out a plausible claim under Title VII.

A.     **Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)**

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).  "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks, alterations, and citation omitted); *see also Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (explaining that a court need not accept "conclusory allegations or legal conclusions masquerading as factual conclusions").

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials."  *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559

(2d Cir. 2016).  This narrow universe includes the "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken."  *Id.* (internal alterations and citation omitted); *see also United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).  Beyond the Amended Complaint and the exhibits attached thereto, the Court may consider on this motion the email communications between Plaintiff and Rigodis Appling that are referenced in the Amended Complaint (Belovin Decl., Ex. 1), as well as the articles referenced in that correspondence (Wolman Decl., Ex. 2-4).  Additionally, the Court may take judicial notice of statements that Plaintiff made to media outlets that bear on her allegations in this case.  *See N.J. Carpenters Health Fund* v. *Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 n.11 (2d Cir. 2013) ("Generally, courts considering a motion to dismiss may take judicial notice of the fact that press coverage ... contained certain information so long as they do not rely on the truth of that information" (internal quotation marks omitted)).

**B.     Discrimination "Because of" Race Under Title VII**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1) (emphasis added).  An essential element of any claim under Title VII is that a plaintiff plead that she experienced some form of discrimination due to a protected characteristic.  *See Brown* v.

*Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's … protected characteristic.").  Because Defendants have argued principally that none of Plaintiff's allegations implicates a protected characteristic, the Court first discusses Title VII's causation principles, before turning to the remaining elements of Plaintiff's Title VII claims.

Under Title VII, "an action is 'because of' a plaintiff's [protected characteristic] where it was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action."  *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015); *see also* 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.").  "Thus, to state a claim for hostile work environment, at a minimum, a plaintiff must allege facts that suggest that the complained-of conduct was motived by prohibited animus."  *Trujillo* v. *City of New York*, No. 14 Civ. 8501 (PGG), 2016 WL 10703308, at *13 (S.D.N.Y. Mar. 29, 2016) (internal alterations omitted) (quoting *DeLaurencio* v. *Brooklyn Children's Ctr., Superintendent*, 111 F. Supp. 3d 239, 248 (E.D.N.Y. 2015)), *aff'd*, 696 F. App'x 560 (2d Cir. 2017) (summary order).  As the text of 42 U.S.C. § 2000e-2(a)(1) makes clear, one's stance on a political or social issue is not a protected

13

characteristic under Title VII.  *See, e.g., Tsanganea* v. *City Univ. of New York*, No. 06 Civ. 15366 (DAB) (JCF), 2008 WL 4054426, at *1 n.4 (S.D.N.Y. Aug. 28, 2008) ("[C]laims of discrimination based on political belief are not actionable under Title VII[.]"), *report and recommendation adopted*, 2008 WL 4548857 (S.D.N.Y. Oct. 8, 2008).[7]

The crux of Plaintiff's Title VII claims is that the public statements issued by LAS and BALA criticized Plaintiff and her ability to work as a public defender *because of* her race.  (Pl. Opp. 1).  Plaintiff highlights the important context that LAS's and BALA's public statements were issued in direct response to Plaintiff's public objections to an ideology that "relentlessly insists all white people are racist" and forced her to identify foremost as a "white woman."  (*Id.* at 10-11).  Plaintiff also alleges that BALA's and LAS's statements contain "numerous race-based falsehoods and false statements," none of which would have been circulated if she were not white.  (Am. Compl. ¶¶ 31, 41).

---

[7]  Because Plaintiff brings claims of "reverse discrimination," involving alleged discrimination on the basis that she is white, LAS urges the Court to apply the heightened standard established in *Olenick* v. *New York Telephone/A NYNEX Co.*, which requires a plaintiff to allege "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority."  881 F. Supp. 113, 114 (S.D.N.Y. 1995).  (*See* LAS Br. 11 & n.3).

The Second Circuit has not decided whether such a heightened standard applies in reverse discrimination cases.  *See Aulicino* v. *N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80 n.5 (2d Cir. 2009) (expressly declining to decide the issue of whether a plaintiff bringing a reverse discrimination claim under Title VII bears a heightened burden). This Court understands the Supreme Court's pronouncements in Title VII cases involving claims of reverse discrimination to undercut LAS's argument that a different standard should apply.  *See, e.g., McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279 (1976) (observing that Title VII prohibits "racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites").  This Court finds persuasive Judge Motley's opinion in *Cully v. Milliman & Robertson, Inc.*, which reasoned that "[a]bsent binding authority to the contrary, this court must assume that *McDonald* means what it says: a Title VII case is a Title VII case on the 'same terms' for plaintiffs of all races."  20 F. Supp. 2d 636, 641 (S.D.N.Y. 1998).

Chief among these asserted falsehoods, the statements present a warped interpretation of Plaintiff's views by painting her as a racist, an opponent of school integration, and a denier of institutional racism. (*Id.*). Extrapolating from this caricature of Plaintiff's views, the statements call into question her commitment to representing indigent people of color and accuse her of affirmatively harming and gaslighting her clients. (*See* BALA Statement 1; LAS Statement 1). Significantly, Plaintiff argues that Defendants labeled her a racist and misconstrued her views *because* she is a white woman who spoke out against anti-racism, thus establishing an inescapable link between Defendants' derogatory remarks and her race. (Pl. Opp. 10-12).

Defendants counter that the Amended Complaint is devoid of any allegations that would permit the Court to infer that they spoke out against Plaintiff because of her race, rather than her perspective on anti-racism. (LAS Br. 13; ALAA Br. 6-7). On Defendants' account, BALA's and LAS's statements condemned only Plaintiff's perspective on anti-racism articulated in the Op-Ed, which perspective would be just as anathema to LAS's mission if expressed by an employee of any other race. (LAS Br. 12; ALAA Br. 8). LAS further contends that Plaintiff *conceded* that her views motivated Defendants' statements through her allegations that she "was subjected to harassment for her political beliefs" (Am. Compl. ¶ 12); was constructively terminated for her "personal political and social beliefs" (*id.* at ¶ 34); and held "beliefs LAS thinks white people should not be allowed to hold" (*id.* at ¶ 57). (LAS Br. 11-12). Lastly, LAS points to several post-filing statements that Plaintiff made to media outlets

15

expressing her displeasure that LAS targeted her for her views.  (LAS Br. 14-15).[8]

The Court's careful review of the BALA and LAS Statements demonstrates that they were not, as Defendants claim, limited to expressing disapproval of Plaintiff's political views on an issue touching upon race.  If this were the sum total of the statements, the Court would agree with Defendants that the statements would not implicate Title VII.  But the LAS Statement goes further, expressly tying white attorneys' — specifically Plaintiff's — ability to do the work of a public defender to whether they accept the anti-racist credo and assume the attendant responsibilities.  Poignantly, the LAS Statement imposes additional obligations on white public defenders "merely because" they are white:

> To be anti-racist, to dismantle racism here at LAS, and in every organization, we must all recognize that white supremacy drives every policy and law, every opportunity and every advantage.  For those of us who are white, it is a recognition that power and privilege has been granted merely because we are white.  While you have dedicated your life to public interest, you cannot do this work effectively and fully unless and until you face that reality and own that you are part of the problem.  You cannot stop there, you must actively work to dismantle the systems that lend you privilege and oppress BIPOC people.  To push against the deep work needed to change and be threatened by the conversation, is the exact definition of white fragility.…  White people have a duty to no longer be silent and a responsibility to confront these systems of oppression

---

[8]    By way of example, LAS cites a July 12, 2021 interview, during which Plaintiff discussed this case and admitted that "[t]he reason they went after me is because I have a different point of view."  Bari Weiss, *A Witch Trial at the Legal Aid Society*, COMMON SENSE (July 12, 2021), https://bariweiss.substack.com/p/a-witch-trial-at-the-legal-aid-society.

> and to shun all forms of white supremacy in our society,
> in our workplaces, and within our hearts and minds.

(LAS Statement 2).  Espousing a similar view, the BALA Statement doubted

Plaintiff's "commitment to zealous representation of poor people of color," in

part because she falls into the category of "white practitioners [who believe]

that being public defenders preclude[s] them from being racist."  (BALA

Statement 1).  BALA characterized Plaintiff as "one of many charlatans who

took this job not out of a desire to make a difference, but for purposes of self-

imaging," and made clear that public defenders "cannot oppose anti-racism

and effectively represent Black and Brown people."  (*Id.* at 3).

The context and content of Defendants' statements, including in

particular LAS's stated expectation that white public defenders must shoulder

additional responsibilities based solely on their race, convinces the Court that

Plaintiff has adequately alleged that the statements were motivated, at least in

part, by her race.  *See Vega*, 801 F.3d at 85 (explaining that to sustain a claim

under Title VII, a plaintiff must provide "at least minimal support for the

proposition that the employer was motivated by discriminatory intent"); *see

also Littlejohn* v. *City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) ("An

inference of discrimination can arise from circumstances including, but not

limited to, the employer's criticism of the plaintiff's performance in ethnically

degrading terms; or its invidious comments about others in the employee's

protected group[.]").  That these statements also rebuke Plaintiff for the views

she articulated in the Op-Ed does not strip the statements of their racial

overtones.  *See Rivera* v. *Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11,

23 (2d Cir. 2014) (citation omitted) (noting that a plaintiff alleging a hostile work environment under Title VII "need not demonstrate that [a protected characteristic] was the only motivating factor," but need show only that a protected characteristic "was a motivating factor in the harassment").

To be clear, the Court's finding that Plaintiff has plausibly alleged that Defendants' criticism of Plaintiff was racially motivated is based on more than the mere fact that Plaintiff is white and was accused of being racist. Indeed, as a matter of both logic and precedent, accusations of racism against a white person are not *ipso facto* indicia of race-based discrimination. *See Maraschiello* v. *City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013) ("[A] statement that someone is a 'racist,' while potentially indicating unfair dislike, does not indicate that the object of the statement is being rejected *because of his race*."). Here, Plaintiff has alleged not just that she was accused of being a racist, but also that a caucus of her union and her employer issued statements impugning her competence to perform legal work for clients of different racial backgrounds because she was a white woman masquerading her "racist" views as a public defender. Given Defendants' avowed disappointment that Plaintiff was a white person who failed to accept that her race and job title obligated her to adhere to their understanding of anti-racism — as expressed in explicit racial lines in their statements — the Court concludes that Plaintiff has adequately alleged that the BALA and LAS Statements were motivated, at least in part, by her race.

18

### C.  Plaintiff Fails to Allege a Hostile Work Environment

Given its finding that Plaintiff has plausibly alleged that Defendants' statements were motivated by her race, the Court turns next to Plaintiff's claim that she experienced a hostile work environment.  Plaintiff asserts such claims against both LAS and ALAA, stemming primarily from their public statements critical of Plaintiff.  With regard to her employer, Plaintiff contends that LAS created a hostile work environment by publishing two statements that humiliated her and tarnished her professional reputation.  (Pl. Opp. 14).  And with regard to her union, Plaintiff alleges that ALAA is responsible for the pattern of hostile conduct she endured at LAS, which included the farcical investigation in 2019, BALA's harmful statement, and permitting LAS's retweet of the BALA Statement.  (*Id.* at 24-25).  For the reasons that follow, the Court finds that Plaintiff's hostile work environment claims fail as a matter of law against both Defendants because she has not adequately alleged conduct sufficiently severe or pervasive to satisfy the high bar to make out a hostile work environment claim under Title VII.

### 1.  The Legal Aid Society

#### a.  Applicable Law

To adequately plead a claim against an employer for hostile work environment under Title VII, a plaintiff must plausibly allege that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Littlejohn*, 795 F.3d

at 320-21 (quoting *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  This test has both objective and subjective elements: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive."  *Id.* at 321.  "Moreover, to hold an employer liable for such a hostile work environment, federal law requires the plaintiff to show 'a specific basis for imputing the conduct creating the hostile work environment to the employer.'"  *Bentley* v. *AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019) (quoting *Summa* v. *Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013)).

"As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"  *Alfano* v. *Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Perry* v. *Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).  "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness," although "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace."  *Id.* (citations omitted).  Distilling the applicable standard, the Second Circuit has explained that a plaintiff alleging a hostile work environment "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment."  *Id.*

In determining whether a plaintiff has satisfied this burden, courts "examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

20

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Rivera*, 743 F.3d at 20. "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe … [but] are not intended to promote or enforce civility, gentility or even decency." *Isbell* v. *City of New York*, 316 F. Supp. 3d 571, 591 (S.D.N.Y. 2018). Put differently, "excessive criticism and rudeness do not constitute a hostile work environment." *Ramirez* v. *Temin & Co., Inc.*, No. 20 Civ. 6258 (ER), 2021 WL 4392303, at *8 (S.D.N.Y. Sept. 24, 2021).

**b.    Analysis**

Plaintiff alleges four instances of harassment that, she claims, subjected her to a race-based hostile work environment at LAS: (i) Appling's email, sent to all LAS employees in late December 2019, asking Plaintiff not to associate LAS with her campaign for City Council (Am. Compl. ¶ 12; Belovin Decl., Ex. 1); (ii) BALA's initiation of a baseless investigation into Plaintiff at the close of 2019 (Am. Compl. ¶¶ 13-16); (iii) BALA's July 26, 2020 statement labeling Plaintiff as racist, which LAS retweeted on its official, verified Twitter account (*id.* at ¶¶ 29-31)[9]; and (iv) LAS's July 27, 2020 statement containing "numerous race-based

---

[9]    LAS contends that it is shielded from liability for its retweet of BALA's statement by Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1), which provides that, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." (*See* LAS Br. 17 n.5).

The Court harbors doubts as to whether Section 230 bars an employer from being held liable for retweeting a statement that allegedly contributes to a hostile work environment. *Cf. Barnes* v. *Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009), *as amended* (Sept. 28, 2009) (explaining that under Section 230, "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker'" and "[i]f it does, [S]ection 230(c)(1) precludes liability."). It need not definitively resolve this issue, however, as even

false statements that injured Plaintiff" (*id.* at ¶ 40).  As the Court will explain, these allegations, whether viewed individually or collectively, do not rise to the level of pervasiveness or severity to state a claim for hostile work environment under Title VII.

Beginning with Plaintiff's earliest allegation, the Court perceives no hostility or abuse in Appling's officewide email.  Appling sent the email in response to Plaintiff's officewide announcement informing her colleagues that she planned to take a leave of absence in 2020 to run for City Council. (Belovin Decl., Ex. 1).  Appling's message read, in full, "Requesting that you please leave the Legal Aid Society's name and recognition out of your campaign materials and speeches.  It's not a good look for us." (*Id.*).  Embedded below the body of the email were three links: (i) a petition urging Plaintiff to resign from her Community Education Council position because she "has consistently attempted to undermine [DOE's] push for more diverse and inclusive schools" (Wolman Decl., Ex. 2); (ii) a news article summarizing the contents of this petition (*id.*, Ex. 3); and (iii) a summary of a podcast exposé on the fight to desegregate schools in New York City, on which Plaintiff was a featured guest (*id.*, Ex. 4).

Plaintiff describes this email as "disparaging" and the first example of "racial harassment" she endured at LAS (Pl. Opp. 1-2), but the Court finds no invidious harassment in the email or the linked materials.  Appling's message

assuming LAS can be held responsible for its retweet of the BALA Statement, the Court concludes that Plaintiff has failed to allege circumstances amounting to a hostile work environment.

amounts to a request that Plaintiff distance LAS from her campaign for City Council that she had just announced to the workplace, presumably out of a concern that doing otherwise might associate LAS with Plaintiff's controversial position on education policy. Appling communicated this view civilly and without resorting to any language that could plausibly be construed as hostile. Subsequent emails exchanged between Appling and Plaintiff on this email chain reveal that Appling accepted Plaintiff's offer to engage in a constructive conversation on the issue of school segregation at a future date. Notably, unlike the BALA and LAS Statements, the links that Appling included in the email do not, in any way, associate Plaintiff's ability to perform as a public defender with her views on education policy or anti-racism. Plaintiff may have been displeased with the content of Appling's email, especially if she wished her colleagues to support her campaign for City Council, but Plaintiff has not plausibly alleged that this email "disparaged" her in any way, let alone based on her race. And even if she had, Plaintiff has not alleged any basis for imputing such disparagement to LAS. *See Bentley*, 935 F.3d at 92 ("Where a hostile work environment is created by a co-worker who is not a supervisor, the employer can still be liable, but only for its own negligence." (internal quotation marks omitted)); *see also Turley* v. *ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014) (explaining that in order to impute the discriminatory conduct of a co-worker to an employer, a plaintiff must show that "the employer knew or reasonably should have known about harassment by non-supervisory co-

23

workers, yet failed to take appropriate remedial action" (internal citations, footnote, and quotation marks omitted)).

Next, Plaintiff asserts that the "baseless investigation" initiated by "politically motivated members" of BALA at the end of 2019 added to the air of race-based hostility in her work environment. (Pl. Opp. 15, 25). Accepting as true that this investigation was entirely politically motivated, as the Court must on this motion, LAS's alleged conduct during this investigation undermines Plaintiff's argument that LAS should be held liable for any hostility that may have flowed from the investigation. Plaintiff attributes the opening of the investigation to a "coordinated group of coworkers," who further threatened to leak the fact of the investigation to the press to damage her campaign for City Council. (Pl. Opp. 15; *see also* Am. Compl. ¶¶ 14, 18). Ultimately, following a review of her caseload and interviews of three of her supervisors, Plaintiff was cleared of any wrongdoing, and the investigation was deemed unfounded. (Am. Compl. ¶¶ 15-16). Luongo, the Attorney-in-Charge of LAS's Criminal Defense Practice, is the only supervisor alleged to have been involved in the investigation, and, by Plaintiff's own allegations, she affirmatively assisted Plaintiff by promising her that LAS would "release a statement acknowledging [Plaintiff's] exemplary record of service when the fully anticipated and acknowledged attempt to smear her arose in the press." (*Id.* at ¶ 21). Plaintiff argues that LAS's failure to release a statement in defense of Plaintiff reflects the organization's hostility, yet conspicuously absent from the Amended Complaint is any allegation that the BALA attorneys leaked any information

24

regarding this investigation to trigger Luongo's promise.  Without any basis to tie it to someone in a supervisory capacity at LAS, the prompting of this ultimately unfounded investigation by a group of Plaintiff's coworkers does not buttress Plaintiff's claim for hostile work environment against LAS.  *See Bentley*, 935 F.3d at 91 (explaining that one basis for imputing a hostile work environment to an employer is "strict vicarious liability if an employer's supervisor has created the hostile environment").

Turning to the heart of Plaintiff's hostile work environment claim against LAS, Plaintiff contends that LAS worked a transformation of her workplace when it issued a public statement calling into question her ability to perform her responsibilities as a public defender.  (Pl. Opp. 14-16).  Plaintiff posits that following the publication of the LAS Statement, her clients — a majority of whom are individuals of color — cannot be expected to trust that she will provide them adequate representation when her employer has publicly disavowed her ability to do so.  (*Id.* at 14-15).  For this reason, Plaintiff argues that this case presents those "unfortunate right circumstances" in which "a single comment can be severe enough to create a hostile work environment." (*Id.* at 14 (quoting *Sanderson* v. *Leg Apparel LLC*, No. 19 Civ. 8423 (GHW), 2020 WL 7342742, at *6 (S.D.N.Y. Dec. 14, 2020))).  The Court cannot agree.

It is true that "a hostile work environment can … be established through evidence of a single incident of harassment that is extraordinarily severe." *Miller* v. *N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *2 (2d Cir. Apr. 18, 2022).  But the Court is hard-pressed to compare the LAS Statement

to the singular incidents of harassment that courts have found to be so "extraordinarily severe" as to create a hostile work environment. *See, e.g.*, *Howley* v. *Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (holding that a single instance of verbal abuse gave rise to a hostile work environment where co-worker went on a "tirade" about female plaintiff being promoted to lieutenant for performing fellatio, "at length" and "loudly" in front of large group of male subordinates); *see also Pryor* v. *Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 255, 259 (S.D.N.Y. 2014) (finding single incident to give rise to hostile work environment where co-worker subjected female plaintiff to sexual advances and forcibly tried to kiss her, despite knowing she was a recent domestic violence victim); *cf. Albert-Roberts* v. *GGG Constr., LLC*, 542 F. App'x 62, 64 (2d Cir. 2013) (summary order) (rejecting plaintiff's argument "that the single use of the [n-word] is so severe as to make out a *prima facie* case and survive summary judgment").

As critical of Plaintiff as the LAS Statement is, it uses no racial epithets, reveals no personally sensitive or private information, and levies no salacious allegations, any of which would enhance the statement's severity for the purpose of the Title VII analysis.[10]  To be sure, the content of the statement makes clear that LAS harbors doubts concerning Plaintiff's ability to represent

---

[10]    This is not to say that any such elements are necessary conditions to make out a hostile work environment based on an alleged single incident of racial harassment, but rather that the totality of circumstances in this case do not suggest that these statements exposed Plaintiff to a hostile work environment. *See Dawson* v. *Cnty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) ("Courts look to the totality of the circumstances in determining whether a plaintiff has established a hostile work environment claim … [and] no single factor is required.").

individuals of color as a public defender, and the Court has already determined that LAS's decision to release this statement was motivated in part by Plaintiff's race.  While the Court views the statement as sufficiently implicating Plaintiff's race to bring it within the ambit of the federal civil rights laws, the statement is more than just a missive targeting Plaintiff.  It stakes out LAS's stance on an issue of public importance; articulates the organization's mission vis-à-vis the constituencies it works to support; calls on the organization as a whole for failing to realize this mission; and commits the organization to doing more to address issues of systemic racism in the future.  Even accepting Plaintiff's characterization that the statement constituted an unfair attack and mischaracterized her views, it does not meet the requisite standard for a Title VII hostile work environment claim.  *See, e.g.*, *Nugent* v. *St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 945 (2d Cir. 2008) (summary order) (holding that derogatory language from supervisor, dismissive comments from management, and intense scrutiny of plaintiff were together "insufficiently severe and pervasive" to create hostile work environment); *Alvarado* v. *Mt. Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 781-82 (S.D.N.Y. 2019) (rejecting hostile work environment claim predicated on comments that were "tasteless, meanspirited, and sound of ignorance and bias," and explaining that Title VII "does 'not prohibit employers from maintaining nasty, unpleasant workplaces, or even ones that are unpleasant for reasons that are due to [a] protected characteristic'"); *Gibson* v. *Wyeth Pharms., Inc.*, No. 07 Civ. 946 (LTS), 2011 WL 830671, at *11 (S.D.N.Y. Mar. 9, 2011) (finding that allegations of explicitly

27

racial comments, three-day suspension, forced overtime, and written warning were insufficient to establish hostile work environment).

Plaintiff urges the Court to consider the public nature of the LAS Statement in assessing its severity.  (Pl. Opp. 15).  Taking heed of this fact, the Court finds that the content of the statement, when analyzed in its proper context, further suggests that it is insufficient to support Plaintiff's claim for hostile work environment.  LAS issued its statement on the heels of the BALA Statement from the day prior and in response to Plaintiff's controversial Op-Ed, which she wrote while on sabbatical and running a campaign for City Council.  Needless to say, this political context does not give LAS *carte blanche* to issue derogatory statements premised on any employee's race; however, the fact that Plaintiff injected herself into the public discourse on a matter of public importance implicating race, and identified herself as a public defender in doing so, provides important context to LAS's decision to release the statement in the first place.  In other words, the statements were not gratuitous, out-of-the-blue, racialized attacks on Plaintiff, but rather represented LAS's attempt to distance itself from the position articulated in the Op-Ed.  (LAS Br. 20-21).

The Court finds several additional factors relevant to its analysis.  The Court first notes that the fact that Plaintiff was on sabbatical and not actually present in the workplace when she instigated what became a public debate on this issue unavoidably reduces the degree of hostility Plaintiff experienced.  Furthermore, the LAS Statement, even on its own terms, did not represent the organization's final say on the issue, as the organization avowed to "bravely

28

have the much needed, and long overdue, conversations and engag[e] in the critical dialogue and discourse concerning racism, transphobia, sexism and intersectionality." (LAS Statement 1). And while Plaintiff's writings in the *New York Post* were the impetus for LAS's public proclamation, a swath of the LAS Statement is devoted to expressing LAS's views on how best to "fight for justice for [its] clients" and "advocate against and litigate policies and laws that silence and oppress BIPOC and communities of color." (*Id.*). In this context, the Court does not view the LAS Statement, on its own, as exposing Plaintiff to a hostile work environment.

Plaintiff cites two cases for the proposition that "single statements made in public about private matters can be severe enough to meet the hostile work environment threshold," but both are easily distinguishable from the case at bar. (Pl. Opp. 15 (citing *Cherry* v. *N.Y.C. Hous. Auth.*, 564 F. Supp. 3d 140, No. 15 Civ. 6949 (MKB), 2021 U.S. Dist. LEXIS 191353 (E.D.N.Y. Sept. 30, 2021); *Roberts* v. *Clark Cnty. Sch. Dist.*, 215 F. Supp. 3d 1001, 1017 (D. Nev. 2016))). For instance, in *Cherry*, Judge Brodie denied summary judgment on the plaintiff's claims for hostile work environment based on his gender, sexual orientation, and disability status. *Cherry*, 2021 U.S. Dist. LEXIS 191353, at *68-88. Plaintiff highlights Judge Brodie's discussion of the *Cherry* plaintiff's allegation that his supervisor held a town-hall type meeting to discuss plaintiff's HIV-positive status, a medical condition he intended to keep confidential, which allegation supported a claim for disability-based hostile work environment. *Id.* at *21-23, 84-88. But Plaintiff neglects to mention the

29

additional allegations supporting the plaintiff's claim for disability-based hostile work environment, which included his supervisor's "regular" conversations with his co-workers to discuss the plaintiff's upcoming medical appointments and his supervisor's denial of the plaintiff's request to take a leave of absence after publicly humiliating him about his private medical condition. *Id.* at *85-86. The allegations in *Cherry* supporting the hostile work environment in that case were both more pervasive and more severe than those alleged by Plaintiff in this case. Similarly, the allegations sustaining the plaintiff's hostile work environment claim in *Roberts* involved a school district's transmission of emails "to every police-department employee," which messages "disclosed sensitive information about [the plaintiff's] sexual identity." *Roberts,* 215 F. Supp. 3d at 1017. As a result of this disclosure, the plaintiff, who was a transgender police officer, was subjected to "questions about his transition" and "inappropriate remarks about his genitalia." *Id.* No comparable disclosure of sensitive, personalized information is alleged to have occurred in this case. To the contrary, LAS's public statement discusses only matters that Plaintiff brought to the fore of the public discourse.

Even expanding Plaintiff's allegations to include LAS's retweet of the BALA Statement does not alter the Court's conclusion. As an initial matter, the publication of two harmful statements, both concerning the same subject matter, in rapid succession — indeed, within 24 hours of each other — cannot qualify as pervasive for purposes of the Title VII analysis. *See, e.g., Sandler* v. *Montefiore Health Sys., Inc.,* No. 16 Civ. 2258 (JPO), 2018 WL 4636835, at *9

(S.D.N.Y. Sept. 27, 2018) ("As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" (quoting *Alfano*, 294 F.3d at 374)).  While LAS's retweet of the BALA Statement can plausibly be perceived as an endorsement of BALA's repeated assertion that Plaintiff "is racist, and openly so" (BALA Statement 2), such criticism, even if unwarranted, does not suffice to create a hostile work environment in these circumstances.  *See Ramirez*, 2021 WL 4392303, at *8 ("[E]xcessive criticism and rudeness do not constitute a hostile work environment.").  Just like the LAS Statement, the BALA Statement and LAS's retweet of the same existed in conversation with Plaintiff's Op-Ed on a politicized topic.  Further, it is difficult to see how LAS's retweet could have interfered with the performance of Plaintiff's responsibilities as a public defender when Plaintiff was on sabbatical at the time and remains so to this day.  (Am. Compl. ¶ 8).

The Court's conclusion that Plaintiff has not alleged a hostile work environment under Title VII is not intended to trivialize the harsh criticism that Plaintiff encountered during the 24-hour period in July 2020 when BALA and LAS released the statements at issue.  But harsh criticism, even that Plaintiff alleges was unwarranted, does not itself make out a claim for hostile work environment.  Here, the totality of the circumstances — namely, the fact that the statements were in response to a highly politicized Op-Ed authored by Plaintiff, that Plaintiff was on sabbatical campaigning for City Council at the time the statements were issued, and that LAS sought to stake out a broader

position on a matter of public policy, beyond merely criticizing Plaintiff —
counsel against finding that LAS's retweet of the BALA Statement and
publication of its own statement rise to the level of severity or pervasiveness to
state a hostile work environment under Title VII.

Accordingly, the Court dismisses Plaintiff's hostile work environment
claim against LAS.[11]

### 2.   Association of Legal Aid Attorneys

Plaintiff brings a separate Title VII hostile work environment claim
against ALAA, resting on substantially the same allegations that were
addressed above.  (Pl. Opp. 24-26).  As the Court has already discussed,
Plaintiff has not alleged that she endured a hostile work environment, thus
necessitating dismissal of her hostile work environment claim against ALAA.

### a.   Applicable Law

Under Title VII, a union may not "discriminate against any individual
because of his race, color, religion, sex, or national origin" or "cause or attempt
to cause an employer to discriminate against an individual in violation of this
section."  42 U.S.C. § 2000e-2(c)(1), (3).  To state a claim of hostile work
environment under Title VII against a union organization, a plaintiff must

---

[11]   LAS additionally argues in a footnote in its opening brief that "Plaintiff's claims plainly
implicate New York's recently amended Civil Rights Law addressing strategic lawsuits
against public participation ('SLAPPs')."  (LAS Br. 21 n.6 (citing N.Y. Civ. Rights Law
§§ 70-a, 76-a)).  Whether this claim falls within the reach of New York's anti-SLAPP law
is of no moment, because the standard outlined by "New York's anti-SLAPP law is
inapplicable in federal court."  *Nat'l Acad. of Television Arts & Scis., Inc.* v. *Multimedia
Sys. Design, Inc.*, 551 F. Supp. 3d 408, 432 (S.D.N.Y. 2021) (reasoning that because the
pleading standard articulated in New York's anti-SLAPP law conflicts with those
outlined in Rules 12 and 56 of the Federal Rules of Civil Procedure, the federal rules
control in federal court).

allege "[i] the existence of a hostile work environment, [ii] that a union representative caused or attempted to cause the hostile work environment, and [iii] that the representative's conduct may properly be imputed to the union." *Grandy* v. *Manhattan & Bronx Surface Transit Operating Auth.*, No. 16 Civ. 6278 (VEC), 2018 WL 4625768, at *21 (S.D.N.Y. Sept. 26, 2018) (citing *Agosto* v. *Corr. Officers Benev. Ass'n*, 107 F. Supp. 2d 294, 307 (S.D.N.Y. 2000)).

In order for "a union representative's role in causing or attempting to cause a hostile work environment to be properly imputed to a union, a plaintiff must show not only that the union had actual or imputed knowledge of the improper conduct, but also that the union representative's conduct related to union activity and that therefore, in acting in such a manner, the representative breached the duty of fair representation." *Agosto*, 107 F. Supp. 2d at 308. Put differently, "a union's liability under Title VII rests on the union's duty of fair representation," which requires a union "in relation to all union activity to treat all members 'without hostility or discrimination ... [in] complete good faith and honesty, and to avoid arbitrary conduct.'" *Id.* (quoting *Vaca* v. *Sipes*, 386 U.S. 171, 177 (1967)); *see also Grandy*, 2018 WL 4625768, at *24 ("While the Second Circuit case law on the issue is thin, the preponderance of authority suggests that [a union] cannot be liable for hostile work environment under Title VII ... for conduct that does not fall within its duty of fair representation."); *Oparaji* v. *United Fed'n of Tchrs.*, 418 F. Supp. 2d 139, 146 (E.D.N.Y. 2006) (observing that "[t]o establish a Title VII claim concerning representation by a union of its member's interests, the plaintiff

33

must first demonstrate that the union breached its duty of fair representation to the member").

"[B]reach [of the duty of fair representation] occurs only when a union's conduct toward a member ... is arbitrary, discriminatory, or in bad faith," *United Steelworkers of Am., AFL-CIO-CLC* v. *Rawson*, 495 U.S. 362, 372 (1990) (internal quotation marks omitted), or "when [the union] causes an employer to discriminate against employees on arbitrary, hostile, or bad faith grounds," *Ramey* v. *Dist. 141, Int'l. Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 277 (2d Cir. 2004).  A union's conduct is "arbitrary" if it is "so far outside a wide range of reasonableness that it is wholly irrational."  *Dillard* v. *SEIU Loc. 32BJ*, No. 15 Civ. 4132 (CM), 2015 WL 6913944, at *5 (S.D.N.Y. Nov. 6, 2015) (quoting *Marquez* v. *Screen Actors Guild, Inc.*, 525 U.S. 33, 45 (1998)).  "A union's acts are discriminatory when 'substantial evidence' indicates that it engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'"  *Id.* (quoting *Vaughn* v. *Airline Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010)).  Finally, "[a] showing of bad faith requires a showing of fraudulent, deceitful, or dishonest action" by a union.  *Id.* (quoting *White* v. *White Rose Food*, 237 F.3d 174, 179 (2d Cir. 2001)).

### b.    Analysis

In support of her hostile work environment claim against ALAA, Plaintiff alleges that union representatives engaged in race-based harassment by: (i) initiating a baseless investigation into Plaintiff at the close of 2019 (Pl.

Opp. 25); and (ii) publishing the BALA Statement on July 26, 2020 (*id.* at 24).[12]
Even assuming that Plaintiff has alleged a breach of the Union's duty of fair
representation, her hostile work environment claim cannot survive because she
has not adequately alleged the existence of a hostile work environment.

The Court finds certain of Plaintiff's allegations concerning ALAA's
breach of the duty of fair representation to be plausible.  Plaintiff's most
persuasive argument in this regard relates to the publication of the BALA
Statement, specifically that ALAA's publication of "a statement maliciously
accusing [its] own member of being unable to do her job because of her race"
was discriminatory conduct that breached the duty of fair representation.  (*See*
Pl. Opp. 27).  ALAA emphasizes as part of its mission statement that the
"Union does not merely represent members in contract negotiations,
grievances, and arbitrations ... [because its] mission requires it 'to advocate
through political outreach for the advancement of the interests of our
membership, our clients and of poor and working people in general.'"  (ALAA
Reply 4 (quoting *About ALAA*, Ass'n of Legal Aid Att'ys, https://www.alaa.org/
about-alaa (last visited June 2, 2022)).  Stated thusly, BALA's statement

---

[12]    Plaintiff further alleges that ALAA caused LAS to discriminate against Plaintiff by
allowing LAS to retweet its statement.  (Pl. Opp. 24 & n.17; *see also* Am. Compl. ¶¶ 67-
70).  This argument is unavailing.  According to Plaintiff, ALAA should be held
responsible for LAS's retweet because ALAA failed to block LAS's Twitter account or
adjust its account settings to prevent LAS from retweeting the statement.  (Pl. Opp. 24
n.17).  The Court does not believe that ALAA can be held responsible for either of these
omissions.  ALAA's failure to adopt Plaintiff's preferred course of action does not
transform the Union's mere posting of a statement on its public Twitter account into an
affirmative inducement of LAS to retweet or endorse the statement.  Without any word
or deed to support the allegation that ALAA encouraged LAS to retweet the BALA
Statement, there is no basis to hold the Union responsible for LAS's conduct.

expressing the caucus's position on racial justice issues falls within the universe of activity contemplated by the Union.  Considering the indicia of race-based discrimination that the Court has located in this statement, Plaintiff has plausibly alleged that ALAA breached its duty of fair representation by publishing a statement that harmed Plaintiff, in part, because she is white.

As already discussed above, Plaintiff has failed to plead the existence of circumstances sufficiently severe or pervasive to constitute a hostile work environment.  With respect to conduct that may be attributable to the Union, Plaintiff alleges the initiation of a baseless investigation at the end of 2019 and the publication of the BALA Statement in June 2020.  As in the context of her employer, these allegations fail to rise to the level of severity or pervasiveness to make out a hostile work environment under Title VII.  *First*, even accepting Plaintiff's contention that BALA prompted a baseless investigation into Plaintiff, the course of the investigation does not evince hostility or harassment sufficiently severe to meaningfully contribute to a hostile work environment. Besides the alleged improper motive underpinning the investigation, there is no allegation that ALAA biased, unfairly influenced, or in any way skewed the outcome of the investigation.  To the contrary, Plaintiff indicates that she was accompanied by a union representative at the January 13, 2020 meeting where Luongo informed Plaintiff that she had been cleared of any wrongdoing and the investigation was deemed unfounded.  (Am. Compl. ¶¶ 16-17).  Plaintiff proffers no allegation that her Union representative discriminated against her or provided her deficient representation in connection with this investigation.

36

*Second*, for substantially the same reasons why the LAS Statement did not expose Plaintiff to a hostile work environment, neither did the publication of the BALA Statement.  Plaintiff initiated the public debate that impelled BALA to release its statement.  The statement does not merely denigrate Plaintiff because of her race, but also represents BALA's challenge to the views expressed in the Op-Ed.  In addition, Plaintiff was on leave from LAS and actively running a campaign for City Council at the time of the statement's release, which necessarily undermines her contention that this statement impacted her work as a public defender.  *Cf. Kleinman* v. *Fashion Inst. of Tech.*, No. 16 Civ. 4348 (KPF), 2017 WL 3016940, at *11 (S.D.N.Y. July 14, 2017) (dismissing claim for hostile work environment resting on allegations that occurred after Plaintiff went on medical leave).  Plaintiff's attempt to analogize this case to an instance of harassment against an individual who is working remotely is inapt (Pl. Opp. 26), because Plaintiff was not merely physically removed from the office.  Instead, she was not working at all for LAS, given that she was on sabbatical and campaigning for a seat on City Council at the time the statement was released.

*Third*, even when viewed collectively, Plaintiff's allegations do not amount to a hostile work environment.  Plaintiff has alleged two incidents attributable to ALAA over the course of approximately six months, which fail to rise to the level of "continuous and concerted" activity necessary to establish a "pervasive" hostile work environment.  *Littlejohn*, 795 F.3d at 321; *see also, e.g., Garcia* v. *NYC Health & Hosps. Corp.*, No. 19 Civ. 997 (PAE), 2019 WL 6878729, at *7

(S.D.N.Y. Dec. 17, 2019) (dismissing hostile work environment claim where plaintiff alleged that his "supervisor yelled at him on four occasions over three months"); *Chukwueze* v. *NYCERS*, 891 F. Supp. 2d 443, 455 (S.D.N.Y. 2012) (granting motion to dismiss hostile work environment claim where plaintiff alleged three incidents over a year in which he had been chastised and berated in front of coworkers). And for the reasons already discussed at length, these allegations are insufficiently severe to give rise to a hostile work environment.

Accordingly, the Court dismisses Plaintiff's hostile work environment claim against ALAA.

## D. Plaintiff Fails to Allege Constructive Discharge

In her final claim, Plaintiff asserts that LAS constructively terminated her while she was on sabbatical. (Pl. Opp. 16-18). Plaintiff alleges that "[w]here an employer proclaims to the world that you are not capable of performing your job because you are a white woman who holds beliefs the employer opposes white employees from having, it is so intolerable that a reasonable person would feel compelled to resign." (Am. Compl. ¶ 87). LAS advocates for dismissal of this claim on several interrelated grounds, including that Plaintiff has failed to allege (i) the existence of a hostile work environment, (ii) that LAS acted with the requisite intent, and (iii) that she has (or even will) leave LAS. (LAS Br. 22-24; LAS Reply 9-10). Because Plaintiff attempts to dilute the applicable legal standard for constructive termination and because she has

failed to allege that she, in fact, resigned from her position at LAS, her claim cannot withstand LAS's motion to dismiss.[13]

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green* v. *Brennan*, 578 U.S. 547, 555 (2016) (quoting *Pa. State Police* v. *Suders*, 542 U.S. 129, 141 (2004)); *see also Shultz* v. *Congregation Shearith Israel of N.Y.*, 867 F.3d 298, 308 (2d Cir. 2017) (explaining that a constructive discharge claim under Title VII requires a plaintiff to allege facts indicating (i) "the employer's intent to create an intolerable environment that forces the employee to resign" and (ii) "work conditions so intolerable that [a reasonable person] would have felt compelled to resign"). A claim of constructive discharge has two basic elements: (i) "[a] plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign" and (ii) a plaintiff "must also show that he actually resigned." *Green*, 578 U.S. at 555; *see also Brescia* v. *LTF Club Mgmt. Co., LLC*, No. 18 Civ. 8715 (NSR), 2020 WL 137311, at *6 (S.D.N.Y. Jan. 9, 2020) ("Resignation is the *sine qua non* of a constructive discharge claim.").

Fatal to Plaintiff's constructive discharge claim is her failure to allege that she has actually resigned from LAS. Instead, by Plaintiff's own allegations,

---

13      ALAA also argues that Plaintiff has failed to state a claim of constructive termination. (ALAA Br. 13-15). However, Plaintiff has not asserted such a claim against the Union.

she remains on sabbatical with an open offer to return to LAS.  (Am. Compl.
¶ 8 ("Plaintiff has been on sabbatical.  Although she has been on sabbatical, at
all relevant times herein she remained an employee of LAS and a member of
ALAA."); *id.* at ¶ 33 ("[Plaintiff] is currently promised a return from sabbatical
pursuant to § 3.4.4.1.2 of the [Collective Bargaining Agreement.])).  This fact
alone compels the dismissal of her constructive discharge claim.

Even if Plaintiff had alleged her resignation from LAS, her allegations
would still fail to state a claim for constructive discharge.  Constructive
discharge is generally "regarded as an aggravated case of hostile work
environment."  *Lee* v. *Colvin*, No. 15 Civ. 1472 (KPF), 2017 WL 486944, at *15
(S.D.N.Y. Feb. 6, 2017) (citation omitted); *see also Suders*, 542 U.S. at 147-48
(describing a constructive discharge claim as a "'worse case' harassment
scenario, harassment ratcheted up to the breaking point").  "Here, because
plaintiff has not stated a hostile work environment claim ... *a fortiori* [she] has
not stated a claim for constructive discharge."  *Lee*, 2017 WL 486944, at *15
(quoting *Kelly* v. *N.Y. State Office of Mental Health*, No. 13 Civ. 3383 (KAM)
(SLT), 2016 WL 4203470, at *16 (E.D.N.Y. Aug. 9, 2016)).

Plaintiff's argument that a reasonable person might not want to return to
a workplace following the release of a statement such as that released by LAS
is well taken by the Court.  (Am. Comp. ¶ 87).  But, letting a constructive
discharge claim survive on these allegations runs the risk of diminishing the
applicable standard, which is saved for cases in which "the abusive working
environment became so intolerable that [plaintiff's] resignation qualified as a

fitting response." *Suders*, 542 U.S. at 134.  As described above, the circumstances of this case convince the Court that Plaintiff was not exposed to a hostile environment, especially given the fact that she was on sabbatical doing work unconnected to her role as a public defender at the time the statements at issue were released.  Therefore, the Court dismisses Plaintiff's claim for constructive discharge.

## CONCLUSION

For the foregoing reasons, LAS's and ALAA's motions to dismiss are GRANTED in full.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      June 2, 2022
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

41